# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WORLD FUEL SERVICES, INC.,

      Plaintiff,

vs.                                       No. CIV 18-0836 JB\SCY

NAMBE PUEBLO DEVELOPMENT
CORPORATION,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Nambe Pueblo Development Corporation's[1] Motion to Dismiss, filed October 1, 2018 (Doc. 14)("Motion").  The Court held a hearing on December 21, 2018.  The primary issues are: (i) whether the Court has subject matter jurisdiction over the case, wherein Plaintiff World Fuel Services, Inc. -- a non-Indian party -- asserts claims against Defendant Nambe Pueblo Development Corporation ("Nambe Corp."), an Indian party; (ii) whether the Court should consider the Motion as a rule 12(b)(1) or a rule 12(b)(6) of the Federal Rules of Civil Procedure motion and, based on the appropriate rule, whether the Court may consider an affidavit and other documents affixed to the Motion; (iii) whether Nambe Corp. and Nambe Pueblo are entitled to, or have waived, Tribal sovereign immunity; and (iv) whether World Fuel, who entered a Motor Fuel Supply Agreement (dated May 17, 2017), filed September 11, 2018 (Doc. 9-1)("Agreement"), with an Indian party, Nambe Corp., regarding fuel

---

[1]Although the parties refer to Defendant Nambe Pueblo Development Corporation at times as "Nambe" or "Nambe Pueblo," the Court refers to Nambe Pueblo Development Corporation as "Nambe Corp.," to distinguish the corporation from the Pueblo of Nambe ("Nambe Pueblo"), which the Court refers to as "Nambe Pueblo."  Because this dispute implicates questions of a corporation's waiver of a sovereign's immunity, the Court determines that it is important to clearly distinguish between the corporation, Nambe Corp., and the sovereign, Nambe Pueblo.

sales on Nambe Pueblo lands, must exhaust Tribal remedies before seeking relief in federal district court on its demand for arbitration of a dispute arising from the Agreement, when its claim arises under the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), but there is no intra-Tribal dispute and there is no attempt to circumvent a pending parallel proceeding in Nambe Pueblo Tribal Court. The Court concludes that: (i) the Court has subject matter jurisdiction based on diversity; (ii) the Court considers the Motion under rule 12(b)(6) and, accordingly, does not rely on the documents affixed to the Motion, but does consider the documents attached to and referenced by the Complaint; (iii) both Nambe Corp. and Nambe Pueblo are entitled to Tribal sovereign immunity and Nambe Corp., but not Nambe Pueblo, waived Tribal sovereign immunity for the purposes of arbitration; and (iv) World Fuel must exhaust Tribal remedies before seeking relief in federal district court on its demand for arbitration, although there is no intra-Tribal dispute and there is no attempt to circumvent a pending parallel proceeding in Tribal Court, because no exceptions to the Tribal exhaustion doctrine's application apply and the Nambe Pueblo Tribal Court has colorable jurisdiction over the case. Accordingly, the Court stays the case pending World Fuel's exhaustion of Tribal Court remedies.

## FACTUAL BACKGROUND

The Court draws its facts from World Fuel's Petition to Compel Arbitration Pursuant to Section 4 of the Federal Arbitration Act, filed August 31, 2018 (Doc. 1)("Complaint"). World Fuel then filed a Notice of Errata, in which World Fuel "respectfully notifies the Court and all parties that the Petition to Compel Arbitration Pursuant to Section 4 of the Federal Arbitration Act,

filed electronically on August 31, 2018 and served on September 6, 2018, was inadvertently filed

and served without Exhibits 1, 2 and 3." Notice of Errata at 1, filed September 11, 2018 (Doc. 9).

Exhibit 1 is the Agreement, see Agreement at 1; Exhibit 2 is the Federal Corporate Charter Issued

By the United States of America Department of the Interior Bureau of Indian Affairs to the Pueblo

of Nambe for Nambe Pueblo Development Corporation at 6 (dated May 29, 1996), filed September

11, 2018 (Doc. 9-2)("Federal Charter"), and Exhibit 3 is a letter from World Fuel to Nambe Corp.,

addressed to Carlos Vigil ("C. Vigil"),[2] in which World Fuel notifies Nambe Corp. of a dispute

based on unpaid taxes Nambe Corp. allegedly owes to Alta Fuels[3] under the Agreement, notifies

Nambe Corp. of a demand letter Alta Fuels sent to Nambe Corp. demanding payment, and notifies

Nambe Corp. of World Fuel's demand that the parties use binding arbitration to resolve the dispute.

See Letter from Tim Bohall, Vice President, Credit & Risk, World Fuel Services, Inc., to Carlos

Vigil, Nambe Pueblo Development Corporation (dated Aug. 8, 2018), filed September 11, 2018

(Doc. 9-3)("Aug. 8, 2018 Letter").

The Court accepts World Fuel's factual allegations in the Complaint, the Agreement, the

Federal Charter, and the Aug. 8, 2018 Letter, as true for the limited purpose of deciding the

---

[2]Although the letter does not identify Carlos Vigil's role, the Affidavit of Randy Vigil, ¶ 8, at 3 (dated Sept. 27, 2018), filed October 1, 2018 (Doc. 14-1)("R. Vigil Aff.") identifies Carlos Vigil as Nambe Corp. Board President. R. Vigil Aff. ¶ 8, at 3. The Court does not rely on the R. Vigil Aff. in deciding the Motion but notes its explanation of Carlos Vigil's role here for clarity purposes.

[3]Alta Fuels is World Fuel Services, Inc's trade name. See Agreement ¶ 21, at 9 ("World Fuel Services, Inc. d/b/a Alta Fuels.").

Motion.[4]  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)("Iqbal")(clarifying the "tenet that a court must accept as true all of the [factual] allegations contained in a complaint")(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)); Archuleta v. Wagner, 523 F.3d 1278, 1283 (10th Cir. 2008)(concluding that, in the motion to dismiss posture, a court must "accept as true all well-pleaded facts, as distinguished from conclusory allegations").  Generally, a complaint's sufficiency must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 25 (10th Cir. 2005)(unpublished)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").[5]  Emphasizing this point, the United States Court of Appeals for the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th

---

[4]In its Analysis section, the Court explains its decision to construe the Motion as a rule 12(b)(6) motion.

[5]McGee v. Hayes is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Gossett v. Barnhart, Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004)(unpublished), Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005), Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), Gossett v. Barnhart, 139 F. App'x 24 (10th Cir. 2005), Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004), Lomax v. Ortiz-Marquez, 2018 WL 5870555 (10th Cir. 2018), Slocum v. Corp. Express U.S. Inc., 446 F. App'x 957 (10th Cir. 2011), Hicks v. Cadle, Co., 355 F. App'x 186 (10th Cir. 2009), Pennington v. Northrop Grumman Space & Mission Sys. Corp., 269 F. App'x 812, and Harvey on behalf of Chavez v. Star, 96 F.3d 1453, 1996 WL 511586 (10th Cir. 1996)(unpublished table decision), have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Cir. 2004)(unpublished), states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint. The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint." 91 F. App'x at 85. There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). The Tenth Circuit has held that written documents attached to a complaint as exhibits are "considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal," unless the documents are affidavits. Hall v. Bellmon, 935 F.2d 1106, 1112 (10th Cir. 1991)(citations omitted). The Agreement, the Federal Charter, and the Aug. 8, 2018 Letter are all attached to the Complaint as exhibits and none are affidavits. See Notice of Errata at 1. World Fuel does not dispute the authenticity of the Agreement, Federal

Charter,[6] or Aug. 8, 2018 Letter, and the Complaint refers to all three.  See Complaint ¶¶ 7, 10,

13, at 2-3.  Following Hall v. Bellmon, the Agreement, the Federal Charter, and the Aug. 8, 2018

Letter are considered part of the Complaint and the Court may consider them in deciding the

Motion.

With that understanding, World Fuel is a corporation organized and existing under the laws

of the State of Texas, qualified to do business in the State of New Mexico, and with its principal

place of business in the County of Miami-Dade, State of Florida.  See Complaint ¶ 1, at 1.  Nambe

Corp. is a "federally chartered corporation organized under the laws of the United States, pursuant

to 25 U.S.C. § 477, with its principal place of business located in Santa Fe, New Mexico."

Complaint ¶ 3, at 1.  Nambe Pueblo wholly owns Nambe Corp.  See Federal Charter at 2 ("The

Pueblo of Nambe is the sole shareholder and no physical shares [of Nambe Corp.] are issued.").

The amount in controversy exceeds $75,000.00.  See Aug. 8, 2018 Letter at 1 (stating that Nambe

---

[6]Nambe Corp. asserts that the version of Nambe Corp.'s Federal Charter, which the Secretary of the Interior approved and the Nambe Pueblo Tribal Council ratified, and which World Fuel attaches to the Complaint, is the 1994 charter and that the version currently in force, the 2007 charter, is attached to an affidavit affixed to the Motion.  See R. Vigil Aff. ¶ 5, at 2.  As the Court explains in its Analysis section, the Court may not rely on the R. Vigil Aff. in deciding a motion under rule 12(b)(6) and the Court does not, therefore, rely on documents attached to the R. Vigil Aff., to which the Complaint does not refer, and which do not fall within any of the exceptions to the general rule that, when deciding a rule 12(b)(6) motion, the Court may consider only the Complaints' allegations.  The Court notes that neither party contests the authenticity of the Federal Charter attached to the Complaint and, although the version of the charter attached to the R. Vigil Aff. may be more current, the Court notes that it is inconsistently paginated, and the Court declines to rely on it in deciding the Motion.  See infra n.14.  The Court may, and does, rely on the Federal Charter attached to the Complaint, and to which the Complaint refers.

Corp. owes World Fuel unpaid taxes of $1,929,486.18). The Court has jurisdiction over the Complaint based on diversity, pursuant to 28 U.S.C. § 1332(a)(1), "because (a) the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and (b) World Fuel is a citizen of the States of Texas and Florida, and [Nambe Corp.] is a citizen of the State of New Mexico." Complaint ¶ 5, at 2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), because Nambe Corp. resides in New Mexico and the events giving rise to the Complaint occurred in New Mexico. See Complaint ¶ 6, at 2.

World Fuel is engaged in, among other things, supplying petroleum fuel to distributors. See Complaint ¶ 2, at 1. Nambe Corp. is engaged in the tourism and gasoline business, and operates the Nambe Falls Travel Center, where Nambe Corp. operates a gasoline station. See Complaint ¶ 4, at 2. World Fuel and Nambe Corp. entered into a ten-year contractual relationship with a term from May 17, 2017, through May 16, 2027, providing that Nambe Corp. would purchase World Fuel branded and unbranded fuels, including alternative or biofuels (collectively, "Motor Fuel") from World Fuel, for its Nambe Falls Travel Center gasoline station, located on Tribal lands. Complaint ¶ 7, at 2; Agreement ¶ A, at 1.[7] The parties memorialized the

---

[7]Paragraph A states in full:

Customer [Nambe Corp.] is authorized by the Pueblo of Nambe to use and occupy certain tribal lands situated on the Highway U.S. 84/285 frontage road on which Customer currently markets and in the future intends to market gasoline, diesel fuel and related fuels as well as alternative fuels at a facility known as the Nambe Falls Travel Center.

contractual agreement in the Agreement, which contains an arbitration provision, Agreement ¶ 18(a), at 7, and a sovereign immunity waiver, Agreement ¶ 18(b), at 8. See Complaint ¶¶ 8-9, at 2-3.

The arbitration provision states in relevant part:

> If any dispute arises between the parties over or in connection with this Agreement and the parties, after good faith efforts, are unable to resolve the dispute between themselves, either party may serve notice in writing to the other of such dispute and demand that it be resolved through binding arbitration, giving the other party the name of an arbitrator of the noticing party's choice.

Agreement ¶ 18(a), at 7. See Complaint ¶ 8, at 2. The sovereign immunity waiver provision states, in relevant part:

> Nothing in this Agreement is or shall be deemed to be a waiver of the Pueblo's sovereign immunity from suit, provided however, that Customer [Nambe Corp.] agrees to waive its immunity protection for the limited and sole purposes of compelling arbitration or enforcing any binding arbitration decision rendered pursuant to the terms and conditions of this Agreement by any court having jurisdiction over the parties and the subject matter and for purposes of any such arbitration proceedings.

Agreement ¶ 18(b), at 8. See Complaint ¶ 9, at 2-3. The Federal Charter contains a "sue and be sued" clause, providing that Nambe Corp. is expressly authorized and empowered "[t]o sue and be sued in its Corporate name in courts of competent jurisdiction within the United States." Complaint ¶ 10, at 3 (quoting Federal Charter § 3.01(b), at 2).

On or about May, 2018, "a dispute arose between World Fuel and [Nambe Corp.] regarding unpaid taxes owed by [Nambe Corp.] to World Fuel pursuant to the Agreement." Complaint ¶ 11,

---

Agreement ¶ A, at 1.

- 8 -

at 3. On July 27, 2018, World Fuel issued an invoice for the unpaid taxes, and Nambe Corp. refused to pay. See Complaint ¶ 12, at 3. On August 8, 2018, World Fuel provided Nambe Corp. formal notice of the dispute and a demand that, pursuant to the Agreement, the dispute be resolved through binding arbitration. See Aug. 8, 2018 Letter at 1. The Aug. 8, 2018 Letter states, in relevant part:

> In accordance with section 18(a) of the Agreement, Alta gives [Nambe Corp.] formal notice of the above-mentioned dispute and demands that the dispute be resolved through binding arbitration. As one of the three arbitrators to hear and decide the dispute, Alta selects the Honorable Bruce D. Black, the former United States District Judge for the District of New Mexico.[8] Under the terms of the Agreement, [Nambe Corp.] must select a second arbitrator within ten days of the receipt of this notice, and then Judge Black and [Nambe Corp.]'s selected arbitrator will jointly appoint a third person to serve on the arbitration panel. The panel shall convene as soon as practicable, and hear and decide the dispute within 60 days of this notice to arbitrate.

Aug. 8, 2018 Letter at 1. See Complaint ¶ 13, at 3 (internal quotation marks omitted)(quoting Aug. 8, 2018 Letter at 1, and stating that, to date, Nambe Corp. has not responded to the Aug. 8, 2018 Letter).

## PROCEDURAL BACKGROUND

World Fuel's Complaint raises a single claim for relief against Nambe Corp. See Complaint ¶ 14, at 3. World Fuel alleges that the Agreement is valid and enforceable, and that Nambe Corp. agreed to its terms -- including the arbitration provision. See Complaint ¶¶ 15-16,

---

[8]The Court, of course, knows of and served with Judge Black. The Court is confident that it can remain fair and impartial in this case. The Court infrequently sees or converses with Judge Black, and it has been years since it has been in Judge Black's home or he in the Court's home.

at 3.  World Fuel alleges that the parties' dispute is "over or in connection with [the] Agreement," and falls within the arbitration provision's scope.  Complaint ¶ 17, at 3 (quoting Agreement ¶ 18(a), at 7).  World Fuel alleges that "[a]ll conditions precedent to the maintenance of this [Complaint] have been performed, have been waived, or have occurred."  Complaint ¶ 18, at 4. World Fuel alleges that, pursuant to § 4 of the FAA, the Court has the authority to compel Nambe Corp. to arbitrate the parties' dispute, and World Fuel requests that the Court issue an Order compelling arbitration pursuant to the Agreement's terms.  See Complaint ¶ 19, at 4.

    **1.**    **The Motion.**

    Nambe Corp. moves the Court to dismiss the case, alleging that World Fuel "is required to exhaust its tribal remedies in the Nambe Tribal Courts, including its designated appellate court, the Southwest InterTribal Court of Appeals."  Motion at 1.  Nambe Corp. alleges that, when required to answer in the "appropriate court," it will deny many of World Fuel's allegations, will otherwise show that its actions were justified, and will raise other dispositive defenses, including "Nambe Corp.'s unwaived sovereign immunity."  Motion at 2.  Nambe Corp. contends that, under the Tribal exhaustion doctrine, "the proper forum for addressing Plaintiff's demand for arbitration and Nambe Corp.'s legal defenses (and the merits of Plaintiff's claims) in the first instance is the Nambe Tribal Courts."  Motion at 2.

## 2.     **The R. Vigil Aff.**[9]

To the Motion, Nambe Corp. affixes the R. Vigil Aff.  See Affidavit of Randy Vigil, ¶ 1, at 1 (dated Sept. 27, 2018), filed October 1, 2018 (Doc. 14-1)("R. Vigil Aff.").  R. Vigil states that he is an enrolled member of Nambe Pueblo and is currently the Operations Manager of the Los Alamos National Laboratory's Utilities Department, a position that he has held since August, 2008.  R. Vigil Aff. ¶ 1, at 1.  R. Vigil states that he has been a member of Nambe Corp.'s[10] Board of Directors since 2002 and served as the Board's Secretary for many years.  See R. Vigil Aff. ¶ 2, at

---

[9]To the extent that the factual allegations in the R. Vigil Aff. differ from the factual allegations contained in the Complaint, the Agreement, the Federal Charter, and the Aug. 8, 2018 Letter, the Court does not consider the factual allegations in the R. Vigil Aff. in deciding the Motion.

[10]R. Vigil attests that Nambe Corp.'s headquarters "is located on Nambe Pueblo grant lands at 33 Arroyo Cuyamungue, Santa Fe, New Mexico, within the Nambe Indian Country."  R. Vigil Aff. ¶ 12, at 3.  The Court believes R. Vigil's reference to Nambe Pueblo grant lands refers to the land Nambe Pueblo purchased from Pojoaque Pueblo in a grant effectuated on January 12, 1983.  See Warranty Deed at 26 (dated Aug. 20, 1997), filed October 1, 2018 (Doc. 14-1)(memorializing the exchange of Tribal lands between Nambe Pueblo and Pojoaque Pueblo, resulting in a tract of land known as the Cuyamungue Grant's transfer to Nambe Pueblo ownership).  R. Vigil states that Nambe Corp. owns the Nambe Travel Center, which "is located on Nambe Indian reservation lands within the Nambe Indian Country," west of and adjacent to the lands on which Nambe Corp.'s headquarters are located.  R. Vigil Aff. ¶¶ 13-14, at 3.  The Court believes R. Vigil's reference to Nambe Indian reservation lands refers to all land which the Nambe Indians own.  See, e.g., Pueblo of Nambe Law and Order Code 2015, ¶ 2.1, at 37, filed October 1, 2018 (Doc. 14-1)("Nambe Tribal Code")(establishing the Tribal Code as applicable on the entire Nambe Pueblo Indian Reservation); Federal Register at 30 (dated Sept, 14, 1999), filed October 1, 2018 (Doc. 14-1)(describing the addition of the lands acquired through grant from Pojoaque Pueblo "to the reservation of the Pueblo of Nambe Indians").  R. Vigil asserts that these grant lands "were initially taken in trust for the Pueblo in 1997 and were later declared Nambe Indian reservation lands in 1999."  R. Vigil Aff. ¶ 14, at 3-4.

1.  R. Vigil states that, since 2002, he has served as the Board's acting Secretary, and currently serves as a Board member and as the Board's Treasurer.  See R. Vigil Aff. ¶ 2, at 1.  R. Vigil states that, as Board Secretary, he is the custodian of the Board's records, prepares and maintains the agendas and minutes of the Board's meetings, and maintains copies of Nambe Corp.'s corporate charter and of Board-adopted resolutions.  See R. Vigil Aff. ¶ 3, at 1.  R. Vigil asserts that the version of Nambe Corp.'s federal charter, which the Secretary of the Interior approved and the Nambe Pueblo Tribal Council ratified, and which World Fuel attaches to the Complaint, is the 1994 charter and that R. Vigil attaches the charter currently in force, the 2007 charter, to his affidavit.  See R. Vigil Aff. ¶ 5, at 2.

R. Vigil states that fuel sales transactions between Alta Fuels/World Fuel and Nambe Corp. related to the Nambe Travel Center have continued from 2009 until the present.  See R. Vigil Aff. ¶ 11, at 3.  R. Vigil states that, on November 10, 2008, the Board approved a contract with Alta Fuels for fuel sales at the Nambe Travel Center.  See R. Vigil Aff. ¶ 6, at 2.  On April 8, 2009, Alta Fuels entered into that valid and binding contract with Nambe Corp., which Herbert Yates, Nambe Corp.'s Chief Executive Officer, executed.  See R. Vigil Aff. ¶ 6, at 2.  R. Vigil attests that the Board understood §§ 301(e) and 701 of the Federal Charter to require its approval of the contract.[11]  See R. Vigil Aff. ¶ 6, at 2.  R. Vigil states that, on March 12, 2012, upon the 2009

---

[11]The Federal Charter numbers the sections to which R. Vigil refers 3.01 and 7.01, respectively.  See Federal Charter §§ 3.01, 7.01, at 2-3, 5.  Section 3.01 describes the duties Nambe Corp. is expressly authorized and empowered to perform.  See Federal Charter § 3.01, at 2.  Section 3.01(e) states in full:

contract's expiration, Alta Fuels entered into another contract for fuel sales with Nambe Corp.,

which Yates signed, but which the Board did not approve.  See R. Vigil Aff. ¶ 7, at 2.  R. Vigil

asserts that the Board "has never recognized" the 2012 contract as binding on Nambe Corp.  R.

Vigil Aff. ¶ 7, at 2.  When the 2012 contract expired in 2017, World Fuel -- having acquired Alta

Fuels -- entered into another contract, dated May 17, 2017, for fuel sales with Nambe Corp., this

time which Nambe Board President C. Vigil signed.  See R. Vigil Aff. ¶ 8, at 3.  R. Vigil attests

that this 2017 contract, on which World Fuel bases its arbitration demand, "was also done without

the knowledge or approval of the [Nambe Corp.] Board."  R. Vigil Aff. ¶ 8, at 3.  R. Vigil states

that the Board delegated no authority to C. Vigil to execute the Agreement, and that C. Vigil signed

---

To make contracts, guarantees, or agreements, incur liabilities and borrow money in any amount, from any source, upon such terms and at such rates of interest as the Corporation may determine; to issue notes, bonds, and other obligations and secure any of its obligations by specifically mortgaging, pledging or assigning its corporate property or income as collateral for its corporate debts or liabilities, all without the approval of the Secretary of the Interior, except when its use of trust or Federally-restricted Indian property requires such approval.

Federal Charter § 3.01(e), at 3.  Federal Charter § 7.01 states in full:

Control and operation of this Corporation and all powers and authorities thereof shall be vested in its governing Board.  The Board shall have full power and authority to manage and operate the Corporation in accordance with the powers and limitations set out in these Articles of Incorporation.

Federal Charter § 7.01, at 5.

without Board approval.  See R. Vigil Aff. ¶ 9, at 3.  R. Vigil asserts that, based on his own knowledge and review of Board records and documents, C. Vigil never presented the Agreement to the Board for consideration or approval, and, when the Board first reviewed the Agreement in 2018, after the excise tax dispute with World Fuel arose,[12] the Board expressly repudiated it. See R. Vigil Aff. ¶ 10, at 3.

R. Vigil attests that World Fuel sent Nambe Corp. an arbitration demand in the Aug. 8, 2018 Letter attached to the Complaint.  See R. Vigil Aff. ¶ 16, at 4.  R. Vigil states that, although the Complaint's ¶ 13 states otherwise, Nambe Corp. authorized a response to the Complaint and sent it by letter on August 9, 2018.  See R. Vigil Aff. ¶ 17, at 4.

### 3.     **The Memo.**[13]

In the Memorandum in Support of the Motion to Dismiss, filed October 1, 2018 (Doc. 15)("Memo."), Nambe Corp. states the facts which the R. Vigil Aff. describes.  See Memo. at 1-5.  Nambe Corp. asserts that two triggers for Montana v. United States, 450 U.S. 544 (1981)("Montana") jurisdiction exist: first, that each fuel transaction "between Alta Fuels/World Fuel and NPDC which has occurred at the Travel Center on Nambe Indian Reservation" is "a

---

[12]R. Vigil attests that the federal excise tax dispute which gives rise to World Fuel's arbitration demand "is based on fuel sales transactions which occurred at the Nambe Travel Center on Nambe Indian Reservation lands."  R. Vigil Aff. ¶ 15, at 4.

[13]To the extent that the factual allegations in the Memo. differ from the factual allegations contained in the Complaint, the Agreement, the Federal Charter, and the Aug. 8, 2018 Letter, the Court does not consider the factual allegations in the Memo. in deciding the Motion.

voluntary commercial consensual relationship . . . even in the absence of any separate written contracts between the parties," and second, that "disputes arising after the expiration of a written voluntary consensual relationship involving commercial use of (and activity on) tribal land will independently anchor tribal jurisdiction." Memo. at 5. Nambe Corp. cites to Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F.3d 802, 805, 817-19 (9th Cir. 2011), in which the United States Court of Appeals for the Ninth Circuit held that a Tribal Court had Montana jurisdiction "to adjudicate tort claims against non-Indian corporate lessor and its owner/manager seeking money damages," based on their "consensual relationship evidenced by [an] expired land lease and subsequent disputes . . . ." Memo. at 5 (alteration in original)(internal quotation marks omitted)(quoting Water Wheel Camp Rec. Area, Inc. v. LaRance, 642 F.3d at 805, 817-19).

Nambe Corp. asserts that, under the Williams v. Lee, 358 U.S. 217 (1959), test, because World Fuel, the non-Indian party, is the Plaintiff and not the Defendant, the Nambe Pueblo Tribal Court and the Southwest InterTribal Court of Appeals are the appropriate forums for adjudication of disputes between World Fuel and Nambe Corp. based on fuel sales at the Nambe Travel Center. See Memo. at 5. Nambe Corp. asserts that the Tenth Circuit has adopted the Williams v. Lee rule that "absent Congressional authorization Tribal Courts rather than state courts have jurisdiction to adjudicate suits filed by non-Indians against Indian parties regarding disputes arising from the Indian party's conduct within their Indian Country." Memo. at 5 (citing Navajo Nation v. Dalley, 896 F.3d 1196, 1204-05 (10th Cir. 2018)). Nambe Corp. asserts that the Williams v. Lee test is independent of the Montana test, as the Honorable Curtis LeRoy Hansen, Senior United States

District Judge for the District of New Mexico explained in <u>Fine Consulting, v. Rivera</u>, 915 F. Supp. 2d 1212, 1224 (D.N.M. 2013)(Hansen, J.).  According to Nambe Corp., <u>Montana</u> applies only when the non-Indian party is or would be a Tribal Court defendant.  <u>See</u> Memo. at 6.  Nambe Corp. contends that, "if *Montana* were otherwise applicable, . . . the exercise of tribal jurisdiction over this dispute would also be appropriate under that test."  Memo. at 6.

Nambe Corp. argues that the Court must dismiss or stay World Fuel's suit because of World Fuel's failure to exhaust Tribal remedies.  <u>See</u> Memo. at 6.  Nambe Corp. contends that <u>National Farmers Union v. Crow Tribe of Indians</u>, 471 U.S. 845 (1985)("<u>National Farmers</u>"), and <u>Iowa Mutual Insurance v. LaPlante</u>, 480 U.S. 9 (1987)("<u>Iowa Mutual</u>"), hold, subject to certain exceptions which Nambe Corp. describes in a footnote but contends are irrelevant, that

> where a party seeks to secure a federal court ruling on a civil cause of action arising on lands constituting a federally recognized Tribe's Indian Country based on voluntary transactions or other commercial relationships between one of the parties to the dispute and a tribal member, tribe or tribal entity of that tribe (or Pueblo), the federal court must dismiss (or stay) the federal suit until plaintiff has exhausted its tribal remedies -- so long as there exist colorable Tribal Court jurisdiction over the claims pled under <u>Montana</u> . . . and/or <u>Williams v. Lee</u> . . .  In this case, the tribal entity sued is [Nambe Corp.].

Memo. at 6-7.  Nambe Corp. argues that the Supreme Court of the United States has repeatedly reaffirmed the requirement that, where there is at least a colorable claim that the federal requirements for exercising Tribal jurisdiction over a non-Indian party are met, the parties must exhaust Tribal remedies as <u>National Farmers</u> and <u>Iowa Mutual</u> require.  <u>See</u> Memo. at 7 (citing <u>Atkinson Trading Co. v. Shirley</u>, 532 U.S. 645 (2001); <u>Strate v. A-1 Contractors</u>, 520 U.S. 438 (1997)).  Nambe Corp. contends that the Tenth Circuit has reaffirmed the same Tribal exhaustion

doctrine.  See Memo. at 7-8 (citing Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation, 862 F.3d 1236 (10th Cir. 2017); Valenzuela v. Silversmith, 699 F.3d 1199 (10th Cir. 2012); Crowe & Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1149 (10th Cir. 2011); Hartman v. Kickapoo Tribe Gaming Comm'n, 319 F.3d 1230, 1233 (10th Cir. 2003); Smith v. Moffett, 947 F.3d 442, 446 (10th Cir. 1991)).  Nambe Corp. contends that the Ninth Circuit, and the United States Courts of Appeals for the First and Fifth Circuits have also reaffirmed the Tribal exhaustion requirement. See Memo. at 8 (citing Stock W. Corp. v. Taylor, 964 F.2d 912, 920 (9th Cir. 1992) TTEA Corp. v. Ysleta Del Sur Pueblo, 181 F.3d 676 (5th Cir. 1999); Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 31 (1st Cir. 2000)("Ninigret")).

Nambe Corp. contends that, even when a plaintiff seeks to compel arbitration under the FAA or based on a binding arbitration clause in an allegedly binding contract, the plaintiff must still exhaust Tribal remedies.  See Memo. at 9.  Nambe Corp. cites to several cases from other federal district courts and Courts of Appeals, and in particular references Bank One N.A. v. Shumake, 281 F.3d 507 (5th Cir. 2002)("Bank One").  Nambe Corp. contends that, in Bank One, the Fifth Circuit concluded that the district court's duty to bar the plaintiff from proceeding in district court based on diversity jurisdiction until the plaintiff exhausted its Tribal remedies superseded the court's duty to compel arbitration under the FAA.  See Memo. at 10.  In Bank One, the Fifth Circuit also concluded that, in accordance with Tribal law, a Tribal court had to decide whether the parties involved had actually approved and agreed to be bound by a contract

amendment which allegedly added a binding arbitration clause.  See Memo. at 10 (citing Bank One, 281 F.3d at 509).

Nambe Corp. asserts that, to satisfy its duty to exhaust Tribal remedies, World Fuel must seek adjudication of all legal questions bearing on its dispute with Nambe Corp. in the Nambe Pueblo Tribal Court, including appellate review by the Southwest InterTribal Court of Appeals. See Memo. at 10.  Nambe Corp. contends that questions for the Nambe Pueblo Tribal Court include "whether the 2017 contract document upon which World Fuel bases its demand for arbitration was lawfully executed and became a binding contract under Nambe law and the terms of [Nambe Corp.]'s corporate charter," and "whether the limited waiver of immunity set out at § 301(b) of that charter is applicable to the 2017 contract document [-- the Agreement --] here at issue."  Memo. at 11.  Nambe Corp. alleges that § 301(b) does not apply to the Agreement, even if the Agreement is valid, binding, and Board-approved, because the Agreement contains no language involving "property or income of the Corporation . . . specifically mortgaged, pledged or assigned as collateral for particular corporate debts or liabilities," Memo. at 11 (quoting Federal Charter § 301(b)), and § 301(b) "only applies to such contacts," Memo. at 11.

Nambe Corp. contends that the Nambe Pueblo Tribal Court must also address whether "the unauthorized execution of contracts containing immunity waivers by officials or employees of a tribe or a § 477 corporation[14] are not effective to create an enforceable waiver of the tribe's or

---

[14]A § 477 corporation is an Indian Tribe operating as a federally chartered corporation. See Indian Reorganization Act of 1934, 25 U.S.C. § 477 ("IRA").

§ 477 corporation's sovereign immunity." Memo. at 12. Nambe Corp. alleges that, if the 2017 contract "was lawfully executed and became binding on [Nambe Corp.]," then its arbitration and sovereign immunity waiver provisions are also legally binding. Memo. at 13. Nambe Corp. contends that, if, however, §§ 301(e) and 701 of the Federal Charter require the Board to authorize and approve the contract, and if the Board did not properly do so, then the 2017 contract and its provisions are not binding on Nambe Corp., and have never been effective. See Memo. at 13. Nambe Corp. contends that the Nambe Pueblo Tribal Court must address this issue first, before the Court. See Memo. at 13.

Nambe Corp. next argues that the "Plaintiff's duty to exhaust tribal remedies did not go away just because" World Fuel brought its suit in federal court before Nambe Corp. had an opportunity to raise a claim in the Nambe Pueblo Tribal Court. Memo. at 14. Nambe Corp. contends that a plaintiff's duty to exhaust Tribal remedies exists even when no Tribal lawsuit is pending "at the time a federal action is commenced." Memo. at 14. Nambe Corp. avers that this duty to exhaust exists especially where, as here, "the party seeking to evade tribal jurisdiction is a non-Indian Plaintiff seeking judicial relief against a tribal entity for causes of action arising within that Tribe's Indian Country, as to which it has long been settled that Tribal Courts are the appropriate forums for resolving such disputes." Memo. at 14.

Nambe Corp. next avers that the Nambe Pueblo Tribal Court and the Southwest InterTribal Court of Appeals have colorable jurisdiction to adjudicate all of World Fuel's claims. See Memo. at 14. Nambe Corp. states, in support of this assertion, that its headquarters and travel center are located on Nambe Pueblo lands, that all actions of which World Fuel complains occurred on Nambe Pueblo lands, and that the Nambe Tribal Code confers jurisdiction on Nambe Pueblo Tribal Courts to hear and decide civil disputes arising from Nambe Corp.'s actions or inactions occurring on Nambe Pueblo lands. See Memo. at 15. Nambe Corp. contends:

> Under *Williams v. Lee*, where a cause of action arises on lands constituting a tribe's Indian country and involves a non-member plaintiff suing a tribal defendant, based on alleged civil wrongs committed by the Indian defendant on the reservation in derogation of the rights of the non-Indian plaintiff, the propriety of Tribal Court jurisdiction to adjudicate such claim under federal law is well-settled.

Memo. at 16. Nambe Corp. contends that in Nevada v. Hicks, 533 U.S. 353, 357 n.2 (2001)("Hicks"), the Supreme Court noted that "the typical case in which the court has addressed and upheld the exercise of tribal jurisdiction" has involved claims against Tribal defendants. Memo. at 17. Nambe Corp. contends that, while Hicks ruled that Tribal Court "could not adjudicate" tort or 42 U.S.C. § 1983 claims against state officers in cases "filed by tribal members against those officers based on their on-reservation conduct carried out while on duty," Hicks did not otherwise undermine "the existence of Tribal Court jurisdiction to adjudicate civil claims filed by non-members against tribal defendants" under the Williams v. Lee test. Memo. at 17.

Nambe Corp. argues that, after Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316 (2008), see Memo. at 18, the "*Montana* analysis is controlling in tribal jurisdiction

cases, with party alignment in the Tribal Court action as the most important factor to be weighed in determining the application of *Montana*'s rule and exceptions to the case at hand," Memo. at 20. Nambe Corp. contends that, where the non-Indian party is the plaintiff, Williams v. Lee controls in lieu of Montana. See Memo. at 20. Nambe Corp. argues that, under the Williams v. Lee test, Nambe Pueblo Tribal Courts have colorable jurisdiction over all of World Fuel's claims. Moreover, according to Nambe Corp., even if Nambe Corp. were the plaintiff, under the Montana test, the Nambe Pueblo Tribal Court has colorable jurisdiction over all of World Fuel's claims. Memo. at 20-21. Nambe Corp. also argues that National Farmers and Iowa Mutual require World Fuel to pursue their claims in the Nambe Pueblo Tribal Court, "thereby exhausting their tribal remedies and this Court is required to dismiss or stay Plaintiffs' action in this Court." Memo. at 20-21.

4.     **The Response**.

World Fuel responds. See Petitioner's Opposition to Respondents Motion to Dismiss, filed October 29, 2018 (Doc. 22)("Response"). World Fuel begins by asserting that, in enacting the FAA, Congress sought to "control the procedures employed by a federal court, and thus ensure that petitions to compel arbitration would be expeditious summary proceedings." Response at 1. World Fuel argues that, by insisting on Tribal exhaustion, Nambe Corp., contrary to Congress' intent in enacting the FAA, "seeks to drag out the litigation regarding the preliminary question of whether to enforce the parties' arbitration agreement in at least two tiers of Tribal Courts before World Fuel may seek enforcement in this Court." Response at 1-2. World Fuel contends that Congress has

empowered only federal courts to hear petitions under the FAA's § 4, and that the 2017 contract's arbitration clause contemplates resolving disputes in a non-Tribal forum. <u>See</u> Response at 2. World Fuel contends that arbitration agreements with Tribes and Tribal entities would be meaningless if it were the law "that every time a party and a tribal corporation contractually agree to arbitration, the tribal corporation has a virtual veto power over the contractually-agreed-to forum through invocation of the tribal exhaustion doctrine." Response at 2.

World Fuel avers that the Court should deny the Motion for several reasons. <u>See</u> Response at 2. First, World Fuel argues that two threshold issues bar the Court from considering the exhaustion argument: (i) arbitrators, not a court, should determine whether World Fuel has satisfied conditions precedent to arbitration, including Tribal exhaustion, and whether the parties' agreement is valid; and (ii) the Motion "improperly relies on matters extrinsic to World Fuel's petition and allegations contrary to World Fuel's factual allegations." Response at 2. World Fuel asserts that, even if the Court reaches the merits of Nambe Corp.'s Tribal exhaustion argument, it must deny the Motion, because: (i) "especially" where a petition's filing is not "an attempt to circumvent the tribal entity's invocation of a parallel proceeding in Tribal Court and the underlying controversy is not an intra-tribal dispute," the Tribal exhaustion doctrine is inapplicable to petitions to compel arbitration under the FAA's § 4; (ii) the parties' arbitration clause waives any otherwise applicable

Tribal exhaustion rule; and (iii) there is no pending proceeding in the Nambe Tribal Courts, rendering the Tribal exhaustion doctrine inapplicable. Response at 3.

World Fuel describes the arbitration clause, which states:

> If any dispute arises between the parties over or in accordance with this Agreement and the parties, after good faith efforts, are unable to resolve the dispute between themselves, either party may serve notice in writing to the other of such dispute and demand that it be resolved through binding arbitration.

Response at 2 (quoting Agreement ¶ 18(a), at 7). World Fuel states that the arbitration clause "provides that the arbitration panel 'shall convene as soon as practicable' and that the panel 'shall hear and decide the dispute within sixty (60) days of the notice to arbitrate'" "based on the laws of the State of New Mexico." Response at 3-4 (quoting Agreement ¶ 18(a), at 7).

World Fuel contends that the arbitration provision expressly waives Nambe Corp.'s immunity from suit "for the limited and sole purposes of compelling arbitration or enforcing any binding arbitration decision . . . <u>by any court</u> having jurisdiction over the parties and the subject matter and for purposes of any such arbitration provisions." Response at 3 (emphasis in Response)(quoting Agreement ¶ 18(b), at 7). World Fuel also notes that the Federal Charter contains a "sue and be sued" clause, stating that Nambe Corp. "is expressly authorized and empowered . . . [t]o sue and be sued in its Corporate name in courts of competent jurisdiction within the United States." Response at 4 (quoting Federal Charter § 3.01(b), at 2). World Fuel contends that the Federal Charter waives Nambe Corp.'s immunity "independently of the contractual waiver of sovereign immunity in the Agreement." Response at 4 n.1 ("The narrower waiver in the

Agreement does not negate the general waiver of immunity in the sue and be sued clause of Nambe's corporate charter -- each waiver operates independently.").

World Fuel asserts that it provided Nambe Corp. formal notice of the dispute regarding unpaid taxes that Nambe Corp. owes to World Fuel, after Nambe Corp. refused to pay an invoice for amounts owed and demanded arbitration pursuant to the Agreement. <u>See</u> Response at 4. World Fuel asserts that Nambe Corp. "has not selected a second arbitrator within ten days of its receipt of the notice as required by the Agreement, and has refused to proceed to arbitration." Response at 4-5. World Fuel avers that, on August 31, 2018, it "filed a petition in this Court to compel arbitration pursuant to Section 4 of the FAA." Response at 5. World Fuel contends that, according to Nambe Corp.,

> before World Fuel may avail itself of the summary procedures afforded under Section 4 of the FAA, which apply only to federal courts, it must bring its FAA claim in the Nambe Tribal Courts and engage in the exact type of protracted litigation about venue that the FAA was enacted to curb.

Response at 5. World Fuel argues that arbitrators, and not a court, must decide the exhaustion argument, because it is a procedural question regarding grievance procedure. <u>See</u> Response at 5. World Fuel asserts that arbitrators, and not a court, must determine the Agreement's validity, because the Supreme Court has held that, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Response at 5-6 (quoting <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 445-46 (2006)). World Fuel avers that, because Nambe Corp. challenges the 2017 contract's validity as a whole, arbitrators must decide the issue. <u>See</u> Response at 6.

Next, World Fuel argues that, even if Nambe Corp.'s issues were for the Court to decide, "a district court generally may not consider matters outside the four corners of the complaint on a motion to dismiss, and certainly may not consider matters directly contrary to the allegations in the complaint." Response at 6. World Fuel argues that the Court must disregard the R. Vigil Aff. See Response at 6-7. World Fuel contends that motions to dismiss for lack of jurisdiction may be based on extrinsic evidence, but that Nambe Corp.'s Motion is not based on a lack of jurisdiction, because the Supreme Court "has made clear that, when applicable, the tribal exhaustion doctrine 'is required as a matter comity, not as a jurisdictional prerequisite.'" Response at 7 (emphasis in Response)(quoting Iowa Mutual, 480 U.S. at 16 n.8).

Next, World Fuel avers that it "undoubtedly states a claim under Section 4 of the FAA" where World Fuel alleges that it and Nambe Corp. entered into a written contract containing an arbitration clause, and Nambe Corp. failed to arbitrate a dispute within the scope of the clause, despite the occurrence, waiver, or performance of all conditions precedent. Response at 7. World Fuel argues, accordingly, that "[a]ny counterfactual arguments that NPDC seeks to present," including regarding the Agreement's validity and the Tribal exhaustion requirement, "must be made at trial, not on a motion to dismiss[,]" because the FAA requires that where factual issues exist, courts shall proceed summarily to trial. Response at 7 (quoting 9 U.S.C. § 4). World Fuel argues that a "court reversibly errs by summarily denying a petition to compel arbitration in the face of a factual dispute instead of proceeding to trial as required by the FAA's express terms." Response at 7.

World Fuel argues that the FAA supersedes the Tribal exhaustion doctrine, which is "merely a judicially-created, non-jurisdictional rule."  Response at 8.  World Fuel argues that the Tribal exhaustion doctrine's purpose is to serve the congressional policy of promoting Tribal self-governance, and that it does not apply where Congress has expressed an "unmistakable preference for a federal forum" or applying the doctrine would "frustrate a 'congressional policy of immediate access to federal forums.'"  Response at 8 (quoting El Paso Nat. Gas Co. v. Neztsosie, 526 U.S. 473, 484-86 (1999)("El Paso")).  World Fuel argues that, in Hicks, the Supreme Court also held that "the tribal exhaustion doctrine does not apply in cases where it is clear that the Tribal Court lacks jurisdiction and that the exhaustion requirement would serve 'no purpose other than delay.'"  Response at 8 (quoting Hicks, 533 U.S. at 369).  World Fuel contends that the FAA expresses Congress' requirement -- not just preference -- that district courts hear FAA § 4 petitions.  See Response at 8.  World Fuel contends that the FAA's provisions applying the Federal Rules of Civil Procedure confirm Congress' requirement that district courts -- a federal forum -- hear FAA petitions.  See Response at 9.  World Fuel notes that FAA § 4's title reads: "[f]ailure to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof, hearing and determination."  Response at 9 n.2 (quoting 9 U.S.C. § 4)).

World Fuel argues that the Supreme Court has "strongly doubted that Section 4 applies to courts other than federal courts."  Response at 9-10.  World Fuel argues that § 4's language is mandatory and that, under the FAA, a district court "must exercise its jurisdiction when confronted with a petition to compel arbitration."  Response at 10 (emphasis in Response).  World Fuel argues

that "[a]pplying an exhaustion doctrine would mean that a party could <u>never</u> take advantage of the quick resolution offered by Section 4 of the FAA, as satisfying the exhaustion requirement would always add delay."  Response at 12 (emphasis in Response).

World Fuel analogizes its dispute to those in <u>El Paso</u> and <u>Preston v. Ferrer</u>, 552 U.S. 346 (2008), and argues that <u>El Paso</u> "makes clear that the rationales for federal displacement of state-court proceedings are equally applicable to displacement of tribal proceedings," Response at 15 (citing <u>El Paso</u>, 526 U.S. at 484-86), and <u>Preston v. Ferrer</u> "rejected a proposed distinction between judicial and administrative proceedings, and opted for an expansive view of the FAA . . . ," Response at 15 (citing <u>Preston v. Ferrer</u>, 552 U.S. at 359).  World Fuel argues that "there is no reason to single out tribal exhaustion as an unwritten exception to Congress's policy of speedy resolution of Section 4 petitions."  Response at 15.

Next, World Fuel argues that the cases which Nambe Corp. cites are distinguishable or do not address World Fuel's arguments, and that, because the Tenth Circuit has never ruled on "the issue of tribal exhaustion in the context of a petition under Section 4 of the FAA," the Court need not follow blindly cases from other circuits with distinguishable circumstances and considering different arguments than those raised here.  Response at 16.  World Fuel argues that "each case Nambe relies on for the proposition that tribal exhaustion is required when a plaintiff seeks to compel arbitration was animated by the fact that the plaintiff filed a suit to compel arbitration only in response to the tribe or tribal member already filing suit in Tribal Court."  Response at 18. World Fuel concedes that the Tenth Circuit has held that a parallel Tribal proceeding is not required

for Tribal exhaustion to apply but contends that the Tenth Circuit "has not held that the absence of such a parallel proceeding is irrelevant to the analysis." Response at 19. World Fuel argues that several factors demonstrate that comity concerns are at their lowest here: (i) there is no pending Tribal proceeding; (ii) the parties' contract requires its interpretation in accordance with New Mexico state law; (iii) the FAA requires applying federal substantive law regarding arbitration; (iv) the parties' dispute is not intra-Tribal; (v) the Agreement provides for "any court having jurisdiction" to hear a petition to compel arbitration; (vi) the arbitration clause selects a non-Tribal forum for adjudication; and (vii) the Agreement prioritizes rapid adjudication by providing that the arbitration should conclude within sixty days of the formal arbitration demand. Response at 19-20. World Fuel contends that the cases that Nambe Corp. cites do not address FAA § 4's plain text or Preston v. Ferrer's holding that delays caused by exhaustion requirements are inconsistent with Congress' policy, in enacting the FAA, of encouraging speedy resolution of disputes. See Response at 20.

World Fuel argues that Nambe Corp. waived the Tribal exhaustion requirement by allowing any court of competent jurisdiction to preside over an action to compel arbitration. See Response at 21. World Fuel contends that that Nambe Corp. did not expressly refer to exhaustion of Tribal proceedings "does not mean that Nambe did not waive an exhaustion defense" and that the Court must consider the real-world consequences of the Agreement's language. Response at 22. World Fuel contends that, in stating that any court could preside over an action

to compel arbitration, Nambe Corp. could not have intended that only the Nambe Pueblo Tribal Court preside.  See Response at 22.

Finally, World Fuel contends that the Tribal exhaustion requirement does not apply where there are no pending parallel proceedings in Tribal Court and that, even though the Tenth Circuit has not spoken on the issue, there is "a pending petition for a writ of certiorari for which the Supreme Court has entered an order calling for the views of the Solicitor General (CVSG)" on the issue.  Response at 23 n.8 (citing Petition for Writ of Certiorari, <u>Harvey v. Ute Indian Tribe of Uintah ab Ouray Reservation</u>, Case No. 17-1301 (dated March 7, 2018)).[15]  World Fuel avers that this case is not about jurisdiction; rather, it is about the right to arbitrate a contractual dispute between parties.  See Response at 23-24.  World Fuel argues that, for the foregoing reasons, the Court should deny Nambe Corp.'s Motion.  See Response at 24.

### 5.    **The Reply**.

Nambe Corp. begins by arguing that whether a contract ever came into existence is a matter for a court and not an arbitrator to decide.  See Defendant's Reply in Support of Motion to Dismiss at 1-2, filed December 10, 2018 (Doc. 27)("Reply").  Nambe Corp. concedes that, where execution of a contract is undisputed and there is no separate challenge to an arbitration clause's validity -

---

[15]The petition is available at https://www.supremecourt.gov/DocketPDF/17/17-1301/38004/20180307131150405_Harvey%20v.%20UTE%20et%20al.%20Petition.pdf). Nambe Corp. filed a Notice of Supplemental Authority, filed January 7, 2019 (Doc. 31) stating: "the U.S. Supreme Court issued an order denying certiorari on January 7, 2019 regarding Case No. 17-1301."  Notice of Supplemental Authority at 1.

- distinct from a challenge to the overall contract's validity, arbitrators and not courts must determine the contract's validity. See Reply at 2. Nambe Corp. contends, however, that the Supreme Court "expressly excluded from this rule situations in which the party resisting arbitration claims it never entered into the contract containing the arbitration clause." Reply at 2. Nambe Corp. contends that "it is well settled that no party can be compelled to engage in arbitration unless they have agreed to do so," Reply at 4, and that World Fuel, as the party seeking to compel arbitration, bears the burden to prove in court that an agreement to arbitrate was formed, see Reply at 4.

Nambe Corp. asserts that the Motion's core issue is its "contention that because of Plaintiff's duty to exhaust tribal remedies, the proper court to rule on the contract formation question (and all related arbitration and contract questions . . . , most of which require interpretation of NPDC's Charter[] is the Nambe Tribal Court, not this Court." Reply at 4-5. Nambe Corp. next turns to World Fuel's contention that wording in the arbitration clause allowing any court with competent jurisdiction to enforce any binding arbitration decision and referring to a limited sovereign immunity waiver associated with the arbitration clause, "implicitly waived World Fuels' [sic] duty to exhaust its tribal remedies." Reply at 5.

Nambe Corp. argues that World Fuel cannot rely on words in a contract instrument to which Nambe Corp. is not a party to excuse itself from the Tribal exhaustion requirement. See Reply at 5. Nambe Corp. avers that "it is well-settled in this Circuit that the duty to exhaust tribal remedies applies even if the party seeking to compel arbitration claims the Tribal party has waived its

immunity." Reply at 6. Nambe Corp. contends that waiver of sovereign immunity and Tribal remedy exhaustion are two separate issues. See Reply at 6. Nambe Corp. argues that pursuant to federal policy, in the Tenth Circuit, a party may not waive the Tribal exhaustion requirement through contract, even with explicit waiver language. See Reply at 6.

Next, Nambe Corp. asserts that, in the Tenth Circuit, "the duty to exhaust tribal remedies exists and must be enforced even if no parallel Tribal Court proceedings are ongoing." Reply at 7. Nambe Corp. argues that, "no matter whether the tribal or federal case is filed first" the risk of creating competition between Tribal and federal court proceedings exists and, "if the absence of a Tribal Court case excused exhaustion, parallel Tribal Court proceedings would be routinely filed in every case following a federal court filing, thus giving rise to the very inter-court conflict the exhaustion doctrine is intended to avoid." Reply at 7.

Nambe Corp. argues that World Fuel's assumption that Tribal resolution of its contract and arbitration dispute will take longer than dispute resolution in federal court is erroneous, and that "any delay World Fuels [sic] suffers from initially filing in the wrong court is a self-inflicted wound." Reply at 8. Nambe Corp. contends that, after Tribal remedies are exhausted, the only post-Tribal Court proceedings permitted would be to challenge the Nambe Pueblo Tribal Courts' jurisdiction, because res judicata would bar relitigation of the Nambe Pueblo Tribal Court's rulings. See Reply at 8. Nambe Corp. avers that "even persons detained by tribal governments who seek to invoke the speedy statutory *habeas corpus* remedy to obtain their release under 25 U.S.C. § 1303 must first exhaust their tribal remedies before seeking federal court relief . . . ."

Reply at 8.  Nambe Corp. contends that "[s]ecuring a speedy arbitration remedy is certainly of no greater import than seeking a speedy release from unlawful tribal custody."  Reply at 8.  Nambe Corp. contends that World Fuel improperly relies upon Preston v. Ferrer to evade exhaustion of Tribal remedies, because, according to Nambe Corp., Preston v. Ferrer considers a situation where the formation of a binding arbitration agreement is undisputed.  See Reply at 9.

Nambe Corp. contends that, contrary to World Fuel's assertion that federal courts are the only courts which may hear FAA claims, state courts "routinely rule on motions to compel arbitration in contract or tort cases that come before them."  Reply at 10.  Nambe Corp. contends that federal courts have also "required non-Indian parties to first present their arbitration demands in Tribal Courts where the dispute giving rise to the arbitration demand arose from on-reservation transactions . . . ."  Reply at 10.  Nambe Corp. avers that the FAA's § 4

> merely provides that the party seeking to compel arbitration "may" choose to seek that relief in a U.S. District Court -- and provides the further restriction that a party can seek that relief only in circumstances where the federal court would otherwise have jurisdiction to adjudicate the underlying dispute between the parties.

Reply at 10 (quoting 9 U.S.C. § 4).  Nambe Corp. argues that the FAA is unlike exclusive federal forum statutes and that federal courts are not the exclusive forums for adjudication of FAA disputes.  See Reply at 10-11.

Nambe Corp. avers that, in El Paso, the Supreme Court held that cases involving ordinary questions of federal law are subject to the Tribal exhaustion requirement unless the Tribe lacks jurisdiction under Montana or one of the exceptions to exhaustion under National Farmers is

invoked.  See Reply at 11.  Nambe Corp. avers that, in El Paso, the Supreme Court also distinguished cases filed in Tribal Court but involving claims which fall within exclusively federal court jurisdiction based either on a completely preemptive statute or on a statute evidencing unmistakable congressional preference for a federal forum, as in the Price Anderson Act, 42 U.S.C. § 2210 ("PAA").  Reply at 12.  Nambe Corp. asserts that, "[u]nlike the PAA, the FAA does not confer exclusive or even concurrent jurisdiction upon the federal courts . . . ."  Reply at 13.  Nambe Corp. argues that, "the FAA neither expects nor requires uniformity in the answer to the question whether a valid arbitration agreement exists, instead leaving this to be determined by the non-federal contract law of the jurisdiction in which the dispute arose . . . ."  Reply at 13 (citing 9 U.S.C. § 2).  Nambe Corp. avers that only once a valid arbitration provision to which both parties agree is found to exist do federal law standards governing what issues are arbitrable come into play.  See Reply at 14.  Nambe Corp. argues that World Fuel "overlooks a critical aspect of the tribal exhaustion doctrine -- the (non-jurisdictional) duty to exhaust tribal remedies only exists in a federal court where there otherwise exists a federal court duty to exercise its jurisdiction to decide the claim presented."  Reply at 14 (emphasis in Reply).

Next, Nambe Corp. argues that it did not improperly rely on materials outside the Complaint, but that, under D.N.M. LR-Civ. 7.3(b), the factual allegations which Nambe Corp. needs to ground its Motion for a failure to exhaust Tribal remedies require the support of an affidavit or of other admissible evidence.  See Reply at 16.  Nambe Corp. states that it filed and referenced the R. Vigil Aff. in its Motion.  See Reply at 17.  Nambe Corp. asserts that World Fuel

"has not controverted any of the factual allegations supported by the R. Vigil Aff. or the other exhibits attached to" the Motion. Reply at 17. Finally, Nambe Corp. asserts that

> the rule that would normally require this Court when handling a Section 4 petition (Resp., p. 6) to "proceed summarily to the trial" of contract formation issues in the face of factual disputes bearing on that issue, or to otherwise rule on that issue without a trial if no disputed facts are involved, is not applicable.

Reply at 17 (quoting Response at 6).

### 6.    The Hearing.

The Court held a hearing. See Draft Transcript of Motion Hearing at 1:10-11 (December 21, 2018)(Court)("Tr.").[16] The Court began by asking whether Nambe Corp. knows of any caselaw suggesting the Court should dismiss the case rather than stay it, as is normally done in cases in which a party files a motion to arbitrate. See Tr. at 3:8-18 (Court). Nambe Corp. responded that no Tenth Circuit case directly addresses the interplay of a motion to dismiss for failure to exhaust Tribal remedies and a motion to compel arbitration. See Tr. at 3:19-23 (Rogers). Nambe Corp. averred that, in other Courts of Appeals, the party required to exhaust Tribal remedies files another action, if they want to return to federal court and challenge the Tribal Court's jurisdiction after exhausting Tribal Court remedies. See Tr. at 3:24-4:2 (Rogers). The Court replied that other Courts of Appeals are also more liberal than the Tenth Circuit "about dismissing cases in which there is a motion to arbitrate as well." Tr. at 4:3-6 (Court). The Court

---

[16]The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

stated that the Tenth Circuit says that a court should stay rather than dismiss. <u>See</u> Tr. at 4:7-8 (Court). Nambe Corp. replied that there is no practical impact on Nambe Corp. either way, because, Nambe Corp. avers, if the Court stays for World Fuel to exhaust Tribal remedies, Nambe Corp. averred that the Nambe Pueblo Tribal Court will decide whether there is a binding contract and binding arbitration clause. <u>See</u> Tr. at 4:9-14 (Rogers). Nambe Corp. stated that if the Nambe Pueblo Tribal Court determines that there is a binding contract, World Fuel will likely argue for the Nambe Pueblo Tribal Court to compel arbitration, and if the Nambe Pueblo Tribal Court determines that there is no binding contract, then Nambe Corp. will not agree to arbitration, because it will argue that its sovereign immunity is not waived. <u>See</u> Tr. at 4:14-19 (Rogers). Nambe Corp. averred that either way, there might be an appeal in the Tribal Court context, "but again, the plaintiffs have the right to come back and challenge the underlying Tribal Court jurisdiction after that process is completed." Tr. at 4:19-23 (Rogers).

Nambe Corp. stated that <u>National Farmers</u> and <u>Iowa Mutual</u> provide the basis for Nambe Corp.'s motion for dismissal or for a stay. <u>See</u> Tr. at 4:24-5:1 (Rogers). Nambe Corp. stated that the Tenth Circuit interprets these cases to establish an inflexible bar "that prohibits this Court from reaching the merits" of World Fuel's petition. Tr. at 5:1-4 (Rogers). Nambe Corp. stated that the Tenth Circuit repeats the inflexible bar holding in so many cases that "there is really no discretion here in regard to [World Fuel's] duty to exhaust Tribal remedies before asking this Court to look at anything." Tr. at 5:4-11 (Rogers). Nambe Corp. asserts that there is a colorable basis for Tribal jurisdiction, first, because the case's impact is "potentially adverse to the resources of the tribe,"

given that Nambe Pueblo wholly owns Nambe Corp., so if World Fuel prevails on their payment dispute, Nambe Pueblo's financial resources will be impacted and, second, because the Nambe Pueblo Tribal Court may exercise jurisdiction over disputes arising from consensual relationships on Nambe Pueblo's land. Tr. at 5:15-25 (Rogers).

Nambe Corp. averred that the fuel sales, the basis of the parties' dispute, "are continuing today, notwithstanding that [Nambe Corp. has] told World Fuel that [their] contract was never approved by the Board." Tr. at 6:3-6 (Rogers). Nambe Corp. argued that whether Board approval was required or what the effect of a lack of Board approval is "needs to go to the Tribal Court." Tr. at 6:6-8 (Roger). Nambe Corp. submitted that Tribal Court jurisdiction clearly exists under federal law, because World Fuel will be the plaintiff in any Nambe Pueblo Tribal Court suit to compel arbitration, and, when a non-Indian plaintiff sues a Tribal entity in Tribal Court, Williams v. Lee clearly establishes jurisdiction, because the dispute arises from the parties' dealings and the Indian party's actions on their reservation. See Tr. at 6:10-20 (Roger). Nambe Corp. asserted that the Tenth Circuit recently reaffirmed Williams v. Lee's rule in Navajo Nation v. Dalley. See Tr. at 6:21-23 (Rogers).

Nambe Corp. contended that Montana's jurisdictional test does not apply, because it applies only where the non-Indian party is the defendant in a suit that a Tribal plaintiff files in Tribal Court, typically arising from something that happened on the reservation. See Tr. at 6:25-7:6 (Rogers). Nambe Corp. averred that, if the Court concludes Montana's test applies, this case also fits Montana's test. See Tr. at 7:6-8 (Rogers). Nambe Corp. contended that, to establish

Tribal Court jurisdiction, Nambe Corp. must show that "there is a non-Indian party involved with a Tribal party [in] some kind of dealings on the reservation, [and] the dispute arises from those dealings, and the relief sought has a nexus to the dispute and the activity of the non[-]Indian party on the reservation." Tr. at 7:15-21 (Rogers). Nambe Corp. averred that <u>Atkinson Trading Co., Inc. v. Shirley</u>, 532 U.S. 645 (2001), added the nexus requirement, which is clearly satisfied, because the dispute arises from the parties' alleged Agreement and World Fuel's activity on Nambe Pueblo Lands, and World Fuel's sought relief, payment of allegedly owed excise taxes, has a nexus to the dispute. <u>See</u> Tr. at 7:21-8:1 (Rogers).

The Court next asked whether both <u>National Farmers</u> and <u>Iowa Mutual</u> involve cases with parallel proceedings in Tribal Court. <u>See</u> Tr. at 8:8-10 (Court). Nambe Corp. responded that parallel Tribal Court proceedings existed for both <u>National Farmers</u> and <u>Iowa Mutual</u>, but that the Tenth Circuit has said there is no requirement of a parallel or prior Tribal Court proceeding to trigger the Tribal remedy exhaustion duty, as <u>United States v. Tsosie</u>, 92 F.3d 1037, 1041 (10th Cir. 1996), states. <u>See</u> Tr. at 8:11-15 (Rogers). In <u>United States v. Tsosie</u>, the Tenth Circuit enforced the exhaustion duty against the United States, concluding that no pending Tribal Court action is required. <u>See</u> Tr. at 8:15-9:3 (Rogers). Nambe Corp. stated that <u>Smith v. Moffett</u>, 947 F.3d at 446, came to the same conclusion. <u>See</u> Tr. at 9:3-5 (Rogers). Nambe Corp. stated that, if a Tribal Court proceeding is filed after a federal action, parallel proceedings and conflicting rulings could result, so, to avoid motivating a race to the courthouse in every dispute, the Tenth Circuit adopted a rule that the existence of parallel proceedings is immaterial. <u>See</u> Tr. at 9:11-19 (Rogers).

Nambe Corp. next contended that World Fuel cannot rely on a contract that no Court has ruled is binding to contend that Nambe Corp. waived the Tribal exhaustion requirement, and furthermore, that nothing in the contract waives or purports to waive Tribal remedies. See Tr. at 9:23-10:7 (Rogers). Nambe Corp. avers that, in the Tenth Circuit, a Tribal party cannot waive the Tribal exhaustion duty. See Tr. at 10:7-9 (Rogers). Nambe Corp. cited to Navajo Nation v. Intermountain Steel Bldgs, Inc., 42 F. Supp. 2d 1222 (D.N.M. 1999)(Parker, J.), in which the Honorable James A. Parker, now-Senior United States District Judge for the District of New Mexico, concluded, based on Smith v. Moffett, that the Tribal exhaustion rule cannot be waived. See Tr. at 10:13-24 (Rogers).

Nambe Corp. next argued that the FAA is unlike the PAA, because the FAA does not make the federal court the exclusive forum to hear arbitration demands. See Tr. at 11:10-14 (Rogers). Nambe Corp. argues that the FAA's § 4 says a party seeking to compel arbitration may file that petition in federal court, but that state and Tribal Courts also hear FAA cases, and that, unlike the PAA, the FAA confers on the court no independent basis for federal jurisdiction. See Tr. at 12:1-11 (Rogers). Nambe Corp. argued that El Paso, on which World Fuel relies, reiterates the normal rule of exhaustion, and carves out a narrow exception for the PAA, which converts state claims to federal ones and allows for removal to federal court, expressing a clear congressional preference for a federal forum. See Tr. at 13:3-19 (Rogers). Nambe Corp. argued that none of the cases on which World Fuel relies exclude from the scope of the Tribal exhaustion rule situations where there is an underlying dispute whether the contract containing the arbitration clause ever bound

the party resisting arbitration and that the Nambe Tribal Court must determine the contract's binding nature. See Tr. at 14:13-19 (Rogers). Nambe Corp. argued, furthermore, that, in the cases on which World Fuel relies, the arbitration clauses at issue committed the gateway issues of the contract's validity to the arbitrator, whereas the clause at issue here does not do that. See Tr. at 14:20-15:2 (Rogers).

Nambe Corp. contended that the Nambe Pueblo Tribal Court should decide all the factual and legal issues here, because their resolution requires Federal Charter interpretation. See Tr. at 15:13-18 (Rogers). Nambe Corp. stated that federal courts have a duty to act when confronted with federal causes of action, but the Tribal exhaustion doctrine creates a non-jurisdictional exception to that duty. See 16: 3-9 (Rogers). Nambe Corp. also argued that there is no reason to believe that requiring Tribal exhaustion will unduly deprive World Fuel of a speedy remedy and that World Fuel elected to file in federal court before exhausting Tribal remedies in the first instance. See 16:17-17:3 (Rogers). Nambe Corp. contended that, if the Nambe Pueblo Tribal Court correctly determines that it has jurisdiction, res judicata will bar relitigation of issues it resolves. See Tr. at 17:3-9 (Rogers). Nambe Corp. also contends that attacks on the Nambe Pueblo Tribal Court's competence do not excuse World Fuel from the Tribal exhaustion requirement. See Tr. at 17:9-13 (Rogers).

The Court asked Nambe Corp. to tell it about the Nambe Pueblo Tribal Court and to what the Court will be deferring, if it dismisses or stays the proceedings. See Tr. at 17:19-21 (Court). Nambe Corp. responded that the Nambe Pueblo Tribal Court's judge was a barred attorney in New

Mexico before her license lapsed, that she is law-trained, and that she has many years of experience.  See Tr. at 17:22-25 (Rogers).  Nambe Corp. stated that the Nambe Pueblo Tribal Court has rules of procedure, and that it borrows from state law where Tribal law does not apply, and that the Southwest InterTribal Court of Appeals hears appeals from the Nambe Pueblo Tribal Court, and that the Nambe Pueblo Tribal Court contracts with many small Tribes to handle appellate matters.  See Tr. at 18:1-8 (Rogers).  Nambe Corp. informed the Court that the Nambe Pueblo Tribal Court issues written opinions and has its own body of law.  See Tr. at 18:8-10 (Rogers).

The Court next asked about the pending petition for certiorari in Harvey v. Ute Indian Tribe of the Uintah & Ouray Reservation, which was fully briefed and distributed for the January 4, 2019, conference and presents two questions: (i) whether the Tribal exhaustion doctrine which requires federal courts to stay cases challenging Tribal jurisdiction until the parties have exhausted parallel Tribal Court proceedings applies to state courts as well, and (ii) whether the Tribal exhaustion doctrine requires that non-Tribal courts yield to Tribal Courts when the parties have not invoked the Tribal Courts' jurisdiction.  See Tr. at 18:14-19:4 (Court).  The Court stated that "it appears that federal courts are split regarding whether the Tribal exhaustion doctrine applies in the absence of parallel Tribal Court proceedings."  Tr. at 19:5-8 (Court).  The Court asked whether United States v. Tsosie suggests that a non-Tribal court may still consider the absence of a parallel Tribal proceeding as a factor in determining whether the Tribal exhaustion doctrine should apply.

See Tr. at 19:13-16 (Court).  Nambe Corp. responded that non-Tribal courts may not consider as a factor the absence of a parallel Tribal proceeding.  See Tr. at 19:19-20:2 (Rogers).

The Court asked whether, if the Tribal exhaustion doctrine is analogous to an abstention doctrine, the Court should abstain from considering a case only when there is a parallel proceeding to which the Court may abstain.  See Tr. at 20:9-20 (Court).  Nambe Corp. responded that, although Tribal exhaustion is a form of abstention, it is a special form that the Supreme Court and the Tenth Circuit created, in the Tribal exhaustion context, and does not require a parallel proceeding.  See Tr. at 20:23-21:2 (Rogers).  The Court next asked whether the Motion is a 12(b)(1) or a 12(b)(6) motion.  See Tr. at 22:7-9 (Court).  Nambe Corp. responded that "a lot of people are struggling with that question" and that it is "sort of neither."  Tr. at 22:10-13 (Rogers).  Nambe Corp. contended that the Motion is akin to a 12(b)(1), but that it is not a jurisdictional motion, and that it is akin to a 12(b)(6), but it is not an attack on the Complaint's merits.  See 22:15-18 (Rogers).  Nambe Corp. averred that, in the District of New Mexico, parties "file affidavits like we did to show the predicate facts that are necessary to invoke the doctrine . . . ."  Tr. at 22:19-21 (Rogers).  Nambe Corp. stated that the Tribal exhaustion requirement is not jurisdictional, but is a unique, non-waivable, Supreme-Court-established duty which does not require a parallel Tribal Court proceeding to apply.  See Tr. at 23:6-14 (Rogers).  Nambe Corp. states that the Tribal exhaustion doctrine falls under neither rule 12(b)(1) nor rule 12(b)(6), and that it "just says notwithstanding" the validity of the pleading in any other context "there is a duty to exhaust Tribal remedies."  Tr. at 23:21-24:1 (Rogers).

World Fuel began by averring that the Tribal exhaustion doctrine is the sole basis for Nambe Corp.'s Motion, and that World Fuel's Complaint is validly pled. <u>See</u> Tr. at 25:1-4 (Zaron). World Fuel alleged that the Agreement is valid, Nambe Corp. breached the arbitration provision's terms, and the conditions precedent for arbitration have been satisfied. <u>See</u> Tr. at 25:6-9 (Zaron). World Fuel argued that the Court may not consider the R. Vigil Aff. unless Nambe Corp.'s Motion is jurisdictional, and that, because it is not jurisdictional, the affidavit improperly alleges facts outside of the Complaint which the Court may not consider. <u>See</u> Tr. at 25:9-16 (Zaron). World Fuel alleges that, because Nambe Corp. improperly relied on the R. Vigil Aff. in filing its Motion, the Court should deny the Motion and require Nambe Corp. to file an Answer, or the Court should summarily move the matter to trial. <u>See</u> Tr. at 25:14-22 (Zaron). The Court asks whether, if Nambe Corp.'s Motion is based on comity, and not on either 12(b)(1) or 12(b)(6), there is any reason the Court cannot rule on the Motion without an Answer. <u>See</u> Tr. at 26:1-5 (Court), <u>id.</u> at 26:8-15 (Court). World Fuel argued that, because there are factual issues here -- including where the cause of action accrued -- there should be an Answer, but the Court asked whether, if the bar is as low as identifying a colorable claim for jurisdiction, the Nambe Pueblo Tribal Courts should take the first look. <u>See</u> Tr. at 26:16-27:1 (Zaron, Court).

World Fuel alleged that, on page 12, the Federal Charter states that the president signs and approves of all contracts and instruments on behalf of Nambe Corp., except for those expressly delegated to the chief executive officer after the Board's authorization. <u>See</u> Tr. at 27:14-22 (Zaron). World Fuel contended, accordingly, that there is no colorable claim for jurisdiction,

because, if the Nambe Corp. president had authority to sign the contract, the contract is valid, and this Court "would have jurisdiction to decide whether or not this matter should go to arbitration." Tr. at 27:22-28:5 (Zaron). World Fuel argued that there is no dispute as to the contract's validity and "that's really the basis for which [Nambe Corp. is] seeking exhaustion . . . ." Tr. at 28:23-25 (Zaron). The Court examined the Federal Charter and stated that it did not appear complete, noting its inconsistent pagination, and stated that "[i]t seems to raise more questions than it does answers."[17] Tr. at 29:16-24 (Court, Zaron).

World Fuel contended that the Tribal Courts do not have jurisdiction to consider an action under the FAA's § 4, because "there is exclusive jurisdiction in this Court to consider actions under section 4." Tr. at 30:4-8 (Zaron). World Fuel argued that, while state courts consider FAA §§ 2 and 3 arbitration claims, exclusively federal courts consider § 4 claims. See Tr. at 30-20-22

---

[17]At the hearing, World Fuel referred to the version of the Federal Charter affixed to the R. Vigil Aff. See Tr. at 27:14-22 (Zaron). See also Amended Federal Corporate Charter Issued By the United States of America at 8-14 (dated April 11, 2006), filed October 1, 2018 (Doc. 14-1)("Amended Charter"). The Court noted that the pagination is inconsistent. See Tr. at 29:16-24 (Court, Zaron). Page 4 of the Amended Charter ends with § 4.03, but page 5 begins with a subsection "B," with no numbered section heading. See Amended Charter at 11-12. No numbered section headings appear on page 5, but page 6 begins with § 6.03. See Amended Charter at 12-13. The Court notes that it does not rely on the R. Vigil Aff. or its attachments in deciding the Motion, and that the Federal Charter, upon which the Court relies, does not display inconsistent pagination. The Court notes that the Federal Charter upon which the Court relies, and the Amended Charter, contain identical language in all relevant provisions. The one difference which the Court notes in a relevant provision is that the Amended Charter states in § 8.02(c) that no more than "three permanent or elected members of the Nambe Tribal Council shall be eligible to serve on the Board concurrently," Amended Charter § 8.02(c), at 13, whereas § 8.02(c) of the Federal Charter states that no more than "two permanent or elected members of the Nambe Tribal Council shall be eligible to serve on the Board concurrently," Federal Charter § 8.02(c), at 6.

(Zaron).  World Fuel argued that § 4 sets forth "specific procedures that are governed by the Federal Rules of Civil Procedure that specifically provide for a speedy and efficient resolution." Tr. at 31:8-11 (Zaron).  World Fuel argued that, although they could seek to compel arbitration under a different FAA section, World Fuel brought their petition pursuant to § 4 "which does have special provisions providing for the application of the Federal Rules of Civil [Procedure] and certain limitations on notice . . . ."  Tr. at 32:1-6 (Zaron).

World Fuel next argued that, if the Court dismisses this case, World Fuel would be the plaintiff in the Nambe Pueblo Tribal Court and would have to file a motion to dismiss World Fuel's own Complaint, because "we think that there is no colorable basis for jurisdiction under this section of the FAA in Tribal Court . . . ."  Tr. at 33:7-16 (Zaron).  World Fuel argued that, in the administrative context, Supreme Court caselaw suggests that arbitration's goals trump the practice of administrative remedy exhaustion, despite the states' strong interest in protecting regulations and ordinances.  See Tr. at 34:24-35:10 (Zaron).  World Fuel argued that, in El Paso, the Supreme Court determined that the PAA's speed and efficiency goals were more important than Tribal exhaustion, and that the FAA has "similar language in terms of the need for speed and efficiency . . . ."  Tr. at 35:14-36:8 (Zaron).  World Fuel then stated that the Court has diversity jurisdiction over the case.  See Tr. at 37:2-15 (Zaron).

World Fuel then argued that, based on Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation, 868 F.3d 1199 (10th Cir. 2017), Nambe Corp. can waive the Tribal exhaustion doctrine.  See Tr. at 38:3-14 (Zaron).  In Becker v. Ute Indian Tribe of the Uintah and Ouray

- 44 -

Reservation, the Tenth Circuit analyzed whether the Tribe had waived Tribal exhaustion, suggesting that a waiver is possible.  See Tr. at 38:3-14 (Zaron).  World Fuel contended that the Court needs "to determine whether or not there has been a waiver of Tribal exhaustion."  Tr. at 38:18-20 (Zaron).

World Fuel argued that, where there is a factual dispute, "the proper mechanism is to go to trial on the factual issues in a summary fashion."  Tr. at 39:14-16 (Zaron).  World Fuel alleged that the dispute involves about two million dollars in allegedly unpaid excise taxes which World Fuel contends that Nambe Corp. owes World Fuel.  See Tr. at 40:10-13 (Zaron).  World Fuel averred that, in Comanche Indian Tribe of Okla. v. 49 L.L.C., 391 F.3d 1129 (10th Cir. 2004), the Tenth Circuit affirmed the federal district court's determination of the issue of contract formation, and that, in that case, there was no Tribal exhaustion or deference to a Tribal Court, because there was no Comanche Tribal Court.  See Tr. at 40:19-41:6 (Zaron).  World Fuel contended that the issues here do not require prior Tribal expertise, but likely involve examining New Mexico law to interpret the contract, something that this Court could do.  See Tr. at 41:12-19 (Zaron).

World Fuel next turned to the issue of parallel proceedings, and argued that the lack of a Tribal proceeding "is a factor in making a decision whether or not you should dismiss this and say that exhaustion applies here."  Tr. at 42:3-6 (Zaron).  World Fuel argued that, because a § 4 arbitration claim may not be filed in Tribal Court, there can be no parallel proceeding, and that the appropriate course of action "would be to deny the motion to dismiss and require the Nambe

corporation to file an answer, and then proceed to a summary trial of the issue . . . ."  Tr. at 42:12-42:22 (Zaron).

Regarding the R. Vigil Aff.'s improper consideration of facts outside the Complaint, Nambe Corp. stated that, while some of Nambe Corp.'s responses regarding the inapplicability of Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 67 (2010), and Buckeye Check Cashing, Inc. v. Cardegna "do depend on the [R.] Vigil affidavit[']s statement that" the Board never approved the contract, the Court may disregard those arguments, "because the issue here is whether or not they need to file their motion to compel arbitration in the Tribal Court."  Tr. at 43:1-8 (Rogers).  Nambe Corp. contended that the arbitration clause at issue here does not reserve gateway issues such as contract validity to arbitration.  See Tr. at 43:8-15 (Rogers).  Nambe Corp. argued that, disregarding the portions of the R. Vigil Aff. that address the Board's lack of approval of the contract, the Federal Charter's §§ 301(e) and 701 indicate that the Board must approve of the contract.  See Tr. at 43:22-44:4 (Rogers).  Nambe Corp. argued that the Federal Charter's interpretation "needs to be handled in the Tribal Court."  Tr. at 44:17-21 (Rogers).  Nambe Corp. contends that, in Comanche Indian Tribe of Okla. v. 49 L.L.C., the Tribe did not argue for exhaustion, because no Comanche Tribal Court existed.  See Tr. at 45:5-8 (Rogers).  Nambe Corp. argues that, although World Fuel, if it files in Nambe Pueblo Tribal Court, will not bring its action under the FAA's § 4, the exhaustion doctrine requires only that the Tribal Court resolve the parties' dispute and the Nambe Pueblo Tribal Court may resolve the dispute without invoking § 4.  See Tr. at 45:22-46:5 (Rogers).

The Court stated that it would not rule definitively at the hearing, but that the Court's impression "is this is a very strong exhaustion requirement . . . ." Tr. at 54:15-55:1 (Court). The Court stated that it is concerned about trying to avoid the Tribal exhaustion doctrine without firmer footing. See Tr. at 55:8-10 (Court). The Court indicated that it would attempt to get an opinion to the parties after the first of the year. See Tr. at 56:1-3 (Court).

## LAW REGARDING RULE 12(b)(1) MOTIONS TO DISMISS.

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress." Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted). A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."). "[Because] federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction." United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to raise, by motion, the defense of the court's "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to

subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter

jurisdiction is based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981). But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9

(D.N.M. March 11, 2009)(Browning, J.)(citations omitted), aff'd on other grounds by 634 F.3d

1170 (10th Cir. 2011). The Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav.

& Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the complaint's allegations

to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or

other evidence properly before the court. See New Mexicans for Bill Richardson v. Gonzales, 64

F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995). In

those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment. See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56. See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997). "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'" Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

### LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned. See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the court properly considered notices attached to the motion and not to the complaint, because the complaint

referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)(Kelly, J.)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered . . . .").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted). See Duncan v. Citibank (S.D.), N.A., No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements required to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). A court will not construe a plaintiff's pleadings

"so liberally that it becomes his advocate." Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007

WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d at 1247 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at

570)(internal citations omitted). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278

F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone. See Casanova v.

Ulibarri, 595 F.3d at 1125; Gossett v. Barnhart, 139 F. App'x at 25 ("In ruling on a motion to

dismiss, the district court is limited to the facts pled in the complaint."). Emphasizing this point,

the Tenth Circuit, in Carter v. Daniels states: "When ruling on a Rule 12(b)(6) motion, the district

court must examine only the plaintiff's complaint. The district court must determine if the

complaint alone is sufficient to state a claim; the district court cannot review matters outside of the

complaint." 91 F. App'x at 85. There are three limited exceptions to this general principle:

(i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are

central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen

v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice,"

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which contains time limitations that the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not

jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See

2012 WL 3656500, at *22-23; <u>Mocek v. City of Albuquerque</u>, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action and as an exception to the general rule, the Court has concluded that the Court may consider a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See <u>Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3</u>, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See also <u>SEC v. Goldstone</u>, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); <u>Mata v. Anderson</u>, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## **LAW REGARDING TRIBAL EXHAUSTION DOCTRINE**

The Supreme Court requires a party to exhaust Tribal Court remedies even in cases where a federal court has jurisdiction concurrent with a Tribal Court and even where non-Indian parties are involved. See <u>National Farmers</u>, 471 U.S. at 857 (federal question jurisdiction); <u>Iowa Mutual</u>, 480 U.S. at 18 (diversity jurisdiction). The tribal exhaustion doctrine is an integral part of the

federal government's longstanding policy of promoting tribal self-government. <u>See</u> <u>National Farmers</u>, 471 U.S. at 856; <u>Iowa Mutual</u>, 480 U.S. at 15-16. The Supreme Court in <u>National Farmers</u> and <u>Iowa Mutual</u> gave three reasons for the Tribal Court exhaustion rule. <u>See</u> <u>Navajo Nation v. Intermountain Steel Bldgs., Inc.</u>, 42 F. Supp. 2d at 1226. The first reason is Congress' commitment to the policy of encouraging Tribal self-government. <u>See</u> <u>National Farmers</u>, 471 U.S. at 853-57; <u>Iowa Mutual</u>, 480 U.S. at 14 (referring to "the Federal Government's longstanding policy of encouraging tribal self-government"). The Supreme Court in <u>Iowa Mutual</u> observes that "[t]ribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development." 480 U.S. at 14-15 (citation and footnote omitted). The Supreme Court also expressed concern that "[a] federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of Tribal Courts." <u>Iowa Mutual</u>, 480 U.S. at 15. <u>See</u> <u>Smith v. Moffett</u>, 947 F.2d at 444 (referring to federal government's "strong interest in promoting tribal sovereignty, including the development of Tribal Courts").

The exhaustion doctrine's second purpose is that "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed." <u>National Farmers</u>, 471 U.S. at 856. In <u>Iowa Mutual</u>, the Supreme Court similarly observed that federal courts should avoid "direct competition" with Tribal Courts by staying or dismissing cases where both the federal and Tribal Court may possess concurrent jurisdiction. 480 U.S. at 15-16. Third, the exhaustion doctrine allows Tribal Courts to "provide other courts with the benefit of their expertise

in such matters in the event of further judicial review," such as in matters of Tribal law.  National Farmers, 471 U.S. at 857.

There are three exceptions to the Tribal exhaustion doctrine's operation.  See National Farmers, 41 U.S. at 856 n.21.  First, exhaustion is not required when Tribal jurisdiction "is motivated by a desire to harass or is conducted in bad faith, . . . ."  National Farmers, 41 U.S. at 856 n.21.  National Farmers imports the bad-faith exception from Juidice v. Vail, 430 U.S. 327 (1977).  See Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc., 715 F.3d 1196, 1201 (9th Cir. 2013).

> In *Juidice*, the state court issued a commitment order, and the defendant was arrested after he failed to attend a deposition, appear for a hearing, and pay a fine. Rather than appeal his case in state court, he filed a 42 U.S.C. § 1983 claim in district court.  Upon review, the Supreme Court held that a federal court must abstain from making a determination during a state proceeding based on the principle of comity unless the proceeding was motivated by a desire to harass or was conducted in bad faith.  The Court looked to the *proceeding* and the court overseeing that proceeding to make its determination.  The defendant there alleged bad faith by the plaintiffs, which the Court explicitly held insufficient to trigger the exception.

Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc., 715 F.3d at 1201 (emphasis in original)(citations omitted)(citing Juidice v. Vail, 430 U.S. at 328-30, 334-38).  The Ninth Circuit interpreted the bad-faith exception to the Tribal exhaustion doctrine, therefore, to require bad faith on the part of the court overseeing the proceeding at issue or bad faith inherent in the proceeding to avoid the Tribal exhaustion requirement.  Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc., 715 F.3d at 1201.  Bad faith exhibited by a party to the case is insufficient.  See Juidice v. Vail, 430 U.S. at 338; Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc., 715 F.3d at 1201-02

("Ultimately, where a tribe has an established judicial system as here, the interpretation most faithful to *National Farmers* is that it must be the Tribal Court that acts in bad faith to exempt the party from exhausting available Tribal Court remedies.").

The second exception to the Tribal exhaustion doctrine is "where the action is patently violative of express jurisdictional prohibitions." National Farmers, 471 U.S. at 856 n.21. The federal court overseeing the proceeding must address whether the federal law under which the plaintiff brings claims "so obviously preempts tribal jurisdiction" as to patently violate express jurisdictional prohibitions, rendering abstention in favor of Tribal exhaustion inappropriate. Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1502 (10th Cir. 1997)(citing National Farmers, 471 U.S. at 856 n.1). To invoke this exception to the Tribal exhaustion doctrine, the party seeking the exception must make a substantial showing. See Kerr-McGee Corp. v. Farley, 115 F.3d at 1502 (citing Iowa Mutual, 480 U.S. at 19 n.12 (concluding that party's assertion that "tribal jurisdiction over outsiders is questionable at best" could not defeat the Tribal exhaustion requirement). The Tenth Circuit stated that "Tribal Courts rarely lose the first opportunity to determine jurisdiction because of an 'express jurisdictional prohibition.'" Kerr-McGee Corp. v. Farley, 115 F.3d at 1502 (quoting National Farmers, 471 U.S. at 856 n.21). The Tenth Circuit noted that the second exception to the Tribal exhaustion doctrine is typically invoked in two situations: when the federal court has exclusive jurisdiction, see Kerr-McGee Corp. v. Farley, 115 F.3d at 1502 (citing Blue Legs v. Bureau of Indian Affairs, 867 F.2d 1094, 1097-98 (8th Cir. 1989)), or where sovereign

immunity forecloses Tribal jurisdiction, see Kerr-McGee Corp. v. Farley, 115 F.3d at 1502 (citing United States v. Yakima Tribal Ct., 806 F.2d 853, 860-61 (9th Cir. 1986)).

The Tribal exhaustion doctrine's third exception is "where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." National Farmers, 471 U.S. at 856 n.21. On the futility exception, the Tenth Circuit has held that "'speculative futility is not enough to justify federal jurisdiction.' The [plaintiff] cannot simply assert that it is not subject to Tribal Court jurisdiction; rather, it must actually seek adjudication of this issue in Tribal Court." Bank of Okla. v. Muscogee (Creek) Nation, 972 F.2d 1166, 1170 (10th Cir. 1992)(quoting White v. Pueblo of San Juan, 728 F.2d 1307, 1313 (10th Cir.1984)). The futility "exception to sovereign immunity clearly does not apply where a party voluntarily chooses not to pursue its case in Tribal Court." Bank of Okla. v. Muscogee (Creek) Nation, 972 F.2d at 1170.

The Tenth Circuit held in Mustang Prod. Co. v. Harrison, 94 F.3d 1382 (10th Cir. 1996), that, after exhaustion of Tribal Court remedies, if the federal district court has concurrent jurisdiction over a case, it "should review Tribal Courts' findings of fact for clear error and conclusions of law de novo." Mustang Prod. Co. v. Harrison, 94 F.3d at 1384. Accord Duncan Energy Co. v. Three Affiliated Tribes, 27 F.3d 1294, 1300 (8th Cir. 1994)("[T]he district court should review the Tribal Court's findings of fact under a deferential, clearly erroneous standard. The Tribal Court's determinations of federal law should be reviewed de novo while determinations of Tribal law should be accorded more deference." (citation omitted)).

The Tenth Circuit has expansively applied the Tribal exhaustion doctrine with respect to issues other than the scope of the Tribal Court's jurisdiction.  See Hartman v. Kickapoo Tribe Gaming Comm'n, 176 F. Supp. 2d 1168, 1180 (D. Kan. 2001)(Saffels, J.).  The Tenth Circuit has routinely required Tribal Court exhaustion.  See Hartman v. Kickapoo Tribe Gaming Comm'n, 319 F.3d 1230, 1233 (10th Cir. 2003); Texaco Inc. v. Hale, 81 F.3d 934, 937 (10th Cir. 1996); Bank of Okla. v. Muscogee (Creek) Nation, 972 F.2d at 1171; Smith v. Moffett, 947 F.2d at 444 ("[T]he federal courts have acknowledged the need to allow Tribal Courts to make an initial determination of tribal jurisdiction over matters arising on Indian reservations.").  The First, Fifth, and Ninth Circuits, and the United States Courts of Appeals for the Second and Eighth Circuits have likewise required exhaustion in such cases.  See, e.g., Gaming World Int'l Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 851-52 (8th Cir. 2003); Bank One, 281 F.3d at 515 ("The policy which animates the tribal exhaustion doctrine . . . subordinates the federal court's obligation to exercise its jurisdiction to the greater policy of promoting tribal self-government." (internal quotation marks omitted)); Ninigret, 207 F.3d at 33-35; Allstate Indem. Co. v. Stump, 191 F.3d 1071, 1073-75 (9th Cir. 1999); Basil Cook Enters. Inc. v. St. Regis Mohawk Tribe, 117 F.3d 61, 66-67 (2d Cir. 1997)("As long as a tribal forum is arguably in existence, as a general matter, we are bound by *National Farmers* to defer to it."); Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d 1412, 1421 (8th Cir. 1996).  Judge Parker has likewise adhered to the principles of National Farmers and Iowa Mutual in requiring exhaustion of Tribal Court remedies.  In Navajo Nation v. Intermountain Steel Buildings, Inc., Judge Parker sua sponte required exhaustion of

Tribal Court remedies "even when no action is pending in the Tribal Court and Indian plaintiffs seek to invoke federal court subject matter jurisdiction." 42 F. Supp. 2d at 1227. Judge Parker stated that, "[w]hen the dispute at issue is a reservation affair, . . . comity concerns 'almost always dictate that the parties exhaust their tribal remedies before resorting to the federal forum.'" 42 F. Supp. 2d at 1226 (quoting Texaco, Inc. v. Zah, 5 F.3d 1374, 1378 (10th Cir. 1993)). Judge Parker stated:

> It is difficult to conceive how tribal self-government and self-determination will be advanced by the exercise of federal court jurisdiction over a matter involving the Navajo Nation, a Navajo commercial entity, and a contract between these Navajo parties and a non-Indian defendant to construct a Navajo-owned building located on Navajo land within the boundary of the Navajo Nation. This is especially true because the parties disagree about the applicability of Navajo law and custom. . . .
>
> . . . .
>
> Moreover, if the Navajo Tribal Court reached the merits of the action, a federal court would have the benefit of the Navajo Tribal Court's prior interpretation of Navajo law and customs that may apply to this case.

Navajo Nation v. Intermountain Steel Bldgs, Inc., 42 F. Supp. 2d at 1229-30. Montana, Strate v. A-1 Contractors, and Hicks concern Tribal jurisdiction over non-Indians, as have virtually all cases that have not required exhaustion. See, e.g., Burlington N. R.R. v. Red Wolf, 196 F.3d 1059, 1062, 1065 (9th Cir. 1999); Mont. Dep't of Transp. v. King, 191 F.3d 1108, 1113 (9th Cir. 1999).

## LAW REGARDING TRIBAL SOVEREIGN IMMUNITY

The Supreme Court has long held that an Indian Tribe has the exclusive power to confer or withdraw Tribal membership, see Roff v. Burney, 168 U.S. 218, 222 (1897), "unless limited by treaty or statute," United States v. Wheeler, 435 U.S. 313, 322 n.18 (1978), superseded in part on

other grounds by statute, 25 U.S.C. § 1301.  Accord Santa Clara Pueblo v. Martinez, 436 U.S. 49,

56-57, 60, 72 (1978).  The Tenth Circuit has long held that, "in absence of express legislation by

Congress to the contrary, a[n Indian] Tribe has the complete authority to determine all questions

of its own membership."  Martinez v. S. Ute Tribe, 249 F.2d 915, 920 (10th Cir. 1957).  As the

Supreme Court in Santa Clara Pueblo v. Martinez stated:

> A tribe's right to define its own membership for tribal purposes has long been
> recognized as central to its existence as an independent political community.  Given
> the often vast gulf between tribal traditions and those with which federal courts are
> more intimately familiar, the judiciary should not rush to create causes of action
> that would intrude on these delicate matters.

436 U.S. at 72 n.32 (citations omitted).

## 1.  Indian Self-Determination Act, 25 U.S.C. § 450 (ISDA).

Congress enacted the ISDA, as well as the Indian Civil Rights Act, 25 U.S.C. §§ 1301-

1303, to promote Tribal self-government.  Congress declared the ISDA's primary purpose to be

> the establishment of a meaningful Indian self-determination policy which will
> permit an orderly transition from the Federal domination of programs for, and
> services to, Indians to effective and meaningful participation by the Indian people
> in the planning, conduct, and administration of those programs and services.  In
> accordance with this policy, the United States is committed to supporting and
> assisting Indian tribes in the development of strong and stable tribal governments,
> capable of administering quality programs and developing the economies of their
> respective communities.

25 U.S.C. § 450a(b).  The courts have so interpreted ISDA.  See, e.g., New Mexico v. Mescalero

Apache Tribe, 462 U.S. 324, 335 & n.17 (1983)(citing ISDA as example of "Congress' objective

of furthering tribal self-government . . . includ[ing] Congress' overriding goal of encouraging

'tribal self-sufficiency and economic development.'" (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980)); White Mountain Apache Tribe v. Bracker, 448 U.S. at 143, 144 n.10 (describing ISDA as one of "a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development"); Demontiney v. United States, 255 F.3d 801, 806 (9th Cir. 2001)(explaining that Congress enacted ISDA "to encourage Indian self-determination and tribal control over administration of federal programs for the benefit of Indians").

The ISDA does not contain any express federal right of action against Tribes or Tribal officials concerning the Tribes' implementation of contracts with the United States to operate contracted federal programs. In a few specified instances, ISDA authorizes federal litigation. See Demontiney v. United States, 255 F.3d at 806-09; 25 U.S.C. § 50d (providing for criminal prosecutions for theft or embezzlement of ISDA funds); id. § 450f(c)(3)(A)(providing limited express waiver of Tribal sovereign immunity for activities covered by mandatory liability insurance); id. § 450m-1 (providing federal court jurisdiction over certain claims by Tribal organizations against federal agencies under ISDA contracts). Otherwise, ISDA preserves Tribal sovereign immunity. See 25 U.S.C. § 450n(1) (nothing in ISDA "shall be construed as . . . affecting, modifying, diminishing, or otherwise impairing the sovereign immunity from suit enjoyed by an Indian tribe"); Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751, 760 (1998)("Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation."); Okla. Tax Comm'n

v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 510 (1991)("Congress has consistently reiterated its approval of the immunity doctrine. *See, e.g.,* . . . [ISDA]. These Acts reflect Congress' desire to promote the 'goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development.'" (quoting California v. Cabazon Band of Mission Indians, 480 U.S. 202, 216 (1987))).

In Demontiney v. United States, the Ninth Circuit held that a Tribe was immune from a suit brought against it by a Tribal member seeking amounts that the member claimed were due him as a subcontractor to the Tribe for work he performed under an ISDA contract between the Tribe and the Bureau of Indian Affairs (BIA). The Ninth Circuit concluded that "[t]here is a strong presumption against waiver of tribal sovereign immunity," 255 F.3d at 811, and that neither ISDA nor the subcontract waived the Tribes' immunity from suit, 255 F.3d at 812-14. Similarly, in Pink v. Modoc Indian Health Project, Inc., 157 F.3d 1185, 1188-89 (9th Cir. 1998), the Ninth Circuit held that ISDA did not confer subject matter jurisdiction on a federal court over a suit by an Indian employee against a Tribal health organization because ISDA does not affect Tribal sovereign immunity, relying on 25 U.S.C. § 450n(1) ("Because the [ISDA] does not effect [sic] Tribal sovereign immunity, the district court was correct in holding that the [ISDA] could not confer subject matter jurisdiction.").

Courts examine several factors "in determining whether a cause of action is implicit in a statute not expressly providing one." Santa Clara Pueblo v. Martinez, 436 U.S. at 60. These factors include:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted -- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state or tribal law, in an area basically the concern of the States or tribes, so that it would be inappropriate to infer a cause of action based solely on federal law?

Cort v. Ash, 422 U.S. 66, 78 (1975)).  Since the Supreme Court decided Santa Clara Pueblo v. Martinez, the Supreme Court has "effectively condensed [Cort v. Ash's four factors] into one -- whether Congress, expressly or by implication, intended to create a private cause of action." Sonnenfeld v. City and Cty. of Denver, 100 F.3d 744, 747 (10th Cir. 1996)(citing Thompson v. Thompson, 484 U.S. 174, 189 (1988)(Scalia, J., concurring); Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 15-16 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 575 (1979).  Accord Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1169 (10th Cir. 2001)(quoting Sonnenfeld v. City and Cty. of Denver, 100 F.3d at 747).  As the Tenth Circuit explained:

> Since Cort [v. Ash], the question of Congressional intent has become the main concern and the other Cort [v. Ash] factors have diminished in significance.  The question of implication of private remedies is now viewed as a strict question of "statutory construction" to determine "whether Congress intended to create the private right of action asserted."  Touche Ross & Co. v. Redington, 442 U.S. [at] 568 . . . .
>
> [I]n Touche Ross [& Co. v. Redington], the Supreme Court employed the familiar maxim "expressio unius est exclusio alterius" to find no implied liability where a statutory scheme contained provisions providing express liability elsewhere.  Thus, there has been a distinct shift away from the full application of the Cort [v. Ash] factors to a narrower exercise of statutory construction in order to glean Congressional intent.

Rawson v. Sears, Roebuck & Co., 822 F.2d 908, 921-22 (10th Cir. 1987)(citations and footnote omitted).  See Miller v. United States, 710 F.2d 656, 667 (10th Cir. 1983)("Subsequent formulation and refinement of the Cort [v. Ash] criteria have indicated that a Congressional intent to create or deny the private remedy asserted is the weightiest factor.")

2. **State Court Jurisdiction.**

In Worcester v. Georgia, 31 U.S. 515 (1832), the Supreme Court held that Indian Tribes and Indians on reservations are generally, absent congressional authorization, not subject to state jurisdiction.  See Worcester v. Georgia, 31 U.S. at 556-57.  The Supreme Court has determined that "'[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history,'" McClanahan v. State Tax Comm'n, 411 U.S. 164, 168 (1973)(internal quotation marks omitted)(quoting Rice v. Olson, 324 U.S. 786, 789 (1945))(alteration in the original) and recognized that "Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation," Bryan v. Itasca Cty., 426 U.S. 373, 376 n.2 (1976)(quoting Williams v. Lee, 358 U.S. at 220).  The Supreme Court recently reaffirmed the rule that, "'[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.'" Hicks, 533 U.S. at 362 (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. at 144).  The Tenth Circuit, this District, and the Supreme Court of New Mexico have similarly held that New Mexico regulatory

and adjudicatory jurisdiction over Tribes and reservation Indians is generally preempted. See, e.g., Joe v. Marcum, 621 F.2d 358, 362 (10th Cir. 1980); United States v. Morris, 754 F. Supp. 185, 187 (D.N.M. 1991)(Parker, J.); Benally v. Marcum, 553 P.2d 1270, 1272-73, 89 N.M. 463, 465-66 (1976).

## LAW REGARDING DIVERSITY JURISDICTION AND ARBITRATION

"Subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (i) complete diversity among the parties; and (ii) that 'the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.'" Thompson v. Intel Corp., No. CIV 12-0620, 2012 WL 3860748, at *12 (D.N.M. Aug. 27, 2012)(Browning, J.)(citing 28 U.S.C. § 1332(a)). As the Court has previously explained, "[t]he Supreme Court of the United States has described this statutory diversity requirement as 'complete diversity,' and it is present only when no party on one side of a dispute shares citizenship with any party on the other side of a dispute." McEntire v. Kmart Corp., No. CIV 09-0567, 2010 WL 553443, at *3 (D.N.M. Feb. 9, 2010)(Browning, J.)(citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267-68 (1806); McPhail v. Deere & Co., 529 F.3d 947, 951 (10th Cir. 2008)). The amount-in-controversy requirement is an "estimate of the amount that will be put at issue in the course of the litigation." Valdez v. Metro. Prop. & Cas. Ins., No. CIV 11-0507, 2012 WL 1132374, at *15 (D.N.M. March 19, 2012)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 956). See De La Rosa v. Reliable, Inc., 113 F. Supp. 3d 1135, 1150 (D.N.M. 2015)(Browning, J.); Ullman v. Safeway Ins. Co., 995 F. Supp. 2d 1196, 1213-14 (D.N.M. 2013)(Browning, J.). The Court will discuss the two requirements in turn.

1.     **Diversity of Citizenship.**

For diversity jurisdiction purposes, a person's domicile determines citizenship.  See Crowley v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).  "A person's domicile is defined as the place in which the party has a residence in fact and an intent to remain indefinitely, as of the time of the filing of the lawsuit."  McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing Crowley v. Glaze, 710 F.2d at 678).  See Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991)("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.").  If neither a person's residence nor the location where the person has an intent to remain can be established, the person's domicile is that of his or her parents at the time of the person's birth.  See Gates v. Comm'r of Internal Revenue, 199 F.2d 291, 294 (10th Cir. 1952)("[T]he law assigns to every child at its birth a domicile of origin.  The domicile of origin which the law attributes to an individual is the domicile of his parents.  It continues until another domicile is lawfully acquired.").  Additionally, "while residence and citizenship are not the same, a person's place of residence is prima facie evidence of his or her citizenship."  McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing State Farm Mut. Auto. Ins. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994)).  A corporation, on the other hand, is "deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  Gadlin v. Sybron Int'l Corp., 222 F.3d 797, 799 (10th Cir. 2000)(quoting 28 U.S.C. § 1332(c)(1)).  See De La Rosa v. Reliable, Inc., 113 F. Supp. 3d at 1151; Ullman v. Safeway Ins. Co., 995 F. Supp. 2d at 1214.

2. **Amount in Controversy.**

The statutory amount-in-controversy requirement, which presently stands at $75,000.00, must be satisfied as between a single plaintiff and a single defendant for a federal district court to have original jurisdiction over the dispute; "a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement," nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold. Martinez v. Martinez, No. CIV 09-0281, 2010 WL 1608884, at *18 (D.N.M. March 30, 2010)(Browning, J.). If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims. See Alberty v. W. Sur. Co., 249 F.2d 537, 538 (10th Cir. 1957); Martinez v. Martinez, 2010 WL 1608884, at *18. Similarly, multiple plaintiffs may aggregate the amounts of their claims against a single defendant if the claims are not "separate and distinct." Martin v. Franklin Capital Corp., 251 F.3d 1284, 1292 (10th Cir. 2001). Multiple claims by the same plaintiff against the same defendant may be aggregated, even if the claims are entirely unrelated. See 14A Charles A. Wright, et al., Federal Practice and Procedure, Jurisdiction § 3704, at 566-95 (4th ed. 2011). While the rules on aggregation sound complicated, they are not in practice: if a single plaintiff -- regardless whether he or she is the only plaintiff who will share in the recovery -- can recover over $75,000.00 from a single defendant -- regardless whether the defendant has jointly liable co-defendants -- then the court has original jurisdiction over the dispute between that plaintiff and that defendant. The court can then exercise supplemental

jurisdiction over other claims and parties that "form part of the same case or controversy under Article III," 28 U.S.C. § 1367(a), meaning that they "derive from a common nucleus or operative fact," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

Satisfaction of the amount-in-controversy requirement must be established by a preponderance of the evidence. See McPhail v. Deere & Co., 529 F.3d at 953. In the context of establishing an amount-in-controversy, the defendant seeking removal could appear to be bound by the plaintiff's chosen amount of damages in the complaint, which would seem to allow a plaintiff to avoid federal jurisdiction "merely by declining to allege the jurisdictional amount [in controversy]." McPhail v. Deere & Co., 529 F.3d at 955. The Tenth Circuit's decision in McPhail v. Deere & Co. has foreclosed such an option from a plaintiff who wishes to remain in state court. McPhail v. Deere & Co. holds that a defendant's burden in establishing jurisdictional facts is met if the defendant proves "jurisdictional facts that make it possible that $75,000 is in play." 529 F.3d at 955.

The Supreme Court recently clarified that a defendant seeking removal to federal court need only include in the notice of removal a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. See Dart Cherokee Basin Operating Co. v. Owen, 135 S. Ct. at 554. The district court should consider outside evidence, and find by a preponderance of the evidence whether the amount in controversy is satisfied "only when the plaintiff contests, or the court questions, the defendant's allegation." Dart Cherokee Basin Operating Co. v. Owen, 135 S. Ct. at 554. See De La Rosa v. Reliable, Inc., 113 F. Supp. 3d at 1152.

### 3.    Diversity of Citizenship in Motions to Compel Arbitration.

In the context of FAA motions to compel arbitration, parties often invoke a federal court's diversity jurisdiction, because the FAA does not by itself create federal question jurisdiction. "[T]he Act does nothing, being 'something of an anomaly in the field of federal-court jurisdiction' in bestowing no federal jurisdiction but rather requiring an independent jurisdictional basis." Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 581-82 (2008)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n.32 (1983)).

A common issue in the arbitration context is the situation in which not all of the parties to a state court action are present in a federal court action to compel arbitration of the state lawsuit. Such a situation implicates the Court's diversity jurisdiction.  Although the Supreme Court and the Tenth Circuit have not ruled on whether a federal court should "look through" to the state court complaint to determine diversity jurisdiction in an FAA motion to compel arbitration, the Court concludes that it should not "look through" to the state court complaint, but rather, should look only at the diversity of the parties before the federal court.

The Supreme Court has held that "a federal court may 'look through' an [FAA motion to compel arbitration] to determine whether it is predicated on an action that 'arises under' federal law." Vaden v. Discover Bank, 556 U.S. 49, 62 (2009)("Vaden").  Importantly, this ruling applies only to federal question jurisdiction, and not diversity.  See Vaden, 556 U.S. at 62.  Although the Tenth Circuit has not ruled on this issue, the Eighth Circuit has held that "diversity of citizenship is determined in these cases by the citizenship of the parties named in the proceedings before the

district court, plus any indispensable parties who must be joined pursuant to Rule 19." Northport Health Servs. of Ark. LLC v. Rutherford, 605 F.3d 483, 491 (8th Cir. 2010)("Rutherford"). In Rutherford, the Eighth Circuit noted that "the pre-*Vaden* circuit decisions were unanimous in looking only to the citizenship of the parties to the federal action." 605 F.3d at 489. The court explained that Vaden did not change the rule of refusing to "look through" to all of the underlying state action's parties because such a procedure

> ignores the underlying facts and the Supreme Court's decision in *Moses H. Cone.* In that case, the Supreme Court stated that the independent basis of federal jurisdiction was diversity of citizenship. But it did not discuss that threshold issue, despite noting the presence of a non-diverse party who made the parallel state court action non-removable. 460 U.S. at 7 & n. 4

> . . . .

> Even if no party challenged diversity jurisdiction, that the Supreme Court did not even discuss the issue is telling because in other cases it has noted that federal courts are obligated to consider lack of subject matter jurisdiction *sua sponte.*

Rutherford, 605 F.3d at 489-90 (footnote and internal citations omitted). Indeed, "[t]he Supreme Court 'does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.'" Rutherford, 605 F.3d at 490 (quoting Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000)). The Court thus concludes that in a situation where not all of the parties to a state court action are present in a federal court FAA action to compel arbitration of the state lawsuit, "diversity of citizenship is determined in these cases by the citizenship of the parties named in the proceedings before the district court, plus any indispensable parties who must be joined pursuant

to Rule 19." <u>Rutherford</u>, 605 F.3d at 491. In other words, the Court will not "look through" to the state court action in diversity cases.

The Court also notes that multiple judges within the District of New Mexico have ruled that a court should not "look through" to the parties in the state court action in a diversity case. "The Eighth Circuit held that non-diverse nursing home administrators who were named as defendants in the underlying state tort action were not necessary and indispensable parties in the nursing home's federal court action to compel arbitration, and thus their citizenship did not destroy diversity jurisdiction." <u>THI of N. M. at Hobbs Ctr, LLC v. Patton</u>, 851 F. Supp. 2d 1281, 1286 (D.N.M. 2011)(Hansen, J.)("<u>THI</u>")(citing <u>Rutherford</u>, 605 F.3d at 491). Judge Hansen followed the Eighth Circuit's ruling, which "determined that *Vaden* did not implicitly overrule the pre-*Vaden* circuit decisions that were unanimous in looking only to the citizenship of the named parties in the federal action." <u>THI</u>, 851 F. Supp. 2d at 1287 (citing <u>Rutherford</u>, 605 F.3d at 489). <u>See THI of N. M. at Vida Encantada, LLC v. Lovato</u>, 848 F. Supp. 2d 1309, 1317 (D.N.M 2012)(Vázquez, J.)("*Vaden* . . . is inapplicable here, where jurisdiction is founded on diversity of citizenship between the parties, rather than on the presence of a federal question."); <u>Life Care Ctrs. of Am., Inc. v. Estate of Blair by and through Rhoden</u>, No. CIV 17-0249, 2017 WL 3432209, at **5, 7 (D.N.M. Aug. 9, 2017)(Molzen, M.J.)(noting that "the Eighth Circuit has explicitly rejected th[e] proposition" that "federal jurisdiction over a diversity-based . . . petition to compel arbitration is simply unavailable when a 'look through' to the underlying controversy implicates non-diverse state court defendants," and holding the same).

4.    **Amount in Controversy in Motions to Compel Arbitration.**

Unlike determining the citizenship of the parties, a court may "look through" to a possible arbitration award when evaluating the amount in controversy.  The Tenth Circuit has held that "[t]his court . . . finds persuasive the holding of other circuits that 'look through to the possible award resulting from the desired arbitration' to determine the amount in controversy." Woodmen of the World Life Ins. Soc'y v. Manganaro, 342 F.3d 1213, 1217 (10th Cir. 2003)(quoting Doctor's Assocs., Inc. v. Hamilton, 150 F.3d 157, 160 (2d Cir. 1998)).  "Accordingly, the requisite jurisdictional amount will be satisfied in a suit to compel arbitration unless it is legally certain that the stakes of the arbitration are $75,000 or less." Woodmen of the World Life Ins. Soc'y v. Manganaro, 342 F.3d at 1217.  See THI of N. M. at Las Cruces, LLC v. Fox, 727 F. Supp. 2d 1195, 1211 n.6 (D.N.M. 2010)(Browning, J.).

## LAW REGARDING ARBITRATION AGREEMENTS

An arbitration agreement is a contract or a provision in a contract whereby parties agree to "settle by arbitration a controversy . . . arising out of such contract or transaction."  9 U.S.C. § 2. Both federal and New Mexico law reflect a public policy in favor of arbitration agreements. See Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994)("There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration."); United Tech. & Res., Inc. v. Dar Al Islam, 1993-NMSC-005, ¶ 11, 846 P.2d 307, 309 ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'"  (quoting Dairyland

Ins. v. Rose, 1979-NMSC-021, ¶ 14, 591 P.2d 281, 284)). To be enforceable, an arbitration agreement must be validly formed pursuant to state contract law principles -- e.g., the arbitration agreement must not be illusory or unconscionable. See Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d 466, 469 ("To determine whether the agreement to arbitrate is valid, courts look to general state contract law . . . .").

1.    **Federal Law.**

"The FAA reflects the fundamental principle that arbitration is a matter of contract." Rent-A-Center, W., Inc. v. Jackson, 561 U.S. at 67. "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate." Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995). "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." Rent-A-Center, W., Inc. v. Jackson, 561 U.S. at 67-68 (internal citations omitted). The FAA governs motions to compel arbitration involving contracts related to commerce. See 9 U.S.C. §§ 1-16.

Under § 4 of the FAA, a party "aggrieved" by another party's failure "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. If one party's refusal to arbitrate under a written agreement aggrieves another party, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing

the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Section 2, the "primary substantive provision of the Act," <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contrac,"t 9 U.S.C. § 2. "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." <u>Rent-A-Center, W., Inc. v. Jackson</u>, 561 U.S. at 64.

Upon a finding that a matter is referable to arbitration, the FAA also indicates that the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Notwithstanding 9 U.S.C. § 3's terms, however, several Courts of Appeals have concluded that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." <u>Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.</u>, 252 F.3d 707, 709-10 (4th Cir. 2001). <u>See</u> <u>Green v. Ameritech Corp.</u>, 200 F.3d 967, 973 (6th Cir. 2000)("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration."); <u>Bercovitch v. Baldwin Sch., Inc.</u>, 133 F.3d 141, 156 n.21 (1st Cir. 1998); <u>Alford v. Dean Witter Reynolds, Inc.</u>, 975 F.2d 1161, 1164 (5th Cir. 1992); <u>Sparling v. Hoffman Constr. Co.</u>, 864 F.2d 635, 638 (9th Cir. 1988).

The Tenth Circuit has cautioned that, when one of the parties petitions the court to stay an action pending compulsory arbitration, 9 U.S.C. § 3's mandatory language is binding, and it is error for the court to dismiss the action.  See Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d 953, 955 (10th Cir. 1994).  When, however, the party seeking to compel arbitration requests the court for dismissal, and there is no evidence in the record of any party requesting a stay, it is not error for the district court to dismiss the case.  See Armijo v. Prudential Ins. of Am., 72 F.3d 793, 797 (10th Cir. 1995); Cornoyer v. AT&T Mobility Servs., LLC, No. CIV 15-0474, 2016 WL 6404853, at *7-8 (D.N.M. Oct. 5, 2016)(Browning, J.); Thompson v. THI of N. M. at Casa Arena Blanca, LLC, No. CIV 05-1331, 2006 WL 4061187, at *16 (D.N.M. Sept. 12, 2006)(Browning, J.)(dismissing a case where the plaintiff neither requested a stay nor argued that some claims may not be arbitrable); Evangelical Lutheran Good Samaritan Soc'y v. Moreno, 277 F. Supp. 3d 1191, 1210 (D.N.M. 2017)(Browning, J.).

## 2.        New Mexico Law.

New Mexico's Uniform Arbitration Act, N.M. Stat. Ann. §§ 44-7a-1 to -32 ("NMUAA"), provides that an agreement to submit any controversy arising between the parties to arbitration is "valid, enforceable and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract."  N.M. Stat. Ann. § 44-7A-7(a).  If the court concludes that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate.  See N.M. Stat. Ann. § 44-7A-8(a).  Where the provision for arbitration is disputed, the court's function is to determine

whether there is an agreement to arbitrate and to order arbitration where an agreement is found. See N.M. Stat. Ann. § 44-7A-8(a).

Similar to the federal courts' interpretation of the FAA, New Mexico courts have viewed the NMUAA as an expression of a public policy favoring arbitration. See United Tech. & Res., Inc. v. Dar Al Islam, 1993-NMSC-005, ¶ 11, 846 P.2d at 309 ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'")(quoting Dairyland Ins. v. Rose, 1979-NMSC-021, ¶ 14, 591 P.2d at 284).   More specifically, New Mexico courts have construed the NMUAA's legislative purpose as an attempt to reduce the court's caseload. See Bd. of Educ. Taos Mun. Sch. v. Architects, Taos, 1985-NMSC-102, ¶ 10, 709 P.2d 184, 186 ("A concern for preserving scarce judicial resources lies at the heart of the preference for arbitration."); Dairyland Ins. v. Rose, 1979-NMSC-021, ¶ 19, 591 P.2d at 285 (concluding that "the legislative intent in enacting the [NMUAA], and the policy of the courts in enforcing it, is to reduce caseloads in the courts, not only by allowing arbitration, but also by requiring controversies to be resolved by arbitration where contracts or other documents so provide").   In New Mexico, when the court finds that an arbitration agreement exists and is valid, then, in accordance with the NMUAA, the court has a duty to enforce the agreement's provisions and order adherence to that arbitration agreement.   See Bernalillo Cty. Med. Ctr. Emps' Ass'n Local 2370 v. Cancelosi, 1978-NMSC-086, ¶¶ 4-5, 587 P.2d 960, 961.   Consistent with this understanding, the Supreme Court of New Mexico has interpreted the NMUAA to limit the court's role to determining if an arbitration agreement exists and, if so, to order the parties to arbitration:

> When a broad and general arbitration clause is used, as in this case, the court should be very reluctant to interpose itself between the parties and the arbitration upon which they have agreed. When the parties agree to arbitrate any potential claims or disputes arising out of their relationships by contract or otherwise, the arbitration agreement will be given broad interpretation unless the parties themselves limit arbitration to specific areas or matters. Barring such limiting language, the courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration. If not, arbitration should be refused.

K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d 752, 754.

Accordingly, in New Mexico, parties entering a contract providing for the resolution of disputes through arbitration are bound by their agreement to arbitrate. See Christmas v. Cimarron Realty Co., 1982-NMSC-079, ¶¶ 7-10, 648 P.2d 788, 790; Evangelical Lutheran Good Samaritan Soc'y v. Moreno, 277 F. Supp. 3d at 1211.

### 3. Public Policy Favoring Enforcement of an Arbitration Agreement.

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d at 1488-89. See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)("Congress declared a national policy favoring arbitration."); Hill v. Ricoh Ams. Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'")(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24). Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision. See Volt Info. Scis., Inc. v. Bd. of Trs., 489 U.S. 468, 474 (1989)(stating that Congress designed the FAA to "overrule the judiciary's longstanding

refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts."). When arbitration's applicability is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25). New Mexico state courts also view arbitration as a "highly favored" method of resolving disputes, "in part because '[i]t promotes both judicial efficiency and conservation of resources by all parties.'" Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 5, 107 P.3d 11, 13 (alteration original). See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8.

### 4. **A Valid Arbitration Agreement's Existence.**

The Supreme Court has noted that "[a]rbitration is simply a matter of contract between parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)(internal citations omitted). Courts must interpret arbitration clauses liberally, and all doubts must be resolved in favor of arbitration. See Hicks v. Cadle, Co., 355 F. App'x 186, 192 (10th Cir. 2009)("We resolve any doubts in favor of arbitrability.")(citing Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 209 (1991)); Armijo v. Prudential Ins. of Am., 72 F.3d at 797-98 (stating that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," and that "arbitration clauses must be interpreted liberally, and any doubts

should be resolved in favor of arbitration," and holding that the plaintiffs had "failed to rebut the presumption of arbitrability.").

While "the presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement, . . . this presumption disappears when the parties dispute the existence of a valid arbitration agreement." Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002). See Riley Mfg. Co. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998)("When the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."); Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 112 F. Supp. at 1157.

In the Tenth Circuit, and in the courts of New Mexico, the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997). See K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 ("[T]he courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration."). "Like other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" Rent-A-Center, W., Inc. v. Jackson, 561 U.S. at 68 (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)). See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8-11. Cf. K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 (holding that, because

a valid arbitration clause existed, the parties had to arbitrate all disputes when the "subject matter of the dispute has a reasonable relationship to the subject matter of the contract").

5.        **Consideration and Illusory Arbitration Agreements.**

"To determine whether the agreement to arbitrate is valid, courts look to general state contract law, with the caveat that state laws that are specifically hostile to arbitration agreements are preempted by the FAA." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d 466, 469 (citations omitted). "It is for the trial court, and not the arbitrator, to decide whether a valid agreement to arbitrate exists." Sisneros v. Citadel Broad. Co., 2006-NMCA-102, ¶ 13, 142 P.3d 34, 39. It is a fundamental tenet of contract law "that each party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby." Ballard v. Chavez, 1994-NMSC-007, ¶ 8, 868 P.2d 646, 648. Under New Mexico law, "[a] legally enforceable contract requires evidence supporting the existence of an offer, an acceptance, consideration, and mutual assent." Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 6, 107 P.3d at 14 (internal quotation marks omitted)(quoting Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 9, 80 P.3d at 498).

"Consideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do." Talbott v. Roswell Hosp. Corp., 2005-NMCA-109, ¶ 16, 118 P.3d 194, 198. "A valid contract must possess mutuality of obligation. Mutuality means both sides must provide consideration." Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 12, 80 P.3d 495, 499. Absent evidence of a "bargained-for exchange between

the parties," an agreement lacks consideration and is unenforceable.  <u>Smith v. Vill. of Ruidoso</u>, 1999-NMCA-151, ¶ 33, 994 P.2d 50, 58.  "Under general New Mexico contract law, an agreement that is subject to unilateral modification or revocation is illusory and unenforceable."  <u>Salazar v. Citadel Commc'ns Corp.</u>, 2004-NMSC-013, ¶ 9, 90 P.3d at 469.  "This principle applies equally to agreements to arbitrate."  <u>Salazar v. Citadel Commc'ns Corp.</u>, 2004-NMSC-013, ¶ 9, 90 P.3d at 469.  The Supreme Court of New Mexico has concluded that, if a party "reserves the right to change the agreement unilaterally, and at any time," the party "has not really promised anything at all and should not be permitted to bind the other party."  <u>Salazar v. Citadel Commc'ns Corp.</u>, 2004-NMSC-013, ¶ 9, 90 P.3d at 469.

Several cases arising in New Mexico provide examples of illusory agreements to arbitrate. For instance, in <u>Dumais v. American Golf Corp.</u>, 150 F. Supp. 2d 1182 (D.N.M. 2001)(Vázquez, J.), the Honorable Martha A. Vázquez, United States District Judge for the District of New Mexico, was asked to determine if an arbitration provision contained in an employment handbook was enforceable, and precluded an employee from bringing a claim for sexual harassment and constructive discharge under Title VII, against her employer.  <u>See</u> 150 F. Supp. 2d at 1193.  The employer suggested that two documents which the employee executed when she became an employee constituted a valid agreement to arbitrate such disputes.  <u>See</u> 150 F. Supp. 2d at 1193. The documents included: (i) a form acknowledging that the employee had read and would abide by the employer's arbitration program -- the "We Can Work It Out" program; and (ii) an acknowledgment form that the employee would comply with the employment handbook and the

"We Can Work It Out" program. 150 F. Supp. 2d at 1193. Judge Vázquez concluded that the arbitration agreement embodied in the "We Can Work It Out" program was illusory, because it was executed over two months after the employee began her employment. 150 F. Supp. 2d at 1193. The agreement also modified the employment terms -- it divested the employee's right to have disputes heard in an Article III court -- without consideration in return for that divestiture. 150 F. Supp. 2d at 1193. Judge Vázquez noted that inconsistent provisions in the employment agreement made it unclear whether the arbitration agreement was binding on the employer and that, therefore, the potentially unilateral character of the promise to arbitrate made it illusory. See 150 F. Supp. 2d at 1194. The Tenth Circuit affirmed Judge Vázquez' holding in a de novo review on appeal. See Dumais v. American Golf Corp, 299 F.3d 1216, 1220 (10th Cir. 2002). In affirming Judge Vázquez, the Tenth Circuit stated: "We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory." 299 F.3d at 1219.

Additionally, in Heye v. American Golf Corp., the Court of Appeals of New Mexico considered a question similar to the one that the federal court addressed in Dumais v. American Golf Corp. See Heye v. Am. Golf Corp., 2003-NMCA-138, ¶¶ 10-15, 80 P.3d at 499-500. The Court of Appeals of New Mexico assessed the validity of an arbitration agreement in an employment contract that bound the employee, but not the employer, to arbitrate and that the employee signed after she was hired. See 2003-NMCA-138, ¶¶ 10-15, 80 P.3d at 499-500. In concluding that the agreement was illusory, the Court of Appeals of New Mexico noted that the

agreement permitted the employer to "amend, supplement, rescind or revise the policy regarding arbitration at its whim." 2003-NMCA-138, ¶ 13, 80 P.3d at 499. Although the employee was bound to arbitrate, the employer "remain[ed] free to selectively abide by its promise to arbitrate," and therefore the employer's "promise to arbitrate [did] not provide the consideration necessary to enforce the arbitration agreement." 2003-NMCA-138, ¶ 15, 80 P.3d at 500.

Next, in <u>Piano v. Premier Distributing Co.</u>, the plaintiff worked as an administrative assistant for the defendant on an at-will employment basis. <u>See</u> 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13. During plaintiff's employment, the defendant presented her with an arbitration agreement to sign, with the understanding that, if she did not sign it, the defendant would terminate her employment. <u>See</u> 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13. The plaintiff signed the agreement, and, later, when defendant terminated her employment, she brought suit against the defendant for wrongful termination; the defendant moved to compel arbitration. <u>See</u> 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13. On appeal of the district court's denial of the defendant's motion to compel arbitration, the Court of Appeals of New Mexico addressed whether an employer's promise of continued at-will employment constitutes sufficient consideration for an employee's promise to submit her claims to arbitration. <u>See</u> 2005-NMCA-018, ¶¶ 6-8, 107 P.3d at 14. The Court of Appeals of New Mexico concluded that the employer's promise was illusory and explained: "The implied promise of continued at-will employment placed no constraints on Defendant's future conduct; its decision to continue Plaintiff's at-will employment was entirely discretionary." 2005-NMCA-018, ¶ 8, 107 P.3d at 14.

In <u>Lumuenemo v. Citigroup, Inc.</u>, No. 08-cv-0830, 2009 WL 371901 (D. Colo. Feb. 12, 2009)(Daniel, J.), the Honorable Wiley Y. Daniel, Chief United States District Judge for the District of Colorado, distinguished the facts in <u>Piano v. Premier Distributing Co.</u> from the facts in <u>Lumuenemo v. Citigroup, Inc.</u>, stating:

> Plaintiff cites <u>Piano v. Premier Distributing Co.</u>, 107 P.3d 11 (N.M. Ct. App. 2004), as support for her argument. However, the holding in <u>Piano</u> turned on the fact that the plaintiff was an at-will employee prior to signing the arbitration agreement, and therefore, the implied promise of continued at-will employment did not constitute consideration. <u>Id.</u> at 60. <u>Piano</u> is distinguishable from the facts before this Court. Here, Defendant's initial hiring of Plaintiff was conditioned on her consent to the terms of the Arbitration Agreement; thus, there was consideration in the form of employment. Further, Defendant does need Plaintiff's approval -- Plaintiff had up to 30 days to contest any changes to the Arbitration Agreement and/or to decide whether to continue employment based on such changes. Moreover, the holding in <u>Piano</u> is not binding on this court.

<u>Lumuenemo v. Citigroup, Inc.</u>, 2009 WL 371901, at *5.

Further, in <u>Salazar v. Citadel Communications Corp.</u>, the Supreme Court of New Mexico held that, because Citadel Communications reserved the right to modify any provision of its employee handbook at any time, including the arbitration agreement contained therein, the agreement to arbitrate was "an unenforceable illusory promise." <u>Salazar v. Citadel Commc'ns Corp.</u>, 2004-NMSC-013, ¶ 16, 90 P.3d at 471. In contrast, the Court of Appeals of New Mexico in <u>Sisneros v. Citadel Broadcasting Co.</u> concluded that the arbitration policy at issue restricted Citadel Broadcasting's right to terminate or amend the agreement to arbitrate, and, thus, when Citadel Broadcasting terminated Sisneros' employment, Citadel Broadcasting was bound to arbitrate the dispute, just as Sisneros was bound to arbitrate, and therefore mutual obligation

existed and the arbitration agreement was not illusory. See Sisneros v. Citadel Broad. Co., 2006-NMCA-102, ¶ 34, 142 P.3d at 43. Similarly, in Hardin v. First Cash Financial Services, Inc, 465 F.3d 470 (10th Cir. 2006), the arbitration agreement required the employer to provide ten-days' notice to its current employees before amending or terminating the arbitration agreement, and provided that the employer could not amend the agreement if it had actual notice of a potential dispute or claim, nor could it terminate the agreement as to any claims which arose before the termination date. See 465 F.3d at 478. The Tenth Circuit, applying Oklahoma contract law, concluded that the "limitations [were] sufficient to avoid rendering the parties' Agreement to arbitrate illusory." Hardin v. First Cash Fin. Servs., Inc., 465 F.3d at 478. See Pennington v. Northrop Grumman Space & Mission Sys. Corp., 269 F. App'x 812, 820 (10th Cir. 2008)(unpublished)(holding that "the reciprocal obligation to arbitrate provides the requisite consideration."); Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics,

LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[18] If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court

---

[18]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state"))).[19]  The Court may also rely on

---

[19]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[20]  Ultimately, "the Court's task is to predict what the

---

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."  (emphasis and title case omitted)).

[20]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit caselaw, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless

whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit caselaw against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening caselaw directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight

states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's Federal Practice</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court,

and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 862 (10th Cir. 2003)(McConnell, J.) the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

_Wankier v. Crown Equip. Corp._, 353 F.3d at 866.  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," _Wankier v. Crown Equip. Corp._, 353 F.3d at 866 -- might additionally compel the determination that any intervening caselaw must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, former United States Circuit Judge for the Tenth Circuit, limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even _Koch v. Koch Industries, Inc._, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which _Wankier v. Crown Equipment Corp._ relies, uses the more inclusive definition.  In fact, _Wankier v. Crown Equipment Corp._ quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of _Allen_ [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." _Koch v. Koch Indus., Inc._, 203 F.3d at 1231.

_Wankier v. Crown Equip. Corp._, 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In _Kokins v. Teleflex, Inc._, the Tenth Circuit, quoting _Wankier v. Crown Equipment Corp._, refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  _See_ _Kokins v. Teleflex, Inc._, 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided _Biosera_[, Inc. v. Forma Scientific, Inc._, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's _highest court_.'"  (emphasis in original)(quoting _Wankier v. Crown Equip. Corp._, 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at

state supreme court would do." <u>Wade v. EMCASCO Ins.</u>, 483 F.3d at 666. <u>Accord</u> <u>Mosley v. Titus</u>, 762 F. Supp. 2d at 1332 (citation omitted); <u>Rimbert v. Eli Lilly & Co.</u>, 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.).

## LAW REGARDING DIVERSITY JURISDICTION AND CHOICE OF LAW

When a court's jurisdiction rests on diversity of citizenship under 28 U.S.C. § 1332, the court should look to the forum state's choice-of-law rules to determine which state's substantive law to apply. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941); <u>Pepsi-Cola Bottling Co. v. PepsiCo., Inc.</u>, 431 F.3d 1241, 1255 (10th Cir. 2005). In New Mexico, choice-of-law analysis is a two-step process. <u>See</u> <u>Mosley v. Titus</u>, 762 F. Supp. 2d at 1314 (citing <u>Terrazas v. Garland & Loman, Inc.</u>, 2006-NMCA-111, ¶ 14, 142 P.3d 374, 377). "First, the Court must characterize the 'area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue.'" <u>Mosley v. Titus</u>, 762 F. Supp. 2d at 1314 (quoting <u>Terrazas v. Garland & Loman, Inc.</u>, 2006-NMCA-111, ¶ 11, 142 P.3d at 377). The next step is to apply New Mexico's choice-of-law rule. <u>See</u> <u>Mosley v. Titus</u>, 762 F. Supp. 2d at 1314 (citing <u>Terrazas v. Garland & Loman, Inc.</u>, 2006-NMCA-111, ¶ 15, 142 P.3d at 377).

---

tension with the above-quoted Supreme Court precedent, as well as its own prior caselaw. <u>Moore's Federal Practice</u> lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." <u>Moore's Federal Practice</u> § 124.22[4] (citing <u>State Farm Mut. Auto. Ins. v. Travelers Indem. Co.</u>, 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of <u>Erie</u>.

"In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place." Mosley v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d 386, 390). The place of the wrong is the location of the last act necessary to complete the injury. See Mosley v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d at 390). "Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred." Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing First Nat'l Bank v. Benson, 1976-NMCA-072, ¶ 6, 553 P.2d 1288, 1289).

## LAW REGARDING ABSTENTION

In Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976)("Colorado River"), the Supreme Court announced an abstention doctrine under which a federal court may, in exceptional circumstances, dismiss a federal suit "due to the presence of a concurrent state proceeding for reasons of wise judicial administration." 424 U.S. at 817-18. The Supreme Court reviewed the decision of a district court to dismiss an action brought by the United States in deference to an ongoing state court proceeding. See 424 U.S. at 805-06. The United States sought a declaration of its water rights, the appointment of a water master, and injunctive relief. See id. at 284. In overturning the Tenth Circuit and affirming the district court's determination, the Supreme Court articulated several factors that district courts should consider in assessing whether to grant dismissals or stays in instances where similar issues are being concurrently litigated in state and federal courts. Those factors are: (i) whether the questions

before the court present difficult questions of state law, are governed by state as opposed to federal law,[21] or bear on policy problems of substantial import to the state; (ii) whether principles of wise judicial administration and economy suggest deferring to the state courts; (iii) which court first assumed jurisdiction over any property at issue; (iv) whether the federal forum is less convenient; (v) whether allowing the matter to go forward in state court would avoid piecemeal litigation; and (vi) in which order jurisdiction was obtained by the concurrent forums.  See Colorado River, 424 U.S. at 814-19; Burford v. Sun Oil Co., 319 U.S. 315 (1943).  A finding of parallel proceedings is a threshold condition for engaging in the Colorado River analysis.  See Fox v. Maulding, 16 F.3d 1079, 1081 (10th Cir. 1994).  Colorado River abstention does not require identical parties and issues.  Rather, state and federal proceedings are sufficiently parallel if "substantially the same parties litigate substantially the same issues."  Fox v. Maulding, 16 F.3d at 1081 (quotation omitted).

In applying the factors set forth in Colorado River, the Supreme Court in Moses H. Cone Memorial Hospital v. Mercury Construction Corp. stated: "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required."  460 U.S.

---

[21]With regard to this factor, its development can be traced from Colorado River, 424 U.S. at 825-26, to Will v. Calvert Fire Insurance Co., 437 U.S. 655, 667, 668-77 (1978), and on to Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. at 23.

at 15-16.  Addressing the factor concerning in which order jurisdiction was obtained, the Supreme Court asserted that:

> This factor, as with the other <u>Colorado River</u> factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand.  Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.  <u>Colorado River</u> illustrates this point well.  There, the federal suit was actually filed first.  Nevertheless, we pointed out as a factor favoring dismissal "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss."

<u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. at 21-22 (quoting <u>Colorado River</u>, 424 U.S. at 820).

District courts may only stay or dismiss such actions when "extraordinary circumstances," as established by a weighing of the factors laid out in <u>Colorado River</u>, warrant such action.  <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. at 14-15.  "Colorado River abstention is based on the policy of conserving judicial resources in situations involving the contemporaneous exercise of concurrent jurisdictions."  <u>Grimes v. Crown Life Ins.</u>, 857 F.2d 699, 707 (10th Cir. 1988).  Highlighting the distinction between the <u>Colorado River</u> abstention doctrine and the abstention doctrine in <u>Brillhart v. Excess Insurance of America</u>, 316 U.S. 491 (1942), the Fifth Circuit, in a case contained within a stream of cases to which the Tenth Circuit has cited favorably, has held:

> <u>Brillhart</u> abstention is applicable "when a district court is considering abstaining from exercising jurisdiction over a declaratory judgement action.  In contrast, when actions involve coercive relief the trial court must apply the standards enunciated by the Court in <u>Colorado River</u>."  [Defendant] concedes that [Plaintiff] has requested both declaratory and injunctive relief, but argues that <u>Brillhart</u> is

nevertheless applicable because [Plaintiffs] claims for coercive relief are merely
"ancillary" to its request for declaratory relief. This Circuit has rejected similar
arguments on at least two occasions. When a party seeks both injunctive and
declaratory relief, the appropriateness of abstention must be assessed according to
the doctrine of <u>Colorado River</u>; the only potential exception to this general rule
arises when a party's request for injunctive relief is either frivolous or is made
solely to avoid application of the <u>Brillhart</u> standard.

<u>Black Sea Inv., Ltd., v. United Heritage Corp.</u>, 204 F.3d 647, 652 (5th Cir. 2000)(citations

ommitted?). <u>See</u> <u>United States v. Las Cruces</u>, 289 F.3d at 1181-82 (stating that "in a suit seeking

coercive relief as well as declaratory relief,[the] broad <u>Brillhart</u> standard [is] inappropriate").

In <u>Moses H. Cone Memorial Hospital v. Mercury Construction Corp.</u>, the defendant moved

for an order compelling arbitration under 9 U.S.C. § 4. <u>See</u> 460 U.S. at 4. The district court

applied the <u>Colorado River</u> abstention doctrine and stayed the diversity action pending resolution

of a pending concurrent state-court action. The United States Court of Appeals for the Fourth

Circuit reversed the stay and the Supreme Court affirmed the Fourth Circuit's reversal. Applying

the <u>Colorado River</u> factors, the Honorable William J. Brennan, then-Associate Justice of the

United States Supreme Court, writing for the majority, wrote:

> [I]t is clear that there was no showing of the requisite exceptional circumstances to
> justify the District Court's stay. The Hospital concedes that the first two factors
> mentioned in <u>Colorado River</u> are not present here. There was no assumption by
> either court of jurisdiction over any res or property, nor is there any contention that
> the federal forum was any less convenient to the parties than the state forum. The
> remaining factors -- avoidance of piecemeal litigation, and the order in which
> jurisdiction was obtained by the concurrent forums -- far from supporting the stay,
> actually counsel against it.

460 U.S. at 18.  The Supreme Court found that there was not piecemeal litigation, because "[a]lthough the Hospital will have to litigate the arbitrability issue in federal rather than state court, that dispute is easily severable from the merits of the underlying disputes."  460 U.S. at 20.  The Hospital argued that the federal court stay was proper because the state court suit was filed nineteen days before the federal suit.  The Supreme Court held that, although the state court suit was filed nineteen days before the federal suit, that fact did not favor abstention, because Mercury's cause of action under § 4 for an arbitration order was filed because the Hospital refused to arbitrate, and that refusal did not occur until less than a day before the Hospital filed its state suit, and thus Mercury had no reasonable opportunity to file its § 4 petition first.  See 460 U.S. at 21.  The Supreme Court also expressed concern over the "probable inadequacy of the state-court proceeding to protect Mercury's rights."  460 U.S. at 26.  Justice Brennan explained:

> In many cases, no doubt, a § 3 stay is quite adequate to protect the right to arbitration.  But in a case such as this, where the party opposing arbitration is the one from whom payment or performance is sought, a stay of litigation alone is not enough.  It leaves the recalcitrant party free to sit and do nothing -- neither to litigate nor to arbitrate.  If the state court stayed litigation pending arbitration but declined to compel the Hospital to arbitrate, Mercury would have no sure way to proceed with its claims except to return to federal court to obtain a § 4 order -- a pointless and wasteful burden on the supposedly summary and speedy procedures prescribed by the Arbitration Act.

460 U.S. at 27.  In his dissent, the Honorable William H. Rehnquist, then-Associate Justice of the United States Supreme Court, with whom the Honorable Warren E. Burger, then-Chief Justice of the United States Supreme Court and the Honorable Sandra Day O'Connor, then-Associate Justice of the United States Supreme Court joined, argued that the district court's stay order was not a

final judgment for purposes of appeal.  See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 30 (Rehnquist, J., dissenting).  Justice Rehnquist stated: "Unless there is some reason to believe that the state court will resolve this factual question wrongly, which the Court quite rightly disclaims, I do not see how this issue is more important than any other interlocutory order that may place a litigant at a procedural disadvantage."  460 U.S. at 35 (Rehnquist, J., dissenting).

In Nationstar Mortgage, LLC v. Knox, 351 F. App'x 844 (5th Cir. 2009), the Fifth Circuit reviewed the district court's decision to decline jurisdiction and deny a motion to compel arbitration because there was a pending state-court proceeding.  See 351 Fed. Appx. at 847 (the district judge declined to exercise jurisdiction based on the "principles of equity, comity, and federalism.").  The Fifth Circuit, on appeal, stated: "[F]or purposes of judicial efficiency, although the district court did not expressly rely on the Colorado River abstention doctrine, we may consider *sua sponte* whether the requirements of Colorado River are met."  351 F. App'x at 851.  The Fifth Circuit found that the first two Colorado River factors were not present and determined that the third factor -- the possibility of piecemeal litigation -- counseled against abstention because "[a]llowing a federal court to order arbitration, even where a state court may construe an arbitration clause differently, is fully consistent with . . . established congressional intent."  Nationstar Mortg., LLC v. Knox, 351 F. App'x at 851-52 (internal quotation marks omitted)(alteration in original?)(quoting Brown v. Pac. Life Ins., 462 F.3d 384, 396 (5th Cir. 2006)("Brown")).  The Fifth Circuit also found that the fifth factor -- the extent federal law provided the rules of decision on the merit -- favored federal jurisdiction because, although the Knoxes' claims in state court

were based on state law, the FAA governed the merits of the federal action.  The Fifth Circuit

found, however, that the fourth factor -- the order in which jurisdiction was obtained by the

concurrent for a -- favored abstention because the state action was filed first, and although

arbitrability was not asserted in state court, Nationstar could have done so and still could do so,

whereas the merits of the federal action had not been reached.  Citation.  The Fifth Circuit also

found that the sixth factor -- the adequacy of the state proceedings in protecting the rights of the

party invoking diversity jurisdiction -- weighed in favor of abstention.  See 351 F. App'x at 852

("Needless to say, we have no reason to doubt the adequacy of the state court's ability to resolve

arbitrability issues.").  After considering the factors and finding that two factors were neutral, two

favored abstention, and two counseled against it, the Fifth Circuit concluded that the district court

did not abuse its discretion in abstaining, stating:

> We are fully cognizant of the "national policy in favor of arbitration."  Brown, 462
> F.3d at 396.  For reasons of "[w]ise judicial administration", Colo. River, 424 U.S.
> at 817, however, abstention was not improper.  As discussed, this diversity action
> is governed by state law (except, of course, the arbitrability issue); the state court
> is subject to, and can likewise apply, the FAA; and the merits of the parties' dispute
> have not been reached in either the state or the federal action.

Nationstar Mortgage, LLC v. Knox, 351 Fed. Appx. at 852.

In Garber v. Sir Speedy, Inc., 930 F. Supp. 267 (N.D. Tex. 1995)(Maloney, J.), aff'd, 91

F.3d 137 (5th Cir. 1996), the state district court stayed a pending litigation and ordered arbitration

under the parties' franchise agreement.  The plaintiffs refused to participate in the arbitration, and

the defendant obtained a judgment against the plaintiffs for breach of the franchise agreement.

Later, the plaintiffs filed another state suit, seeking to enjoin the defendant from engaging in a second arbitration. The defendant removed to federal court and moved for the court to either grant summary judgment or dismiss, stay, or abate the case pending resolution of the first lawsuit between the parties. See 930 F. Supp. at 270. In its request to stay the case pending resolution of the first lawsuit, the defendant relied on the principles articulated in Colorado River and Moses H. Cone Hospital v. Mercury Construction Corp. See 930 F. Supp. at 270. The Honorable Robert B. Maloney, United States District Judge for the Northern District of Texas, found that the first three Colorado River factors counseled against a stay in the case because there was no res or property for a court to gain control over, the relative inconvenience of the forum was not at issue, and the danger of piecemeal litigation was slight, as the pending state court action was stayed when the court compelled arbitration. Judge Maloney found, however, that the remaining factors favored abstention. Specifically, the first lawsuit had been pending for over three and one-half years, while the federal suit was in its initial pleading stage. Moreover, state law would provide the rules of decision, and there was "no reason to suppose that the parties do not enjoy adequate protection in the [state] court." 930 F. Supp. at 270. Judge Maloney explained:

> Because the Colorado River/Moses Cone factors should be weighed in favor of exercising jurisdiction, a mechanical application of the factors would counsel against a stay. However, further analysis is required in light of the unique factual circumstances of this case. . . . Absent a stay in this case, the driving policy of the Arbitration Act would be circumvented. The Court takes judicial notice of the fact an apparently arbitrable dispute has involved three Texas trial courts, one California trial court, one Texas appeals court, one California appeals court, and one federal district court, all without final resolution of the dispute between the

parties. As such, a stay in this case is appropriate to effectuate the policies underlying the Arbitration Act.

In addition, a stay in this case is appropriate to discourage forum shopping. Litigants should be discouraged from filing suits in courts with concurrent jurisdiction for the purpose of avoiding adverse rulings in the court in which the action was originally filed. This factor has been recognized by other courts in the context of deciding whether to stay a case pending concurrent state court litigation. See American Intern. Underwriters v. Continental Ins., 843 F.2d 1253 (9th Cir. 1988). As the action filed in Dallas County was an apparent attempt to circumvent the adverse ruling of the Nacogdoches court, the Garbers should not be rewarded for forum shopping.

930 F. Supp. at 271.

## ANALYSIS

The Court concludes that the parties have established diversity jurisdiction, that tribal exhaustion should be construed as a rule 12(b)(6) motion to dismiss, that -- under the current state of the law -- none of the exceptions to the Tribal exhaustion doctrine apply, and that World Fuel must first exhaust its Tribal remedies in the Nambe Pueblo Tribal Court and the Southwest InterTribal Court of Appeals. Because the Nambe Pueblo Tribal Court must first decide the issues presented to the Court, the Court stays the action against Nambe Corp. as a matter of comity. Accordingly, the Court will stay the proceedings pending World Fuel's exhaustion of their available Tribal remedies, including Tribal appellate review, if any.

## I.     **THE PARTIES HAVE ESTABLISHED DIVERSITY JURISDICTION**.

World Fuel invokes federal diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), "because (a) the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and (b) World Fuel is a citizen of the states of Texas and Florida, and Nambe is a citizen

of the State of New Mexico." Complaint ¶ 5, at 2. Original diversity jurisdiction under 28 U.S.C. § 1332(a) requires complete diversity of citizenship among the parties and an amount in controversy exceeding $75,000.00. See Johnson v. Rodrigues (Orozco), 226 F.3d 1103, 1107 (10th Cir. 2000). Complete diversity of citizenship "exists only if no plaintiff and no defendant are citizens of the same state." Middleton v. Stephenson, 749 F.3d 1197, 1200 (10th Cir. 2014). For diversity jurisdiction purposes, "a person is a citizen of a state if the person is domiciled in that state," i.e., if the "person resides there and intends to remain there indefinitely." Middleton v. Stephenson, 749 F.3d at 1200 (citing Crowley v. Glaze, 710 F.2d at 678). See Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 30-31 (1989). A corporation is "deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." Gadlin v. Sybron Int'l Corp., 222 F.3d at 799 (internal quotation marks omitted)(quoting 28 U.S.C. § 1332(c)(1)). In determining a corporation's principal place of business, "a court should look to the 'total activity of the company' or the 'totality of the circumstances,' considering 'the character of the corporation, its purposes, the kind of business in which it is engaged, and the situs of its operations.'" Gadlin v. Sybron Int'l Corp., 222 F.3d at 799 (quoting Amoco Rocmount Co. v. Anshutz Corp., 7 F.3d 909, 915 & n.2 (10th Cir. 1993)).

Here, it is undisputed that the parties are completely diverse. The parties agree that World Fuel is a corporation duly organized and existing under the laws of the State of Texas, with its principal place of business in the State of Florida. See Complaint ¶ 1, at 1. Nambe Corp. is a federally chartered corporation organized under the laws of the United States, pursuant to 25

U.S.C. § 477, with its principal place of business in the State of New Mexico. See Complaint ¶ 3, at 1. The Supreme Court has held that a federally chartered corporation is not a citizen of any one state. See Bankers' Tr. Co. v. Texas & P. Ry., 241 U.S. 569, 572-73 (1916)(concluding that a railroad company "is not a citizen of any state. It was incorporated under acts of Congress, not under state laws; and its activities and operations were not to be confined to a single state, but to be carried on, as in fact they are, in different states.").[22]

The Tenth Circuit has held that Indian Tribes "are not citizens of any state for purposes of diversity jurisdiction." Gaines v. Ski Apache, 8 F.3d 726, 729 (10th Cir. 1993)(citing Standing Rock Sioux Indian Tribe v. Dorgan, 505 F.2d 1135, 1140 (8th Cir. 1974); Oneida Indian Nation v. Oneida Cty., 464 F.2d 916, 922-23 (2d Cir. 1972)). The Tenth Circuit has held, however, that a Tribal corporation "chartered under the Indian Reorganization Act, 25 U.S.C. § 477 . . . may be

---

[22]Two "limited, well-defined exceptions" to the general rule that federally chartered corporations are ineligible for diversity jurisdiction have emerged, although the Tenth Circuit has commented on neither. Lehman Bros. Bank, FSB v. Frank T. Yoder Mortg., 415 F. Supp. 2d 636, 640 (E.D. Va. 2006)(Ellis, J.). First, Congress may provide for a federally chartered corporation to have citizenship in a particular state, or Congress may incorporate the federally chartered corporation as a body corporate of a particular state. See Lehman Bros. Bank, FSB v. Frank T. Yoder Mortg., 415 F. Supp. 2d at 640 (citing Iceland Seafood Corp. v. Nat'l Consumer Coop. Bank, 285 F. Supp. 2d 719, 723 (E.D. Va. 2003)(Friedman, J.)). Second, "a federally chartered corporation may be eligible for diversity jurisdiction where its activities are sufficiently localized so that it may be deemed a citizen of a single state." Lehman Bros. Bank, FSB v. Frank T. Yoder Mortg., 415 F. Supp. 2d at 640. See Loyola Fed. Savings Bank v. Fickling, 58 F.3d 603, 606 (11th Cir. 1995)(recognizing localization exception to general rule that federally chartered corporations are ineligible for diversity jurisdiction); Feuchtwanger Corp. v. Lake Hiawatha Fed. Credit Union, 272 F.2d 453, 456 (3d Cir. 1959)(same).

considered a citizen of the state of its principal place of business for diversity jurisdiction purposes." Gaines v. Ski Apache, 8 F.3d at 729 (citing Enterprise Elec. Co. v. Blackfeet Tribe of Indians, 353 F. Supp. 991, 992 (D. Mont. 1973)(Smith, C.J.)). Nambe Corp. is a federally chartered corporation chartered under the IRA. See Federal Charter at 3. Nambe Pueblo and Nambe Corp. are distinct legal entities, although the Tribe wholly owns Nambe Corp. See Federal Charter ¶ 1.03, at 7. Nambe Corp.'s principal place of business is in the state of New Mexico. See Complaint ¶ 3, at 1 ("Respondent Nambe is a federally chartered corporation . . . , with its principal place of business located in Santa Fe, New Mexico.").[23] Under Tenth Circuit law, therefore, Nambe Corp. is a citizen of New Mexico for diversity purposes.

At the hearing, World Fuel stated that the Court has diversity jurisdiction over the case, and Nambe Corp. did not dispute World Fuel's characterization of the Court's jurisdiction. See Tr. at 37:2-15 (Zaron). The Aug. 8, 2018 Letter, incorporated by reference into the Complaint, states:

> On July 27, 2018, World Fuel Services, Inc. d/b/a Alta Fuels ("Alta") sent an invoice to Nambe Pueblo Development Corporation ("Nambe") for $1,929,486.18 based on unpaid taxes owing from Nambe to Alta under the Motor Fuel Supply Agreement (the "Agreement") by and between Alta and Nambe dated May 17, 2017. Nambe did not pay Alta these amounts.

Aug. 8, 2018 Letter at 1. The Court concludes that, because World Fuel is a citizen of Texas and Florida, and Nambe Corp. is a citizen of New Mexico, and the amount in controversy,

---

[23]At the hearing, World Fuel agreed that the Court has diversity jurisdiction over the case. See Tr. at 37:2-15 (Zaron).

$1,929,486.18, exceeds $75,000.00, that the requirements for diversity jurisdiction under 28 U.S.C. § 1332(a) are met.

## II.    THE COURT CONSTRUES THE MOTION AS A MOTION TO DISMISS UNDER 12(b)(6).

The Court first addresses the question whether to construe a motion to dismiss for failure to exhaust Tribal remedies as a 12(b)(1) motion, a 12(b)(6) motion, or as neither.  A rule 12(b)(1) motion is a motion to dismiss for lack of subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1). In the Tenth Circuit, 12(b)(1) motions generally take one of two forms: (i) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction, or (ii) a challenge to the facts on which subject matter jurisdiction is based.  See Ruiz v. McDonnell, 299 F.3d at 1180.  On a facial attack, the court considers the complaint's allegations to be true, see Ruiz v. McDonnell, 299 F.3d at 1180, but on an attack on the facts themselves, the court may not presume the facts' truth and, in resolving disputed jurisdictional facts, may consider affidavits, and documents, and conduct a limited evidentiary hearing, without converting the motion to a summary judgment motion, see Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *8-9.  A rule 12(b)(6) motion authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The court, in evaluating a 12(b)(6) motion, takes all factual allegations in the complaint as true.  See Mobley v. McCormick, 40 F.3d at 340.  A court may also consider documents to which the complaint refers, if they are central to the complaint and their

authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d at

1201 n.3.

Rule 12(b)(1) is an improper vehicle for considering application of the Tribal exhaustion

doctrine.  In Iowa Mutual, the Supreme Court "reversed the Ninth Circuit's dismissal for lack of

subject matter jurisdiction . . . ," holding instead that the Tribal Courts should first consider the

case as a matter of comity.  See Brown v. Washoe Hous. Auth., 835 F.2d 1327, 1328 (10th Cir.

1988).  See also Wellman v. Chevron U.S.A., Inc., 815 F.2d 577, 578 (9th Cir. 1987)("The [district

court's] ruling was correct though based upon the wrong reason.  The dismissal should have been

based on comity, rather than lack of subject matter jurisdiction.").  As the Tenth Circuit has stated,

"considerations of comity . . . require . . . exhaust[ion of] tribal remedies before a federal court"

exercise its jurisdiction over a case, implying that comity considerations require exhaustion even

when a federal court has jurisdiction over a case.  Brown v. Washoe Hous. Auth., 835 F.2d at 1328

(stating that "we note that the exhaustion of tribal remedies is required as a matter of comity, not

because there is no subject matter jurisdiction.").  Tribal exhaustion doctrine does not require a

lack of subject matter jurisdiction, and therefore, construing a motion to dismiss for failure to

exhaust Tribal remedies as a motion to dismiss for lack of subject matter jurisdiction is

inappropriate.  See U.S. for Use & Benefit of Gen. Rock & Sand Corp. v. Chuska Dev. Corp., 55

F.3d 1491, 1493 (10th Cir. 1995)(asserting that a district court must first determine whether it has

subject matter jurisdiction over the case, and, only if it does, may it consider the Tribal exhaustion

issues, because without subject matter jurisdiction, the district court lacks the power to enter an abstention order).

The cases on exhaustion provide little guidance as to whether motions to dismiss for failure to exhaust may be treated as 12(b)(6) motions.[24]  Of the fifteen Tenth Circuit cases on Westlaw

---

[24]At the hearing, Nambe Corp. suggested that Tribal exhaustion is a form of abstention. See Tr. at 20:23-21:2 (Rogers).  The Court explored the law regarding abstention doctrines to determine if it might provide guidance as to how to consider a Tribal exhaustion motion.  Kirsten M. Carlson, Towards Tribal Sovereignty and Judicial Efficiency: Ordering the Defenses of Tribal Sovereign Immunity and Exhaustion of Tribal Remedies, 101 Mich. L. Rev. 569 (2002)("Carlson"), analogizes Tribal exhaustion to abstention doctrines:

> The most analogous state law doctrines to exhaustion under federal law are the abstention doctrines, which contend that state court issues have to be decided before a case can be filed in federal court.  See [Erwin Chemerinsky, Federal Jurisdiction 590,] 735 [(3d ed. 1999)].  The tribal exhaustion doctrine functions like a state abstention doctrine because it stays the federal court's jurisdiction until after the tribal court has heard and decided the merits of the case.  Abstention doctrines are judicially created rules that limit the ability of federal courts to decide issues before them even though the jurisdictional and justiciability requirements have been met.  See Chemerinsky at 735.

Carlson at 576 n.44.  The Supreme Court, in Iowa Mutual, stated that:

> Exhaustion is required as a matter of comity, not as a jurisdictional prerequisite. In this respect, the rule is analogous to principles of abstention articulated in Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 . . . (1976): even where there is concurrent jurisdiction in both the state and federal courts, deference to state proceedings renders it appropriate for the federal courts to decline jurisdiction in certain circumstances.

Iowa Mutual, 480 U.S. at 16 n.8.  The Supreme Court analogized Tribal exhaustion to abstention, because neither are jurisdictional, but exhaustion differs from abstention in important ways.  The Supreme Court has never described the Tribal exhaustion doctrine as an abstention doctrine, nor has the Supreme Court applied an abstention-style balancing test to determine whether exhaustion

is appropriate. See, e.g., El Paso, 526 U.S. at 483 (describing the "doctrine of tribal-court exhaustion"); National Farmers, 471 U.S. at 856-57. In Bank One, the Fifth Circuit stated:

> The tribal exhaustion doctrine is in no way based on *Colorado River* . . . . [T]he *Colorado River* doctrine "proceeds from the premise that 'the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given to them" and . . . therefore, the pendency of litigation in state court is not a bar to proceedings in federal court involving the same subject matter in the absence of "exceptional circumstances." The policy which animates the tribal exhaustion doctrine, however, "subordinates the federal court's obligation to exercise its jurisdiction to the greater policy of promoting tribal self-government." *Colorado River* abstention is thus the exception to the rule, whereas tribal exhaustion is the rule rather than the exception.

Bank One, 281 F.3d at 514-15 (citations omitted). The Supreme Court has not incorporated the Colorado River balancing factors into the Tribal exhaustion doctrine. See, e.g., Harvey v. Ute Indian Tribe of Uintah & Ouray Reservation, 2017-UT-75, ¶ 108, 416 P.3d 401, 434 (discussing the differences between Tribal exhaustion and abstention). Furthermore, even in the abstention context, courts remain split whether abstention motions are properly treated as 12(b)(1) or as 12(b)(6) motions, or as a non-12(b) motion, even within the same circuit. Compare, e.g., Porter v. Jones, 319 F.3d 483, 489 (9th Cir. 2003)(reviewing a district court's decision to abstain pursuant to rule 12(b)(6)), with Potrero Hills Landfill, Inc. v. Cty. of Solano, 657 F.3d 876, 881 (9th Cir. 2011)(reviewing a decision to abstain under neither 12(b)(1) nor 12(b)(6)). See also Courthouse News Serv. v. Planet, 750 F.3d 776, 779 n.2 (9th Cir. 2014)(concluding that courts are undecided whether abstention motions are 12(b)(1) or 12(b)(6) motions).

Nor are exhaustion doctrines in other areas of law, such as in the context of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA") analogous enough to be instructive. In the PLRA context, failure to exhaust administrative remedies is treated as an affirmative defense, which the defendant has the burden to plead and prove by a preponderance of the evidence. See Lee v. Willey, 789 F.3d 673, 676 (6th Cir. 2015)(citing Jones v. Bock, 549 U.S. 199, 216 (2007)). Exhaustion under the PLRA, however, is a waivable defense. See, e.g., Monahan v. Winn, 276 F. Supp. 2d 196, 204 n.8 (D. Mass. 2003)(Gertner, J.)(stating that PLRA exhaustion is a waivable, non-jurisdictional affirmative defense). Unlike PLRA exhaustion, a defendant does not have the burden to plead and prove that Tribal remedies have not been exhausted, and the Court may raise Tribal exhaustion sua sponte. Tribal exhaustion is non-waivable and, therefore, under Tenth Circuit law, not properly considered an affirmative defense.

discussing tribal exhaustion in depth, none address whether it may or must be considered as a

12(b)(6) motion, although some use the 12(b)(6) standard regarding what documents a court may

consider in ruling on Tribal exhaustion.[25]  The Court has, in the past, treated similar motions as

---

[25]See Ute Indian Tribe v. Lawrence, 875 F.3d 539 (10th Cir. 2017)(discussing Tribal exhaustion doctrine argument raised in motion for an injunction to halt state court proceedings until Tribal remedies were exhausted); Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation, 868 F.3d 1191 (considering Tribal exhaustion doctrine raised in motion for a preliminary injunction); Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation, 862 F.3d at 1245 n.3 (concluding that federal review of Tribal jurisdiction, to determine whether a Tribe has a colorable claim of jurisdiction, relies on the factual record developed in Tribal court, and employing the 12(b)(6) standard from Iqbal); Thlopthlocco Tribal Town v. Stidham, 762 F.3d at 1232 (addressing Tribal exhaustion doctrine raised via motion to dismiss for lack of subject matter jurisdiction, and the district court denied the motion, finding subject matter jurisdiction, but the Tenth Circuit required exhaustion as a matter of comity); Valenzuela v. Silversmith, 699 F.3d at 1204 (considering appellees raised Tribal exhaustion in motion to dismiss, but the Tenth Circuit does not state whether the motion was brought under any particular rule 12(b) subsection); Crowe v. Dunlevy, P.C. v. Stidham, 640 F.3d at 1143 (addressing Tribal exhaustion doctrine raised via motion to dismiss for lack of subject matter jurisdiction, and the district court denied the motion, finding subject matter jurisdiction, but the Tenth Circuit explained exhaustion as a matter of comity); Hartman v. Kickapoo Gaming Comm'n, 319 F.3d at 1233 (affirming district court's dismissal of claims based on Tribal exhaustion doctrine, but not specifying the proper rule 12(b) subsection under which to bring a motion to dismiss for failure to exhaust Tribal remedies); Enlow v. Moore, 134 F.3d 993, 994 (10th Cir. 1998)(reversing a district court's order dismissing a case for failure to exhaust Tribal remedies under an abuse of discretion standard, because the district court failed to review the tribal court's findings of facts for clear error and conclusions of law de novo, where the tribal court had already made findings of fact); Kerr-McGee Corp. v. Farley, 115 F.3d at 1499 (evaluating Tribal exhaustion doctrine in the context of a declaratory judgment action); Harvey on behalf of Chavez v. Star, 96 F.3d 1453, 1454, 1996 WL 511586, at *1 (10th Cir. 1996)(unpublished table decision)(concluding that the district judge erred in construing Tribal exhaustion argument as a motion to dismiss for lack of subject matter jurisdiction, and stating that abstention is the proper basis); United States v. Tsosie, 92 F.3d at 1040 (reviewing a district court's sua sponte dismissal of an action for failure to exhaust Tribal remedies); Texaco, Inc. v. Hale, 81 F.3d at 935 (reviewing a district court's dismissal of a complaint on Tribal exhaustion grounds, but without discussing the appropriate rule under which to bring a motion to dismiss on Tribal exhaustion grounds); United States for Use & Benefit of Gen. Rock & Sand Corp. v. Chuska Dev.

rule 12(b)(6) motions.[26]  See, e.g., Steward v. Mescalero Apache Tribal Court, No. CIV 15-1178 JB/SCY, 2016 WL 546840, at *2 (D.N.M. Jan. 30, 2016)(Browning, J.)(dismissing petition for failure to state a claim upon which relief can be granted under rule 12(b)(6) based on lack of exhaustion of Tribal remedies).[27]  Because the Court has subject matter jurisdiction, but cannot

---

Corp., 55 F.3d at 1492-93 (evaluating Tribal exhaustion under joint 12(b)(1) and 12(b)(6) motions, but on appeal, the Tenth Circuit agreed the district court did not have subject matter jurisdiction and affirmed the district court's dismissal on jurisdictional grounds, without reaching the Tribal exhaustion issue); Pittsburg & Midway Coal Min. Co. v. Watchman, 52 F.3d 1531, 1532 (10th Cir. 1995)(reviewing district court's denial of motion to dismiss on Tribal exhaustion grounds, without specifying the nature of the motion to dismiss as 12(b)(1), 12(b)(6), or another type); and Texaco, Inc. v. Zah, 5 F.3d at 1375 (evaluating district court's application of tribal exhaustion rule in the context of a declaratory judgment action).

[26]Some courts have held that 12(b)(6) is not the "proper vehicle through which to address the tribal exhaustion rule." Petrogulf Corp. v. Arco Oil & Gas Co., 92 F. Supp. 2d 1111, 1114 (D. Colo. 2000)(Babcock, J.).  In Petrogulf Corp. v. Arco Oil & Gas Co., the Honorable Lewis T. Babcock, United States District Judge for the District of Colorado, concluded that rule 12(b)(6) was an improper vehicle "through which to address the tribal exhaustion rule because dismissal pursuant to that rule is with prejudice," and the Tenth Circuit has held that "[a] federal action may be abated or dismissed without prejudice to enable pursuit of trial court remedies." Petrogulf Corp. v. Arco Oil & Gas Co., 92 F. Supp. 2d at 1114 (quoting United States v. Chuska Dev. Corp., 55 F.3d 1491, 1492 (10th Cir. 1995)(citing National Farmers, 471 U.S. at 857)).  The Court disagrees with Judge Babcock's determination that rule 12(b)(6) dismissals are necessarily with prejudice. See Lomax v. Ortiz-Marquez, No. 18-1250, 2018 WL 5870555, at *2 n.2 (10th Cir. 2018)(unpublished)(noting that rule 12(b)(6) dismissals may be with or without prejudice, and that, "[u]nless otherwise stated, dismissals under Rule 12(b)(6) are with prejudice." (citing Slocum v. Corp. Express U.S. Inc., 446 F. App'x 957, 960 (10th Cir. 2011))).  See also, Orr v. Clements, 688 F.3d 463, 465 (8th Cir. 2012)("Although there is a presumption that a dismissal under Rule 12(b)(6) is a judgment on the merits made with prejudice, such a dismissal can be rendered without prejudice if the court so specifies." (citation omitted)); Stem v. Gen. Elec. Co., 924 F.2d 472, 477 n.7 (2d Cir. 1991); Carter v. Norfolk Cmty. Hosp. Ass'n, Inc., 761 F.2d 970, 974 (4th Cir. 1985).

[27]Some courts have construed Tribal exhaustion as an affirmative defense.  See, e.g., Tenorio v. High Hawk, No. CIV 18-02744 LTB, 2018 WL 6242225, *2 (D. Colo. Nov. 29, 2018)(Babock, J.); Alvarez v. Lopez, 835 F.3d 1024, 1028 (9th Cir. 2016).  However, the Tenth

grant relief on World Fuel's claims, because of World Fuel's failure to exhaust its Tribal remedies -- a requirement which neither party may waive -- the Court construes the motion to dismiss based on a failure to exhaust Tribal remedies as a 12(b)(6) motion for failure to state a claim upon which relief can be granted, for the purposes of determining which documents the Court may consider in evaluating the Tribal exhaustion doctrine's applicability.  Nambe Corp. averred at the hearing that its Motion falls somewhere between a rule 12(b)(1) and a rule 12(b)(6) motion.  See Tr. at 22:10-13 (Rogers); id. at 22:15-18 (Rogers).

The Court concludes that rule 12(b)(6) provides the appropriate standard regarding which documents a Court may review in ruling on a motion to dismiss for failure to exhaust Tribal remedies, because Tribal exhaustion is non-waivable,[28] and, in this case, the facts necessary to

_____

Circuit has stated that "the requirement of exhaustion of tribal remedies" is not "a mere defense to be raised or waived by the parties."  Smith v. Moffett, 947 F.2d at 445.  The Tenth Circuit has stated that a party need not raise the Tribal exhaustion requirement as a defense but, rather, the Court may raise it sua sponte.  See Smith v. Moffett, 947 F.2d at 445 (citing Thomas v. Indiana, 910 F.2d 1413, 1415 (7th Cir. 1990)("[D]elicate questions of comity can be raised on the court's own initiative.")).  See also United States v. Tsosie, 92 F.3d at 1039 (affirming the district court's sua sponte dismissal of the action under the Tribal exhaustion doctrine).  Tribal exhaustion doctrine is non-waivable and, therefore, is unlike other affirmative defenses under Tenth Circuit law.  See Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220, 1225(10th Cir. 2004)(citing 2 Moore's Federal Practice § 8.07[3] (noting that affirmative defenses are waivable)).

[28]The Court notes that there is competing language within the Tenth Circuit whether the Tribal exhaustion doctrine is waivable.  On one hand, Nambe Corp. directs the Court to Smith v. Moffett's language that "the requirement of exhaustion of tribal remedies" is not "a mere defense to be raised or waived by the parties, see Smith v. Moffett, 947 F.2d at 445, and Nambe Corp. states that, based on Smith v. Moffett, the doctrine is non-waivable, see Tr. at 23:6-14 (Rogers).  On the other hand, World Fuel contends that, in Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation, the Tenth Circuit analyzed whether the Tribe had waived Tribal exhaustion,

suggesting that a waiver is possible.  See Tr. at 38:3-14 (Zaron).

Some courts have suggested that a Tribe may waive Tribal exhaustion.  The United States Court of Appeals for the Seventh Circuit concluded, in Altheimer & Gray v. Sioux Manufacturing Corp., 983 F.2d 803 (7th Cir. 1993), that the Tribe waived the Tribal exhaustion doctrine through the inclusion of a forum selection clause in the contract at issue, and the Seventh Circuit stated:

> More importantly, we believe the application of the tribal exhaustion rule would not serve the policies articulated in *Iowa Mutual* and *National Farmers*. As discussed above, the Supreme Court was concerned with implementing Congress's policy of tribal self-government.   The Court feared that "unconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs."  *Iowa Mutual*, 480 U.S. at 16 . . . .  *See generally Duro v. Reina*, 495 U.S. 676, 692 . . . (1990)(history of modern tribal courts indicate they embody only powers of internal self-governance).
>
> In this case, however, the tribal entity wished to avoid characterization of the contract as a reservation affair by actively seeking the federal forum.  In the Letter of Intent, Sioux Manufacturing Corporation [("SMC")] explicitly agreed to submit to the venue and jurisdiction of federal and state courts located in Illinois.  To refuse enforcement of this routine contract provision would be to undercut the Tribe's self-government and self-determination.  The Tribe created SMC to enhance employment opportunities on the reservation.  As the Ninth Circuit recognized, economic independence is the foundation of a tribe's self-determination.  If contracting parties cannot trust the validity of choice of law and venue provisions, SMC may well find itself unable to compete and the Tribe's efforts to improve the reservation's economy may come to naught.

Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d at 814-15.  The First Circuit stated that in the context of Tribal exhaustion, explicit waivers may be effective, but "implied waivers are disfavored," and, "if a tribe has not explicitly waived exhaustion, courts lack discretion to relieve its litigation adversary of the duty of exhausting tribal remedies before proceeding in a federal forum."  Ninigret, 207 F.3d at 31.  The First Circuit noted in a footnote, however, that, "There is virtually no case law as to the effectiveness *vel non* of an express disclaimer of tribal court remedies."  Ninigret, 207 F.3d at 31 n.7.  Nor is it clear whether a sovereign immunity waiver constitutes a Tribal exhaustion waiver.  See, e.g., Bank One, 281 F.3d at 515 (declining to decide whether an arbitration clause waiving sovereign immunity also waives Tribal exhaustion and stating: "We need not decide this issue because in the instant case the Tribe was not a party to the contract.").  Because the record in Ninigret revealed "no explicit waiver or other equivalent circumstance," the First Circuit did not pursue whether a Tribe's express disclaimer of Tribal

jurisdiction would effectively waive the Tribal exhaustion requirement.  Ninigret, 207 F.3d at 31 n.7.

On the other hand, Supreme Court and Tenth Circuit caselaw repeatedly characterizes Tribal exhaustion as an inflexible bar.  In Granberry v. Greer, to which Smith v. Moffett cites, the Supreme Court considers whether a "State's failure to raise nonexhaustion in the district court constitutes a waiver of that defense in the court of appeals . . . ."  Granberry v. Greer, 481 U.S. at 131.  The Supreme Court stated that it might treat the State's failure to raise exhaustion as a waiver, or, "[a]t the other extreme, we might treat exhaustion as an inflexible bar to consideration of the merits of the petition by the federal court, and therefore require that a petition be dismissed when it appears that there has been a failure to exhaust."  Granberry v. Greer, 481 U.S. at 131 (citing Iowa Mutual and National Farmers as examples of "inflexible bar" cases).  In Texaco, Inc. v. Zah, the Tenth Circuit stated:

> Thus, we have characterized the tribal exhaustion rule as "an inflexible bar to consideration of the merits of the petition by the federal court."  *Moffett*, 947 F.2d at 445 (quoting *Granberry v. Greer*, 481 U.S. 129, 131 . . . (1987)); *see also Crawford v. Genuine Parts Co.*, 947 F.2d 1405, 1408 (9th Cir. 1991)("When the dispute is a 'reservation affair,' . . . there is no discretion not to defer.")

Texaco, Inc. v. Zah, 5 F.3d at 1378.  In Hardiman v. Reynolds, the Tenth Circuit concluded that a procedural bar rule based on comity involves concerns which "substantially implicate important interests beyond those of the parties," and, therefore, "it is not exclusively within the parties' control to decide whether such a defense should be raised or waived."  Hardiman v. Reynolds, 971 F.2d 500, 503 (10th Cir. 1992)(citing Smith v. Moffett, 947 F.2d at 445).  The Court, as a district court, is unwilling to conclude that the Tenth Circuit overruled Smith v. Moffett in Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation, a case in which the Tenth Circuit did not mention Smith v. Moffett, and in which the Tenth Circuit determined that the Tribe had not successfully waived exhaustion, and the Court required exhaustion.  See Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation, 868 F.3d at 1205.

Furthermore, even if a Tribe may waive the Tribal exhaustion doctrine's applicability, here, as in Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation, World Fuel's argument that Nambe Corp. waived Tribal exhaustion hinges on the Agreement's validity.  See Response at 3 (stating that "the parties' arbitration clause -- an agreement to resolve disputes in a non-tribal forum and to have petitions to compel arbitration heard in 'any court' -- is a waiver of any otherwise applicable tribal exhaustion rule.").  Nambe Corp. contests the validity of the Agreement which contains the arbitration clause to which World Fuel refers.  See Memo. at 11 ("The questions which must be put before the Nambe Courts include whether the 2017 contract document upon which World Fuels bases its demand for arbitration was lawfully executed . . . .").  In Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation, the Tribe argued that "any waiver is

make the determination whether Tribal exhaustion applies appear on the face of the Complaint. The Complaint alleges claims by a non-Indian Plaintiff, World Fuel, against an Indian Defendant, Nambe Corp., in accordance with an alleged consensual commercial relationship pertaining to business conducted at the Nambe Falls Travel Center. <u>See</u> Complaint ¶¶ 1-4, at 1-2. World Fuel argued at the hearing that the Complaint does not resolve the factual issue regarding where the cause of action occurred. <u>See</u> Tr. at 26:16-27:1 (Zaron, Court). The Agreement, incorporated through the Complaint, states that Nambe Pueblo authorizes Nambe Corp. "to use and occupy certain tribal lands . . . at a facility known as the Nambe Falls Travel Center." Agreement at ¶ A. From the Agreement's face, it appears that the dispute, arising from Nambe Corp.'s alleged failure to pay excise taxes as the Agreement requires, centers on activity occurring on Nambe Pueblo lands, at the Nambe Travel Center. These facts establish that the Nambe Pueblo Tribal Courts have a colorable claim of jurisdiction, as discussed in Section IV of this Memorandum Opinion and Order. Using the 12(b)(6) standard, the Court does not consider the R. Vigil Aff., or any of the documents affixed to the Motion, in arriving at the conclusion that there is a colorable claim

---

ineffective because the Contract is void . . . ." 868 F.3d at 1203. The Tenth Circuit required compliance with the Tribal exhaustion doctrine, concluding that, under these circumstances, "the tribal court should consider in the first instance where it has jurisdiction." 868 F.3d at 1203. The Court concludes that, if a Tribe may waive Tribal exhaustion, it is not clear from the record that Nambe Corp. has waived Tribal exhaustion when the validity of the Agreement said to contain the waiver is disputed. Accordingly, following the guidance of the Tenth Circuit in <u>Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation</u>, the Court concludes that the Tribal exhaustion doctrine applies.

for Tribal jurisdiction, warranting application of the Tribal exhaustion doctrine, and a stay of the Motion for comity reasons.

## III. NAMBE CORP. HAS WAIVED ITS SOVEREIGN IMMUNITY.

When a party raises the defenses of waiver of sovereign immunity and Tribal exhaustion in the same proceeding, the majority of Courts of Appeals generally address waiver of sovereign immunity before Tribal exhaustion.  See, e.g., Thlopthlocco Tribal Town v. Stidham, 762 F.3d 1226, 1235-36 (10th Cir. 2014)(addressing sovereign immunity defense before Tribal exhaustion doctrine); Burlington N. & Santa Fe Ry. v. Vaughn, 509 F.3d 1085, 1093-94 (9th Cir. 2007)(concluding that sovereign immunity and Tribal exhaustion "are not inextricably intertwined," because they turn on different factors, and considering Tribal sovereign immunity before exhaustion of Tribal remedies); Comstock Oil & Gas Inc. v. Ala. & Coushatta Indian Tribes of Texas, 261 F.3d 567, 569-73 (5th Cir. 2001)(same); Ninigret, 207 F.3d at 28-31 (concluding that Tribal sovereign immunity is jurisdictional, while Tribal exhaustion is a matter of comity, and stating that, "[b]efore undertaking a determination of the reach of [the Tribal exhaustion] doctrine, . . . we must address the . . . claim of sovereign immunity"); Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d at 1415-20 (addressing sovereign immunity issues before Tribal exhaustion doctrine); Tamiami Partners, Ltd. By & Through Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Florida, 63 F.3d 1030, 1045 (11th Cir. 1995)(same); Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803, 812 (7th Cir. 1993)(same).  But see Garcia v. Akwesasne Hous. Auth.,

268 F.3d 76, 79 (2d Cir. 2001)(stating that "[w]e consider tribal exhaustion first; sovereign immunity second").

United States courts have acknowledged Tribal governments' sovereign immunity. <u>See</u> <u>United States v. U.S. Fid. & Guar. Co.</u>, 309 U.S. 506 (1940)(concluding that Indian Tribes retain a Tribal sovereign immunity defense from suit). "Tribes may waive tribal sovereign immunity in Federal court through contract." Kirsten M. Carlson, <u>Towards Tribal Sovereignty and Judicial Efficiency: Ordering the Defenses of Tribal Sovereign Immunity and Exhaustion of Tribal Remedies</u>, 101 Mich. L. Rev. 569, 574 n.7 (2002)("Carlson"). <u>See</u>, <u>e.g.</u>, <u>C & L Enters., Inc. v. Citizen Band Potawatomi Tribe</u>, 532 U.S. 411 (2001). Congress may waive Tribal sovereign immunity through statute or congressional consent. <u>See</u> Indian Tucker Act, 28 U.S.C. § 1491; <u>United States v. United States Fid. & Guar.</u>, 309 U.S. at 512-13. Whether by the Tribe or by Congress, a waiver of Tribal sovereignty "cannot be implied but must be unequivocally expressed." <u>United States v. Testan</u>, 424 U.S. 392, 399 (1976)(quoting <u>United States v. King</u>, 395 U.S. 1, 4 (1969)). "In addition to the acknowledgement of tribal sovereign immunity under federal law, tribes have adopted the notion of sovereign immunity and developed their own doctrine . . . under tribal law . . . through contracts and tribal codes." Carlson at 575. <u>See</u>, <u>e.g.</u>, Winnebago Tribe of Nebraska Code tit. 1 § 919 (1994); Cheyenne River Sioux Code ch. VIII § 1-8-4 (1978).

The Tenth Circuit has stated that "Tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, provided that the relationship between

the tribe and the entity is sufficiently close to properly permit the entity to share in the tribe's immunity." Breakthrough Mgmt. Group, Inc. v. Chukchansi Gold Casino and Resort, 629 F.3d 1173, 1183 (10th Cir. 2010)("Breakthrough"). In Breakthrough, the Tenth Circuit stated:

> At this time there is no need to define the *precise* boundaries of the appropriate test to determine if a tribe's economic entity qualifies as a subordinate economic entity entitled to share in a tribe's immunity. In this case, we conclude that the following factors are helpful in informing our inquiry: (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities.

Breakthrough, 629 F.3d at 1187 (emphasis in Breakthrough). The Tenth Circuit also identified a sixth factor: "the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." Breakthrough, 629 F.3d at 1187. The Tenth Circuit stated:

> Those policies include protection of the tribe's monies, *see* [California v.] *Cabazon Band of Mission Indians*, 480 U.S. [202,] 218-19 [(1987)], . . . as well as "preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians," *Dixon* [v. Picopa Constr. Co., 160 Ariz. 251, 258,] 772 P.2d [1104,] 1111 [(1989)].

Breakthrough, 629 F.3d at 1188.

The first factor, Nambe Corp.'s method of creation, weighs against the conclusion that Nambe Corp. is entitled to Tribal sovereign immunity. Unlike the corporate entity in Breakthrough, Nambe Corp. is incorporated under the laws of the United States and is defined in the Federal Charter as a separate corporation. See Federal Charter § 1.03, at 2 ("This Corporation

is a distinct legal entity wholly owned by the Nambe Pueblo . . . .").  Cf. Breakthrough, 629 F.3d at 1192.  Unlike the Tribe in Breakthrough -- the Chukchansi Indians -- Nambe Pueblo includes language in the Federal Charter intended to emphasize the differences between Nambe Corp. and the Tribe.  See, e.g., Federal Charter § 1.03, at 2 (stating that Nambe Corp.'s "corporate activities, transactions, obligations, liabilities and property are not those of the tribe," and that Nambe Corp. may not "waive the Nambe Pueblo's sovereign immunity from suit.").

The second factor, Nambe Corp.'s purpose, weighs for and against immunity, because Nambe Corp., although created for Nambe Pueblo's financial benefit, is restricted in the functions it performs.  On one hand, revenue from Nambe Corp. "clearly benefits the Tribe," Breakthrough, 629 F.3d at 1192, because Nambe Pueblo wholly owns Nambe Corp., see Federal Charter § 1.03, at 2.  On the other hand, the Tribe in Breakthrough authorized the entity to act on its behalf, whereas the Federal Charter states that the Corporation must "secure the prior express written approval of the Nambe Pueblo Tribal Council before initiating new business ventures."  Federal Charter § 2.01(b), at 2.

The third factor, Nambe Corp.'s structure, ownership, and management, weighs for and against immunity.  Whereas in Breakthrough, the Tenth Circuit concluded that the third factor weighed in part in favor of immunity because all members of the corporate entity's board were also sitting members of the Tribal Council, here, the Board consists of seven persons, and "[n]o more than two permanent or elected members of the Nambe Pueblo Tribal Council shall be eligible to serve on the Board concurrently."  Federal Charter § 8.01, at 6.  Unlike in Breakthrough, the

Tribal Council is not identical to the Board. The Court notes, however, that the Nambe Pueblo Tribal Council appoints all members of the Board. See Federal Charter § 8.01, at 6.

The fourth, fifth, and sixth factors weigh in favor of immunity. The fourth factor weighs in favor of immunity, because Nambe Pueblo "clearly intended for" Nambe Corp. "to have tribal sovereign immunity." Breakthrough, 629 F.3d at 1193. As a wholly owned subdivision of the Tribe, see Federal Charter § 1.03, at 2, Nambe Corp. contends that it enjoys Nambe Pueblo's sovereign immunity, see Motion at 2; Federal Charter § 1.04, at 2 ("This Corporation shall have the same immunities and status respecting taxation under Federal law as the Nambe Pueblo."). The sovereign immunity waiver provision in the Agreement, states, in relevant part:

> Nothing in this Agreement is or shall be deemed to be a waiver of the Pueblo's sovereign immunity from suit, provided however, that Customer [Nambe Corp.] agrees to waive its immunity protection for the limited and sole purposes of compelling arbitration or enforcing any binding arbitration decision rendered pursuant to the terms and conditions of this Agreement by any court having jurisdiction over the parties and the subject matter and for purposes of any such arbitration proceedings.

Agreement ¶ 18(b), at 8. See Complaint ¶ 9, at 2-3. The fifth factor, the financial relationship between Nambe Pueblo and Nambe Corp., weighs in favor of immunity, because Nambe Pueblo wholly owns Nambe Corp. The sixth factor, "the overall purposes of tribal sovereign immunity," weighs in favor of immunity. Breakthrough, 629 F.3d at 1194. Nambe Corp. "plainly promote[s] and fund[s] the Tribe's self-determination through revenue generation and the funding of diversified economic development." Breakthrough, 629 F.3d at 1195 (citing California v. Cabazon Band of Mission Indians, 480 U.S. at 218-19).

Considering these factors, Nambe Corp. is so closely related to Nambe Pueblo that it should share in Nambe Pueblo's sovereign immunity. World Fuel contends, however, that Nambe Corp. waived its sovereign immunity. Response at 4. World Fuel contends, specifically, that the Federal Charter waives Nambe Corp.'s immunity "independently of the contractual waiver of sovereign immunity in the Agreement." Response at 4 n.1 ("The narrower waiver in the Agreement does not negate the general waiver of immunity in the sue and be sued clause of Nambe's corporate charter -- each waiver operates independently."). The Federal Charter contains a "sue and be sued" clause, providing that Nambe Corp. is expressly authorized and empowered "[t]o sue and be sued in its Corporate name in courts of competent jurisdiction within the United States." Complaint ¶ 10, at 3 (quoting Federal Charter § 3.01(b), at 2). The Federal Charter authorizes Nambe Corp. to

> sue and be sued in its Corporate name in courts of competent jurisdiction within the United States: **Provided**, however, that this power does not authorize the levy or execution of any judgment, lien, garnishment or attachment upon any property or income of the Corporation other than corporate property or income specifically mortgaged, pledged or assigned as collateral for particular corporate debts or liabilities.

Federal Charter § 3.01(b), at 2 (emphasis in Federal Charter). The Eighth Circuit recognized a clause permitting a Tribal corporation to sue and be sued in its corporate name "as constituting an express waiver of sovereign immunity." Weeks Constr., Inc. v. Oglala Sioux Hous. Auth., 797 F.2d 668, 671 (8th Cir. 1986). See Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d at 812 (addressing a Corporation's written immunity waiver and stating that, "[o]n similar facts, several courts have considered a tribal corporation's sovereign immunity waived by a written contract.").

The Tenth Circuit has held that "sue and be sued" clauses in a Tribal corporation's charter may constitute a waiver of the Tribal corporation's immunity, but such waivers are "limited to actions involving the corporate activities of the tribe and do[] not extend to actions of the tribe in its capacity as a political governing body." Ute Dist. Corp. v. Ute Indian Tribe, 149 F.3d 1260, 1268 (10th Cir. 1998)(citing Ramey Constr. Co. v. Apache Tribe of Mescalero Reservation, 673 F.2d 315, 320 (10th Cir. 1982)(holding that presence of "sue and be sued" provision in corporate charter does not affect immunity of tribe as a constitutional entity); Rosebud Sioux Tribe v. Val-U Constr. Co., 50 F.3d 560, 563 (8th Cir. 1995)(holding "sue and be sued" clause in Tribe's corporate charter does not operate as a general waiver of the Tribe's immunity from suit)). The Court concludes, assuming the validity of the Federal Charter, which neither party disputes, that Nambe Corp. -- but not Nambe Pueblo -- may waive sovereign immunity. At the 12(b)(6) stage, construing the Complaint in the light most favorable to World Fuel, the Court construes the Agreement as validly entered into and, taking the Agreement as valid, Nambe Corp. has waived sovereign immunity. See Seneca-Cayuga Tribe v. Okla., 874 F.2d 709, 715 n.9 (10th Cir. 1989)(explaining that federal corporate charters for Tribal corporations "usually include a 'sue and be sued' clause to enable the tribes to engage in commercial activity as corporations without losing their sovereign immunity as tribes").

## IV.  NO EXCEPTIONS TO THE TRIBAL EXHAUSTION DOCTRINE'S APPLICABILITY APPLY, AND WORLD FUEL HAS NOT EXHAUSTED ITS TRIBAL REMEDIES.

The Court concludes that, although the Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a), and, although Nambe Corp. has waived sovereign immunity, Tribal exhaustion bars this lawsuit.  See Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d at 812 (addressing sovereign immunity and, concluding that the Tribe and Tribal corporation waived sovereign immunity, turning to the issue of Tribal exhaustion).  World Fuel has not exhausted Tribal remedies as the Tribal exhaustion doctrine requires.[29]  The Supreme Court requires a party to exhaust Tribal Court remedies even when a federal court and a Tribal Court have concurrent jurisdiction.  See National Farmers, 471 U.S. at 857 (stating the rule for federal question jurisdiction); Iowa Mutual, 480 U.S. at 18 (stating the rule for diversity jurisdiction).  "The tribal exhaustion rule provides that as a matter of comity, a federal court should not exercise jurisdiction over cases arising under its federal question or diversity jurisdiction, if those cases are also subject

---

[29]Carlson analogizes exhaustion to abstention doctrines:

> The most analogous state law doctrines to exhaustion under federal law are the abstention doctrines, which contend that state court issues have to be decided before a case can be filed in federal court.  See [Erwin Chemerinsky, Federal Jurisdiction 590,] 735 [(3d ed. 1999)].  The tribal exhaustion doctrine functions like a state abstention doctrine because it stays the federal court's jurisdiction until after the tribal court has heard and decided the merits of the case.  Abstention doctrines are judicially created rules that limit the ability of federal courts to decide issues before them even though the jurisdictional and justiciability requirements have been met.  See Chemerinsky at 735.

Carlson at 576 n.44.

to tribal jurisdiction, until the parties have exhausted their tribal remedies." United States v. Tsosie, 92 F.3d at 1041 (internal quotation marks omitted). The Tenth Circuit has "characterized the tribal exhaustion rule as 'an inflexible bar to consideration of the merits of the petition by the federal court.'" Texaco Inc. v. Zah, 5 F.3d at 1378 (quoting Smith v. Moffett, 947 F.2d at 445).

The tribal exhaustion requirement is subject to several exceptions:

(1) where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) where the Tribal Court action is patently violative of express jurisdictional prohibitions; (3) where exhaustion would be futile because of the lack of an adequate opportunity to challenge the Tribal Court's jurisdiction; (4) where it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by the main rule established in Montana v. United States, 450 U.S. 544 (1981); or (5) it is otherwise clear that the Tribal Court lacks jurisdiction so that the exhaustion requirement would serve no purpose other than delay.

Burrell v. Armijo, 450 F.3d 1159, 1168 (10th Cir. 2006)(quotations, alterations, and citations omitted). Because the Tenth Circuit "has taken a strict view of the tribal exhaustion rule," Kerr-McGee Corp. v. Farley, 115 F.3d at 1507, "the exceptions are applied narrowly," Thlopthlocco Tribal Town v. Stidham, 762 F.3d at 1239. See Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation, 862 F.3d at 1243. Tribal Court jurisdiction need only be colorable to invoke the exhaustion rule. See Thlopthlocco Tribal Town v. Stidham, 762 F.3d at 1240. Tribal "civil jurisdiction generally does not extend to nonmembers, with two exceptions." Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation, 862 F.3d at 1243 (citing Montana, 450 U.S. at 565). "First, tribes retain the authority to regulate the 'activities of nonmembers who enter consensual relationships with the tribe or its members.'" Norton v. Ute Indian Tribe of the Uintah & Ouray

Reservation, 862 F.3d at 1243 (quoting Montana, 450 U.S. at 565).  "Second, a tribe 'may also retain inherent power to exercise civil authority over the conduct of non-Indians' if 'that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.'"  Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation, 862 F.3d at 1243-44 (citing Montana, 450 U.S. at 566).  Under the first Montana exception, a Tribal Court has civil jurisdiction over "activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other agreements." Montana, 450 U.S. at 565.

The Nambe Pueblo Tribal Courts have a colorable claim for jurisdiction, because the case involves a non-Indian Plaintiff (World Fuel) that entered into a consensual commercial relationship with an Indian Defendant (Nambe Corp.).  See Montana, 450 U.S. at 565; Williams v. Lee, 358 U.S. at 221-22 (concluding that Tribal Courts have jurisdiction over reservation affairs involving contracts between Indian and non-Indian parties).  World Fuel and Nambe Corp. entered into a ten-year contractual relationship with a term from May 17, 2017, through May 16, 2027, providing that Nambe Corp. would purchase Motor Fuel from World Fuel, for its Nambe Falls Travel Center gasoline station, located on Tribal lands.  See Complaint ¶ 7, at 2; Agreement ¶ A, at 1.[30]  Even if the underlying action did not arise from activities on the reservation, the comity

---

[30]Paragraph A states in full:

Customer [Nambe Corp.] is authorized by the Pueblo of Nambe to use and occupy certain tribal lands situated on the Highway U.S. 84/285 frontage road on

- 127 -

factors still favor exhaustion. World Fuel does not argue against the Nambe Tribal Courts' jurisdiction. See generally Response. There is, therefore, a colorable claim of tribal jurisdiction.

None of the exceptions to the tribal exhaustion rule apply. First, the bad-faith exception to the Tribal exhaustion doctrine refers only to the Tribal Court's bad faith. See Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation, 868 F.3d at 1203 n.2 (citing Norton v. Ute Indian Tribe of Uintah & Ouray Reservation, 862 F.3d at 1249). World Fuel has not alleged bad faith on the Nambe Pueblo Tribal Court's part, and the Court does not believe that World Fuel could reasonably allege bad faith, where the Nambe Pueblo Tribal Court has not yet become involved in this matter. Second, World Fuel does not contend that the Nambe Pueblo Tribal Court's possible invocation of jurisdiction would be patently violative of an express jurisdictional prohibition. See National Farmers, 471 U.S. at 856 n.2. Montana holds that Indian Tribes retain the power to exercise civil jurisdiction over non-Indians on reservation lands, based on consensual commercial relationships between the non-Indian, and the Indian Tribe or its members. See Montana, 450 U.S. at 566. The Court concludes that the Nambe Pueblo Tribal Court's possible jurisdiction over World Fuel's contractual relationship with Nambe Corp. does not patently violate an express jurisdictional prohibition. Nor does World Fuel demonstrate that exhaustion of Tribal remedies

---

which Customer currently markets on in the future intends to market gasoline, diesel fuel and related fuels as well as alternative fuels at a facility known as the Nambe Falls Travel Center.

Agreement ¶ A, at 1.

would be futile.  See National Farmers, 471 U.S. at 856 n.2.  The Tenth Circuit has held that

"'speculative futility is not enough to justify federal jurisdiction.'  The [plaintiff] cannot simply

assert that it is not subject to Tribal Court jurisdiction; rather, it must actually seek adjudication of

this issue in Tribal Court."  Bank of Okla. v. Muscogee (Creek) Nation, 972 F.2d at 1170

(alterations added by Bank of Okla v. Muscogee (Creek) Nation)(quoting White v. Pueblo of San

Juan, 728 F.2d at 1313).  Third, the futility exception "clearly does not apply where a party

voluntarily chooses not to pursue its case in Tribal Court."  Bank of Okla v. Muscogee (Creek)

Nation, 972 F.2d at 1170.  A Tribal Court forum exists for World Fuel, and World Fuel may seek

adjudication of its motion to compel arbitration in Tribal Court.  Because the actions at issue

occurred on Nambe Pueblo grant and reservation lands, the fourth exception does not apply and,

because, for the foregoing reasons, there is a colorable claim of Tribal Court jurisdiction, the fifth

exception does not apply.  See National Farmers, 471 U.S. at 856 n.2.

World Fuel contends that, in enacting the FAA, Congress expressed an unmistakable

preference for a federal forum -- which application of the Tribal exhaustion doctrine would

thwart -- and that, given the guidance in El Paso, the Court should decline to apply Tribal

exhaustion doctrine to claims brought under the FAA's § 4.  See Response at 1-2, 8.  World Fuel

argues that the FAA supersedes the Tribal exhaustion doctrine, which is "merely a judicially-

created, non-jurisdictional rule."  Response at 8.  World Fuel argues that the Tribal exhaustion

doctrine's purpose is to serve the congressional policy of promoting Tribal self-governance, and

that it does not apply where Congress has expressed an "unmistakable preference for a federal

forum" or where applying the doctrine would "frustrate a 'congressional policy of immediate access to federal forums.'" Response at 8 (quoting El Paso, 526 U.S. at 484-86). Nambe Corp. asserts that, "[u]nlike the PAA, the FAA does not confer exclusive or even concurrent jurisdiction upon the federal courts . . . ." Reply at 13. Nambe Corp. argues that, "the FAA neither expects nor requires uniformity in the answer to the question whether a valid arbitration agreement exists, instead leaving this to be determined by the non-federal contract law of the jurisdiction in which the dispute arose . . . ." Reply at 13 (citing 9 U.S.C. § 2).

In El Paso, the Supreme Court held that Congress would have disfavored Tribal exhaustion in cases involving the PAA, because "[a]ny generalized sense of comity toward nonfederal courts is obviously displaced by the provisions for preemption and removal from state courts . . . ." El Paso, 526 U.S. at 485. The Supreme Court limited its holding by clarifying:

> This is not to say that the existence of a federal preemption defense in the more usual sense would affect the logic of tribal exhaustion. Under normal circumstances, Tribal Courts, like state courts, can and do decide questions of federal law, and there is no reason to think that questions of federal preemption are any different. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 65 (1978)(Tribal Courts available to vindicate federal rights). The situation here is the rare one in which statutory provisions for conversion of state claims to federal ones and removal to federal courts express congressional preference for a federal forum.

El Paso, 526 U.S. at 485 n.7. The Supreme Court referenced several PAA provisions providing "clear indications of the congressional aims of speed and efficiency." El Paso, 526 U.S. at 486.

Section 2210(n)(3)(A) empowers the chief judge of a district court to appoint a special caseload management panel to oversee cases arising from a nuclear incident. The functions of such panels include case consolidation, § 2210(n)(3)(C)(i); setting of priorities, § 2210(n)(3)(C)(ii); "promulgat[ion] [of]

> special rules of court . . . to expedite cases or allow more equitable consideration of claims," § 2210(n)(3)(C)(v); and implementation of such measures "as will encourage the equitable, prompt, and efficient resolution of claims arising out of the nuclear incident." § 2210(n)(3)(C)(vi).

El Paso, 526 U.S. at 486.  The Supreme Court also considered the PAA's legislative history, which refers to the "multitude of separate cases" brought in state and federal courts, and "adverts to the expectation that," 526 U.S. at 486, "the provisions for consolidation of claims . . . would avoid the inefficiencies resulting from duplicative determinations of similar issues in multiple . . . ," S. Rep. No. 100-218, at 13.

By contrast, the FAA contains no provisions encouraging consolidation of cases in a federal forum or removal of cases from state to federal courts.  See 9 U.S.C. §§ 1-16.  In fact, the FAA's purpose of enforcing parties' private agreements predominates over its other goals, even if piecemeal litigation between state and federal courts results.  See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. at 221 ("We therefore are not persuaded by the argument that the conflict between two goals of the Arbitration Act -- enforcement of private agreements and encouragement of efficient and speedy dispute resolution -- must be resolved in favor of the latter . . . .").  See also GGNSC Stanford, LLC v. Gilliam, 205 F. Supp. 3d 884, 891 (E.D. Ky. 2016)(Reeves, J.).  The Supreme Court has stated that Congress' "preeminent concern . . . in passing the Act was to enforce private agreements into which parties had entered."  Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. at 221.  Section 4 of Title 9 of the United States Code permits an aggrieved party to "petition any United States district court which, save for such agreement [for arbitration], would have jurisdiction" for "an order directing that such arbitration proceed in the manner provided for in such

agreement." 9 U.S.C. § 4. Although World Fuel analogizes its dispute to those in El Paso, and

Preston v. Ferrer, and argues "there is no reason to single out tribal exhaustion as an unwritten

exception to Congress's policy of speedy resolution of Section 4 petitions," Response at 15, the

Court is not convinced that speedy resolution of disputes was Congress' primary aim in enacting

the FAA, as it was with the PAA. The FAA was promulgated on freedom of contract; dispute

resolution may or may not be speedy, because Congress thought parties should have the freedom

of contract.

Other courts to confront the applicability of Tribal exhaustion doctrine to cases involving

claims brought under FAA § 4 have found that, despite § 4's language referring to a federal forum,

the Tribal exhaustion doctrine applies, unless a National Farmers exception to its applicability

applies. See, e.g., Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe, 117 F.3d at 64 (involving

request for order compelling arbitration pursuant to 9 U.S.C. § 4, and affirming the Honorable

Thomas J. McAvoy, then-Chief United States District Judge for the Northern District of New

York's decision to deny motion to compel arbitration and to stay further proceedings pending

exhaustion of Tribal Court remedies). In Bank One, N.A. v. Lewis, 144 F. Supp. 2d 640 (S.D.

Miss. 2001)(Lee, J.), the plaintiff, Bank One, filed its complaint under the FAA's § 4, "seeking to

compel arbitration of defendant's claims . . . ." 144 F. Supp. 2d at 642. Bank One maintained that

> the tribal exhaustion doctrine does not apply because this case does not involve a
> challenge to the Tribal Court's jurisdiction; rather, this suit seeks simply to
> compel defendant to pursue his claims through arbitration as provided under § 4
> of the FAA and thus, according to Bank One's characterization, raises only

questions of federal law that do not involve tribal sovereignty or implicate the tribal exhaustion doctrine.

Bank One, N.A. v. Lewis, 144 F. Supp. 2d at 645. The Honorable Tom S. Lee, then-Chief United States District Judge for the Southern District of Mississippi, reasoned:

> On the contrary, it is manifest to the court that, directly or not, the relief sought by Bank One in this case would undeniably undermine the Tribal Court's authority to determine its jurisdiction. That is because, while the relief demanded by Bank One is an order compelling arbitration, a concomitant goal, or a necessary byproduct of this suit, is to foreclose the Tribal Court from further consideration of defendant's claims for relief. That is, then, in the court's opinion, properly viewed as a challenge to the Tribal Court's jurisdiction which implicates considerations of tribal exhaustion.

144 F. Supp. 2d at 645. On appeal, the Fifth Circuit affirmed Judge Lee's decision and held that Tribal exhaustion applies to suits to compel arbitration under the FAA. See Bank One, 28 F.3d at 507. Given the current state of the Supreme Court law, the Court agrees with Judge Lee's and the Fifth Circuit's reasoning that granting an order compelling arbitration, as World Fuel requests, would foreclose the Nambe Pueblo Tribal Court from further consideration of Nambe Corp.'s claims for relief and, therefore, undermine the comity rationale of the Tribal exhaustion doctrine. See Strate v. A-1 Contractors, 520 U.S. at 449 (stating that a federal court should, in light of comity considerations, "stay its hand 'until after the Tribal Court has had a full opportunity to determine its own jurisdiction'" (quoting National Farmers, 471 U.S. at 857)).

World Fuel argues that, by insisting on Tribal exhaustion, Nambe Corp., contrary to Congress' intent in enacting the FAA, "seeks to drag out the litigation regarding the preliminary question of whether to enforce the parties' arbitration agreement in at least two tiers of Tribal

Courts before World Fuel may seek enforcement in this Court." Response at 1-2. World Fuel contends that Congress has empowered only federal courts to hear petitions under the FAA's § 4, and that the 2017 contract's arbitration clause contemplates resolving disputes in a non-Tribal forum. See Response at 2. World Fuel contends that arbitration agreements with Tribes and Tribal entities would be meaningless if it were the law "that every time a party and a tribal corporation contractually agree to arbitration, the tribal corporation has a virtual veto power over the contractually-agreed-to forum through invocation of the tribal exhaustion doctrine." Response at 2.

World Fuel contends that the Tribal exhaustion doctrine does not apply where there are no pending parallel proceedings in Tribal Court and that, even though the Tenth Circuit has not spoken on the issue, there is "a pending petition for a writ of certiorari for which the Supreme Court has entered an order calling for the views of the Solicitor General (CVSG)." Response at 23 n.8 (citing Petition for Writ of Certiorari, Harvey v. Ute Indian Tribe of Uintah & Ouray Reservation). Nambe Corp. asserts that, in the Tenth Circuit, "the duty to exhaust tribal remedies exists and must be enforced even if no parallel Tribal Court proceedings are ongoing." Reply at 7. Nambe Corp. argues that, "no matter whether the tribal or federal case is filed first," the risk of creating competition between Tribal and federal court proceedings exists, and, "if the absence of a Tribal Court case excused exhaustion, parallel Tribal Court proceedings would be routinely filed in every case following a federal court filing, thus giving rise to the very inter-court conflict the exhaustion doctrine is intended to avoid." Reply at 7. At the hearing, the Court asked whether both National

Farmers and Iowa Mutual involved cases with parallel proceedings in Tribal Court. See Tr. at 8:8-10 (Court). Nambe Corp. responded that parallel Tribal Court proceedings existed in both National Farmers and Iowa Mutual, but that, in United States v. Tsosie, 92 F.3d at 1041, the Tenth Circuit stated that there is no requirement of a parallel or prior Tribal Court proceeding to trigger the Tribal exhaustion duty. See Tr. at 8:15-9:3 (Rogers). The Petition for Writ of Certiorari was denied, see supra n.13. Current Tenth Circuit law, which the Court is bound to follow, states that there need not be a parallel or prior Tribal Court proceeding to trigger Tribal exhaustion. See United States v. Tsosie, 92 F.3d at 1041.

National Farmers recognized three interests that the Tribal exhaustion rule, properly applied, advances: "(1) furthering congressional policy of supporting tribal self-government; (2) promoting the orderly administration of justice by allowing a full record to be developed in the tribal court; and (3) obtaining the benefit of tribal expertise if further review becomes necessary." Kerr-McGee Corp. v. Farley, 115 F.3d at 1507 (quoting National Farmers, 471 U.S. at 856-57). The Tenth Circuit has stated that, when a dispute centers on activity arising on a reservation, comity concerns "almost always dictate that the parties exhaust their tribal remedies before resorting to the federal forum." Kerr-McGee Corp. v. Farley, 115 F.3d at 1507 (internal quotation marks omitted)(quoting Texaco, Inc. v. Zah, 5 F.3d at 1378). The Tenth Circuit has stated that, when the dispute involves non-Indian activity outside the reservation, "we must depend on the district courts to examine assiduously the *National Farmers* factors in determining whether comity requires the parties to exhaust their tribal remedies before presenting their dispute to the federal

courts." <u>Kerr-McGee Corp. v. Farley</u>, 115 F.3d at 1507 (internal quotation marks omitted)(quoting <u>Texaco, Inc. v. Zah</u>, 5 F.3d at 1378). <u>See</u> <u>United States v. Tsosie</u>, 92 F.3d at 1042-43 (same). Relying solely on the Complaint, World Fuel contends that where the cause of action occurred is disputed. <u>See</u> Tr. at 26:16-27:1 (Zaron, Court). The dispute concerns allegedly unpaid excise taxes that Nambe Corp. owes to World Fuel related to an allegedly binding contract for motor fuel sales at the Nambe Travel Center. <u>See</u> Complaint ¶¶ 1-4, at 1-2. The Agreement, incorporated through the Complaint, states that Nambe Pueblo authorizes Nambe Corp. "to use and occupy certain tribal lands . . . at a facility known as the Nambe Falls Travel Center." Agreement at ¶ A. From the Agreement's face, it appears that the dispute, arising from Nambe Corp.'s alleged failure to pay excise taxes as the Agreement requires, centers on activity occurring on Nambe Pueblo lands, at the Nambe Travel Center. Therefore, comity concerns dictate requiring exhaustion of Tribal remedies. <u>See</u> <u>Kerr-McGee Corp. v. Farley</u>, 115 F.3d at 1507.

Even if the underlying action did not arise from activities on the reservation, the comity factors still favor exhaustion. First, strong Tribal interests are implicated where the Nambe Travel Center was located on Nambe Pueblo lands, and the Tribe's interest as a sovereign in its corporation's affairs is strong. <u>See</u> <u>Kerr-McGee Corp. v. Farley</u>, 115 F.3d at 1508. Nambe Pueblo's core sovereign interest in protecting the Tribe's health and welfare is implicated in a dispute involving Nambe Corp., which the Tribe authorized to enter into contractual relationships with non-members. <u>See</u> <u>Kerr-McGee Corp. v. Farley</u>, 115 F.3d at 1508. Second, under the current state of the law, the orderly administration of justice cuts in favor of Tribal exhaustion. Unlike the

PAA, the FAA does not provide "specific procedures . . . for case consolidation and case management," and "allowing tribal courts to make initial jurisdictional determinations" minimizes the prospect of a procedural "nightmare." Kerr-McGee Corp. v. Farley, 115 F.3d at 1508 (quoting National Farmers, 471 U.S. at 856). Under the current state of the law, allowing the Nambe Tribal Court to develop a full record before the merits, or before "any question concerning appropriate relief" is addressed, will promote the orderly administration of justice. National Farmers, 471 U.S. at 856. Third, under the current state of the law, "obtaining the benefit of tribal court expertise may be of value in this case." Kerr-McGee Corp. v. Farley, 115 F.3d at 1508. Although World Fuel contends that the Nambe Tribal Court will apply state law, Nambe Corp. stated that the Nambe Tribal Court has rules of procedure and that it borrows from state law only where Tribal law does not apply. See Tr. at 18:1-8 (Rogers). Nambe Corp. informed the Court that the Nambe Tribal Court issues written opinions and has its own body of law. See Tr. at 18:8-10 (Rogers). The Nambe Tribal Court may have experience interpreting Tribal law regarding sovereign immunity waivers, as through the Federal Charter, which the Court and the parties had trouble interpreting at the hearing. Tr. at 29:16-24 (Court, Zaron)(examining the Federal Charter, and stating that it did not appear complete, noting its inconsistent pagination, and stating that "[i]t seems to raise more questions than it does answers."). Here, the Court concludes that the dispute centers around transactions occurring on a reservation, requiring exhaustion for comity reasons, but if the dispute occurred elsewhere, the comity factors still lead to the conclusion that abstention or dismissal without prejudice is appropriate. As the Tenth Circuit has stated: "It does not serve

Congress's interest in promoting development of tribal courts, *see Iowa Mutual*, 480 U.S. at 19 . . . , to second-guess the jurisdictional determinations of the [Tribal] district court before the tribal appellate process has run its course." <u>Kerr-McGee Corp. v. Farley</u>, 115 F.3d at 1409.

## IV. THE COURT WILL STAY THE SUIT PENDING EXHAUSTION OF TRIBAL COURT REMEDIES.

The Supreme Court has stated that, "[w]hether the federal action should be dismissed, or merely held in abeyance pending the development of further Tribal Court proceedings, is a question that should be addressed in the first instance by the District Court." <u>National Farmers</u>, 471 U.S. at 857. The "standard of review of district court decisions to stay or dismiss proceedings on abstention grounds is abuse of discretion, but to the extent that such a decision rests on an interpretation of law, [. . . .]review is de novo." <u>Bank One</u>, 281 F.3d at 510. The Ninth Circuit stated that, if a district court erroneously dismisses, instead of simply staying, a federal action, the

> dismissal might mean that [the plaintiff] would later be "barred permanently from asserting his claims in the federal forum by the running of the applicable statute of limitations." <u>Deakins v. Monaghan</u>, 484 U.S. 193, 203 n.7 . . . (1988); *see also* 29 U.S.C. § 2617(c). Under the circumstances, the district court should have stayed, not dismissed, the federal action pending the exhaustion of tribal remedies. *See*, *e.g.*, *Allstate Indem. Co. v. Stump*, 191 F.3d 1071, 1076 (9th Cir. 1999).

<u>Sharber v. Spirit Mtn. Gaming Inc.</u>, 343 F.3d 974, 976 (9th Cir. 2003). The FAA provides no statute of limitations. <u>See</u> 9 U.S.C. §§ 1-16. "A key rationale underlying the tribal exhaustion requirement is to provide federal courts with 'the benefit of a full factual record on the relevant issues and the benefit of tribal court expertise.'" <u>Norton v. Ute Indian Tribe of the Uintah & Ouray</u>

Reservation, 862 F.3d at 1245 n.3 (quoting Thlopthlocco Tribal Town v. Stidham, 762 F.3d at 1237). If the Nambe Pueblo Tribal Court determines that it has jurisdiction, it may decide whether the Agreement was validly entered into, and whether the arbitration clause within the Agreement is enforceable -- threshold issues before determining which issues should be referred to an arbitrator, and which a court should determine. Federal courts may, after the parties have exhausted Tribal court remedies, review the Tribal court's factual findings for clear error. See, e.g., Mustang Prod. Co. v. Harrison, 94 F.3d at 1384 (reviewing tribal court's factual findings for clear error). Once the parties exhaust Tribal court litigation, and if the Tribal courts determine they do not have Tribal jurisdiction, the parties may return to federal court and, if the Court has jurisdiction, the Court can reach the merits of World Fuel's claims for relief.[31] See Thlopthlocco

---

[31]The Court has reservations about the Tribal exhaustion doctrine and thinks the Supreme Court should reconsider it. It should be emphasized that it is a judge-made doctrine and not something the political branch -- Congress -- has enacted. Yet it judicially creates exceptions from congressional statutes. First, it is an exception to the general jurisdictional statutes related to diversity and federal question jurisdiction. If Congress wanted to create an exception, it certainly knows how. Second, it starts creating exceptions from important, long-standing statutes. Here, the judicially created exception undermines Congress' decision to allow parties to enforce arbitration agreements in federal court. Congress was so concerned about the hostility of state courts to arbitration agreements that it vested concurrent jurisdiction in federal courts to protect freedom of contract and the important federal interest in regulating interstate commerce. The Tribal exhaustion doctrine seems to make up a doctrine that the Supreme Court thinks is more right than the statute as Congress wrote it and overrides Congress' decision that federal courts should be able to enforce arbitration agreements. When Congress takes the time to create a federal statute giving the federal courts jurisdiction over an issue, the federal courts should be hesitant to decline the work the people want them to do. Fourth, if the Supreme Court is going to play legislature, and exercise legal powers, it should at least do the job well. There is no empirical evidence that taking away congressionally-granted federal court powers helps strengthen Tribal court systems. It does not appear that the FAA has hurt the wonderful system of state courts the

- 139 -

Tribal Town v. Stidham, 762 F.3d at 1240-41.  Accordingly, the Court, in its discretion, stays the proceedings.

**IT IS ORDERED** that: (i) the Defendant Nambe Pueblo Development Corporation's Motion to Dismiss, filed October 1, 2018 (Doc. 14), is granted in part and denied in part; (ii) the Plaintiff World Fuel Services, Inc. must exhaust Tribal Court remedies in the Nambe Pueblo Tribal Court and the Southwest InterTribal Court of Appeals; and (iii) the Court stays the current federal proceedings pending World Fuel's exhaustion of Tribal Court remedies and Tribal appellate review, if any.

---

nation enjoys, and the Supreme Court knows it could not create an exception for state courts that would not gut the FAA and probably many other federal statutes.  Fifth, the fourth reason above shows how paternalistic and insulting the Tribal exhaustion doctrine is.  A sovereign nation should take pride in its own court system.  It should want the very best for its own sake and for its people's sake.  It should not depend upon another sovereign throwing them a few cases or bones.  Sixth, the Supreme Court should take a hard look at Tribal courts and see whether they are better in 2019 than they were in 1959, when they needed the Tribal exhaustion doctrine.  If they are better, then maybe the nation no longer needs the Tribal exhaustion doctrine.  If they are not better after sixty years, it may be time to get rid of the ineffective doctrine.  American law should not be just aspirational, American laws should be effective.  Seventh, if the law really is that Tribal exhaustion doctrine cannot be waived, it is hard to see how that helps the Tribes.  If the prior criticism, that the doctrine is paternalistic, is not convincing enough alone, when applied to the entire Tribe, the doctrine is paternalistic and insulting.  It would appear that the Tribe -- not the Supreme Court in Washington, D.C. -- is in the best position to decide whether a Tribe should be able to waive Tribal exhaustion as a bargaining chip in an effort to get a non-Indian to come on the reservation to stimulate its economy or the Supreme Court's desire to grow the Tribal courts is more important or is most in the Tribe's interests.  For the foregoing reasons, if the Court were writing on a clean slate, the Court would not recognize the Tribal exhaustion doctrine and would deny the Motion. The Court is not, however, writing on a clean slate, and the Court has worked faithfully to apply the applicable Supreme Court and Tenth Circuit law as correctly as possible.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Larry D. Maldegen
Comeau, Maldegen, Templeman & Indall, L.L.P.
Santa Fe, New Mexico

--and--

Andrew D. Zaron
Ellen Ross Belfer
Jeremy L. Kahn
León Cosgrove LLP
Coral Gables, Florida

     *Attorneys for the Plaintiff*

Ronald J. Van Amberg
C. Bryant Rogers
VanAmberg, Rogers, Yepa, Abeita & Gomez, LLP
Santa Fe, New Mexico

     *Attorneys for the Defendant*